1    JOHN B. SULLIVAN (State Bar No. 96742)
     jbs@severson.com
2    JAN T. CHILTON (State Bar No. 47582)
     jtc@severson.com
3    ANDREA H. HENNINGSEN (State Bar No. 167361)
     ahh@severson.com
4    SEVERSON & WERSON
     A Professional Corporation
5    One Embarcadero Center, Suite 2600
     San Francisco, CA  94111
6    Telephone:  (415) 398-3344
     Facsimile:  (415) 956-0439
7

8    Attorneys for Defendant
     SEATTLE MORTGAGE COMPANY

9

10                   UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12

13   MARY B. LABRADOR, individually and on      Case No.:  CV-08-2270 MEJ
     behalf of all others similarly situated,
14                                              **MOTION TO DISMISS COMPLAINT
                        Plaintiff,              AND SUPPORTING MEMORANDUM**
15
              vs.                               Hearing:     June 19, 2008
16                                              Time:        10:00 a.m.
     SEATTLE MORTGAGE COMPANY,                  Courtroom:   B, 15th Floor
17                                              Judge:       Maria-Elena James
                        Defendant.
18

19

20

21

22

23

24

25

26

27

28

### NOTICE OF MOTION TO DISMISS

Please take notice that on June 19, 2008, at 10:00 a.m., or as soon thereafter as counsel may be heard in Courtroom B of the above-entitled court at 450 Golden Gate, San Francisco, California before the Honorable Maria-Elena James, defendant Seattle Mortgage Company will, and it hereby does, move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss:

1.    Plaintiffs' entire complaint on the ground that the complaint does not allege facts showing a violation of 24 C.F.R. §206.31(a)(1) in that a lender's payment of a "correspondent fee" to a mortgage loan broker does not create a "financial interest" between the broker and lender.  The complaint alleges no other facts to make its other claims plausible.

2.    Plaintiffs' first cause of action on the ground that California law creates no separate private right of action for elder abuse.

3.    Plaintiffs' third cause of action on the grounds that

a.    The California Consumers Legal Remedies Act (Civ. Code, §1750 et seq.) does not apply to transactions, such as those alleged in the complaint, involving only the extension of credit; and

b.    Plaintiff has not alleged facts showing a violation of the Consumers Legal Remedies Act's specific prohibitions.

Defendant brings this motion pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds stated above.  The motion is based on this notice, the accompanying memorandum of points and authorities, the complaint, and all other records and papers on file in this action.

DATED:  May 6, 2008

SEVERSON & WERSON
A Professional Corporation


By: _____/s/_____
                Andrea H. Henningsen

Attorneys for Defendant
SEATTLE MORTGAGE COMPANY

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

# TABLE OF CONTENTS

*Page*

NOTICE OF MOTION TO DISMISS ............................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES.................................................2

I.      INTRODUCTION ...............................................................................................2

II.     STATEMENT OF ISSUES TO BE DECIDED ................................................3

III.    THE COMPLAINT'S PERTINENT ALLEGATIONS ....................................4

IV.     LABRADOR HAS NOT ALLEGED FACTS SHOWING
        A CLAIM ON WHICH RELIEF MAY BE GRANTED....................................5

        A.      Labrador Has Not Alleged A Violation Of HUD's Regulation ..............5

                1.      The Regulation's Words Do Not Support Labrador's Interpretation .........5

                2.      Regulatory History Refutes Labrador's Interpretation.............................7

                3.      Labrador's Counter Arguments Are Without Merit .................................11

        B.      Labrador Has Alleged No Other Basis For A Claim.............................13

                1.      The First Cause Of Action Alleges No Actionable Facts.........................13

                2.      The Second Cause Of Action Alleges No Actionable Facts ....................13

                3.      The Third Cause Of Action Alleges No Actionable Facts ........................15

                4.      The Fourth And Fifth Causes Of Action
                        Allege No Actionable Facts........................................................................15

V.      THE FIRST CAUSE OF ACTION SHOULD BE DISMISSED.....................16

VI.     THE THIRD CAUSE OF ACTION SHOULD BE DISMISSED ...................17

        A.      The CLRA Does Not Apply To Credit Transactions .............................18

        B.      Labrador Has Not Alleged Violation Of The CLRA's Prohibitions....................22

                1.      Labrador Alleges No Violation Of §1770(a)(3).....................................23

                2.      Labrador Alleges No Violation Of §1770(a)(14)....................................24

                3.      Labrador Alleges No Violation Of §1770(a)(19)....................................24

VII.    CONCLUSION ..................................................................................................25

MOTION TO DISMISS COMPLAINT
Case No.:  C 08-02270 MEJ

**TABLE OF AUTHORITIES**

*Page(s)*

*Cases*

*Alaska Trojan Partnership v. Gutierrez*, 425 F.3d 620 (9th Cir. 2005) .........................................6

*ARA Living Centers-Pacific, Inc. v. Superior Court*,
    18 Cal.App.4th 1556, 23 Cal.Rptr.2d 224 (1993) ....................................................3, 16, 17

*Augustine v. FIA Card Services, N.A.*,
    485 F.Supp.2d 1172 (E.D. Cal. 2007) ..............................................................................20

*Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955 (2007) ..........................14, 18, 23, 24

*Berkley v. Dowds,* 152 Cal.App.4th 518, 61 Cal.Rptr.3d 304 (2007) ...............................3, 16, 17

*Berry v. American Express Pub., Inc.,*
    147 Cal.App.4th 224, 54 Cal.Rptr.3d 91 (2007) ..........................................................18-22

*Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942) ......................................................................16

*Corbett v. Hayward Dodge, Inc.,*
    119 Cal.App.4th 915, 14 Cal.Rptr.3d 741 (2004) ..............................................................21

*Daugherty v. American Honda Motor Co.,*
    144 Cal.App.4th 824, 51 Cal.Rptr.3d 118 (2006) ........................................................23, 25

*Deerman v. Federal Home Loan Mortg. Corp.,*
    955 F.Supp. 1393 (N.D. Ala. 1997) ..................................................................................22

*FDIC v. Meyer,* 510 U.S. 471 (1994) .........................................................................................6

*Flatley v. Mauro*, 39 Cal.4th 299, 46 Cal.Rptr.3d 606 (2006) ...................................................21

*Freeman v. DirecTV, Inc.*, 457 F.3d 1001 (9th Cir. 2006) .........................................................18

*Genton v. Vestin Realty Mortg. II, Inc.,* 2007 WL 951838 (S.D. Cal. 2007) ...............................16

*Haeger v. Johnson*, 25 Or.App. 131, 548 P.2d 532 (1976) .........................................................22

*Hartless v. Clorox Co.*, 2007 WL 3245260 (S.D. Cal. 2007) ......................................................15

*Hernandez v. Hilltop Fin. Mortg., Inc.*, 2007 WL 3101250 (N.D. Cal. 2007) .......................20, 21

*Hitz v. First Interstate Bank,* 38 Cal.App.4th 274, 44 Cal.Rptr.2d 890 (1995) ...........................22

*Jefferson v. Chase Home Fin. LLC*, 2007 WL 1302984 (N.D. Cal. 2007) ...................................20

*Kagan v. Gibraltar Sav. & Loan Ass'n,*
    35 Cal.3d 582, 200 Cal.Rptr.38 (1984) ............................................................................21

*Kennedy v. Natural Balance Pet Foods, Inc.,*
    2007 WL 2300746 (S.D. Cal. 2007) ...........................................................................15, 24

*Knox v. Ameriquest Mortg. Co.*, 2005 WL 1910927 (N.D. Cal. 2005) ........................................20

*Lamm v. AMFAC Mortgage Corp.*, 44 Or.App. 203, 605 P.2d 730 (1980) ..................................22

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Maginn v. Northwest Mortgage Inc.*, 919 S.W.2d 164 (Tex. Ct. App. 1996) ............................... 19

*McKell v. Washington Mut., Inc.*,
    142 Cal.App.4th 1457, 49 Cal. Rptr.3d 227 (2006) ..................................................... 20-22

*Minority Television Project Inc. v. FCC,* 2007 WL 4570293 (N.D. Cal. 2007) ........................... 14

*Mitan v. Feeney*, 497 F.Supp.2d 1113 (C.D. Cal. 2007) ............................................................... 18

*Moradi-Shalal v. Fireman's Fund Ins. Cos.*,
    44 Cal.3d 287, 250 Cal.Rptr. 116 (1988) ......................................................................... 17

*Morris v. Redwood Empire Bancorp*,
    128 Cal.App.4th 1305, 27 Cal.Rptr.3d 797 (2005) ........................................................... 25

*Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F.Supp.2d 998 (C.D.Cal.2006)................................. 16

*Nordberg v. Trilegiant Corp.*, 445 F.Supp.2d 1082 (N.D.Cal.2006) ........................................... 24

*Parrish v. Nat'l Football League Players Ass'n*,
    2007 WL 2601385 (N.D. Cal. 2007)................................................................................. 16

*Principal Life Ins. Co. v. Robinson*, 394 F.3d 665 (9th Cir. 2004) ............................................. 16

*Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169 (Tex.1980).......................................................... 22

*Ryman v. Sears, Roebuck & Co.,* 505 F.3d 993 (9th Cir. 2007).........................................17, 20-22

*Shirk v. Vista Unified School Dist.*,
    42 Cal.4th 201, 64 Cal.Rptr.3d 210 (2007) ..................................................................... 18

*State v. First Nat'l Bank*, 660 P.2d 402 (Alaska 1982) ................................................................. 22

*Stickrath v. Globalstar, Inc.*, 2007 WL 2790727 (N.D. Cal. 2007) ....................................... 15, 24

*24 Hour Fitness, Inc. v. Superior Court*,
    66 Cal.App.4th 1199, 78 Cal.Rptr.2d 533 (1998) ............................................................ 25

*United States ex rel. Unite Here v. Cintas Corp.*,
    2007 WL 4557788 (N.D. Cal. 2007)................................................................................. 15

*United States v. Bucher*, 375 F.3d 929 (9th Cir. 2004) ................................................................... 6

*Van Slyke v. Capital One Bank*, 2007 WL 1655641 (N.D. Cal. 2007) ......................................... 20

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003)............................................. 15, 24

*Vikco Ins. Serv., Inc. v. Ohio Indem. Co.*,
    70 Cal.App.4th 55, 82 Cal.Rptr.2d 442 (1999) ............................................................... 17

*Waite v. BancTexas-Houston, N.A.*, 792 S.W.2d 538 (Tex. Ct. App. 1990)................................. 22

*Weinstein v. Saturn Corp.*, 2007 WL 1342604 (N.D. Cal. 2007) ................................................. 24

iii

**TABLE OF AUTHORITIES**

*Page(s)*

*Cases*

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995)..........................................................16

*Wolk v. Green*, 516 F.Supp.2d 1121 (N.D. Cal. 2007)................................................16

*Statutes*

United States Code
    Title 12
        Section 1715z-20 ...........................................................2, 8, 9
        Section 2607 ...........................................................................11
    Title 28
        Section 455 .............................................................................6

Pub. L. 106-569, §201; 114 Stat. 2948, 2950 .................................................................9

Pub.L. 105-276, §593; 112 Stat. 2654, 2655 ..................................................................8

Code of Federal Regulations
    Title 5
        Section 2635.403 .....................................................................6
    Title 17
        Section 270.17a-6 ....................................................................6
    Title 24
        Section 84.42 ..........................................................................7
        Section 85.36 ..........................................................................7
        Section 206.31 .............................................................1-3, 5-15
        Section 206.41 ........................................................................15
        Section 290.25 ........................................................................7
        Section 291.435 ......................................................................7
        Section 511.12 ........................................................................7
        Section 570.611 ......................................................................6
        Section 572.415 ......................................................................7
        Section 574.625 ......................................................................7
        Section 576.57 ........................................................................7
        Section 582.340 ......................................................................7
        Section 583.330 ......................................................................7
        Section 585.503 ......................................................................7
        Section 612.2130 ....................................................................6
        Section 700.175 ......................................................................7
        Section 915.10 ........................................................................6
        Section 3500.13 ......................................................................11

69 Fed. Reg. 15586 (March 25, 2004)..............................................................................10

66 Fed. Reg. 30278 (June 5, 2001)....................................................................................9

Federal Rules of Civil Procedure
    Rule 8...........................................................................15, 22, 24
    Rule 9.................................................................................15, 24
    Rule 12.....................................................................................1

California Business and Professions Code
    Section 17200 ...........................................................................2

iv

## TABLE OF AUTHORITIES

*Page(s)*

*Statutes*

California Civil Code
    Section 1750 ................................................................................................ 1
    Section 1761 .............................................................................................. 18
    Section 1770 ...........................................................................2, 18, 20, 22, 23
    Section 1780 ..........................................................................................21, 22

California Welfare and Institutions Code
    Section 15600 ............................................................................................. 3
    Section 15610.30 ................................................................................. 16, 17
    Section 15657 .......................................................................................... 17
    Section 15657.5 ....................................................................................... 17

*Other Authorities*

Black's Law Dictionary (8th ed.), "interest," "financial interest" ................................. 6

HUD Handbook 4235.1 (rev. 1)
    Section 6-13 ............................................................................................ 11

HUD, Mortgagee Letter 2004-25 ................................................................................ 15

HUD, Mortgagee Letter 00-10 ..............................................................................8-10

HUD, *Real Estate Settlement Procedures Act Statement of Policy 2001-1:*
    *Clarification of Statement of Policy 1999-1 Regarding Lender Payments*
    *to Mortgage Brokers, and Guidance Concerning Unearned Fees*
    *Under Section 8(b)*, 66 Fed. Reg. 53052 (Oct. 18, 2001) ............................... 5, 12

HUD, *Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1*
    *Regarding Lender Payments to Mortgage Brokers,*
    64 Fed. Reg. 10079 (Mar. 1, 1999) .......................................................... 5, 12

Jean Reilly, *Reverse Mortgages:  Backing Into The Future*, 5 Elder L.J. 17 (1997) ..................... 8

Report Relative to Assembly Bill No. 292 (Sept. 23, 1970),
    4 Cal. Assembly Daily J. (1970 Reg. Sess.) p. 8464 .................................. 23, 14

11925/0001/669177.1

MOTION TO DISMISS COMPLAINT
Case No.:  C 08-2270 MEJ

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

In this putative class action, plaintiff Mary B. Labrador ("Labrador") sues Seattle Mortgage Company ("SMC") which entered into a HECM reverse mortgage transaction with Labrador in 2006.

One of the regulations governing the HECM reverse mortgage insurance program,[1] 24 C.F.R. §206.31(a)(1), states that a mortgage broker's fee may be included in the origination fee charged the borrower but only "if there is no financial interest between the mortgage broker and the mortgagee."

SMC paid the mortgage loan broker all or part of the origination fee it charged Labrador. Labrador claims SMC violated §206.31(a)(1) in doing so because there was a "financial interest" between the mortgage broker and SMC. According to Labrador this prohibited "financial interest" was created by SMC's "back-funded" payment of $490 to the mortgage broker for servicing rights in the loan.

Based on these sparse facts, Labrador purports to allege causes of action for (a) elder abuse, (b) violation of California Business and Professions Code §17200 (the "UCL"), (c) violation of the Consumers Legal Remedies Act, Cal. Civ. Code, §1770 (the "CLRA"), (d) unjust enrichment and imposition of a constructive trust, and (e) declaratory relief.

All of these claims fail because the premise of the entire suit is incorrect. SMC's payment of a fee for servicing rights did not create a "financial interest" between it and the mortgage broker. Though undefined in §206.31, "financial interest" is a commonly used term with a well-known meaning; specifically, an ownership or beneficial interest in an asset or business. Payment of a fee creates no such interest. As Labrador's complaint alleges no other factual basis for her claims, her complaint should be dismissed.

---

[1] HECM is an acronym for Home Equity Conversion Mortgage, the title of a federal program under which the Department of Housing and Urban Development ("HUD") provides mortgage insurance for qualifying reverse mortgage loans. *See* 12 U.S.C. §1715z-20.

2

MOTION TO DISMISS COMPLAINT
Case No.:  C 08-02270 MEJ

1    Labrador's first cause of action should be dismissed for another reason as well. It purports

2    to allege a claim for "elder abuse" in violation of California's Elder Abuse and Dependent Adult

3    Civil Protection Act ("Elder Abuse Act"). Welf. & Inst. Code, §15600 et seq. The Elder Abuse

4    Act, however, "does not create a cause of action as such, but provides for attorney fees, costs and

5    punitive damages under certain conditions" as additional remedies when the plaintiff establishes

6    another, independent tort and proves specified additional facts.[2]

7    Labrador's third cause of action under the CLRA should be dismissed for two other reasons.

8    First, the act does not apply to transactions involving only the extension of credit, such as a reverse

9    mortgage loan. Second, Labrador fails to allege conduct violating the CLRA's specific prohibitions,

10    even if the transaction were otherwise covered by the act.

11    For all of these reasons, the complaint and particularly its first and third causes of action

12    should be dismissed.

13    ## II.

14    ## STATEMENT OF ISSUES TO BE DECIDED

15    1.    Should the Court dismiss the complaint because the lender's paying the broker a fee

16    for servicing rights does not create a "financial interest" between the two within the meaning of 24

17    C.F.R. §206.31(a)(1) and because the complaint alleges no other facts to make its claims plausible?

18    2.    Should the Court dismiss the first cause of action on the ground that the Elder Abuse

19    Act does not create an independent private right of action?

20    3.    Should the Court dismiss the third cause of action because the CLRA does not ap-

21    ply to a reverse mortgage transaction or because Labrador has not alleged conduct violating the

22    CLRA's specific prohibitions, or in cooperation?

23

24

25

26

27

28    [2] *Berkley v. Dowds,* 152 Cal.App.4th 518, 529, 61 Cal.Rptr.3d 304 (2007); *ARA Living Centers-Pacific, Inc. v. Superior Court*, 18 Cal.App.4th 1556, 1563-64, 23 Cal.Rptr.2d 224 (1993).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

## THE COMPLAINT'S PERTINENT ALLEGATIONS

Labrador is an 82-year-old San Francisco resident.[3]  (Compl., ¶7.)  In July 2006, a repre-

sentative of Home Center, a mortgage loan broker, contacted Labrador and convinced her to enter

into a reverse mortgage loan.[4]  (*Id.*, ¶22.)  In August 2006, Labrador did enter into a HECM reverse

mortgage loan with SMC.  (*Id.*, ¶¶23, 26.)

The HUD-1 closing statement for the Labrador's reverse mortgage loan disclosed a

$7,255.80 "origination fee," which was paid to Home Center, the originating mortgage broker.  (*Id.*,

¶24.)  The closing statement also showed that a $490 "correspondent fee" was paid to Home Center.

(*Id.*, ¶25.)  SMC sold the assets of its reverse mortgage business to Bank of America in June 2007.

(*Id.*, ¶8.)  In November 2007, Bank of America's in-house counsel told Labrador's lawyer that the

$490 was a "back-funded payment" to the mortgage broker paid for "servicing rights to the loan."

(*Id.*, ¶29.)

Labrador claims that the $490 was not, in fact, paid for servicing rights, but was simply a

referral fee paid for the broker's referring her to SMC.  (*Id.*, ¶¶18, 29, 30.)  Payment of "back-

funded fees," she says, links brokers with lenders in a "community of financial interest," each party

benefiting:  the broker with increased fee income; the lender with additional loans.  (*Id.*, ¶32.)

Therefore, Labrador asserts, SMC's payment of the origination fee to Home Center violated

§206.31(a)(1) which permits payment of all or part of that fee to the mortgage broker only "if there

is no financial interest between the mortgage broker and the mortgagee."  (*Id.*, ¶¶17, 19, 27, 28, 33.)

Based on these factual allegations, Labrador attempts to allege five causes of action for

(1) elder abuse in violation of the Elder Abuse Act (*id.,* ¶¶45-53), (2) violation of the UCL (*id.,*

---

[3]As a motion to dismiss tests only the legal sufficiency of the complaint's allegations, SMC states those allegations without comment now as to their truth or falsity and without waiving its right to contest their truth later.

[4]A reverse mortgage loan is a loan that allows an elderly borrower to convert her home equity into cash while continuing to own the home.  (Compl., ¶12.)  Under a reverse mortgage, the lender typically makes a lump-sum payment to the borrower at the loan closing, followed by monthly additional advances for a specified period.  (*Id.*)  Usually, the loan is not repaid until the borrower dies or leaves the home, at which point the house is sold and the loan is repaid from the sale proceeds.  (*Id.*; *see also* <http://www.hud.gov/buying/reverse.cfm>.)

- 4 -

¶¶54-62), (3) violation of the CLRA (*id.*, ¶¶63-70), (4) unjust enrichment and imposition of a

constructive trust (*id.*, ¶¶71-74), and (5) declaratory relief (*id.*, ¶¶75-77).

**IV.**

**LABRADOR HAS NOT ALLEGED FACTS SHOWING
A CLAIM ON WHICH RELIEF MAY BE GRANTED**

**A.      Labrador Has Not Alleged A Violation Of HUD's Regulation**

HUD's regulation, §206.31(a)(1), allows payment of a mortgage broker fee from the

origination fee on a HECM reverse mortgage loan only "if there is no financial interest between the

mortgage broker and the mortgagee."  Labrador claims SMC violated this regulation by paying her

origination fee to her mortgage broker, Home Center, and at the same time paying Home Center a

$490 "back-funded"[5] "correspondent fee" for servicing rights.  Payment of the "correspondent fee,"

Labrador contends, created a "financial interest" between Home Center and SMC, making it illegal

to pay Home Center any portion of the origination fee.  That is the crux of her complaint and all of

its claims.

Labrador's legal theory is wrong for a simple reason.  It attributes an incorrect meaning to

the term "financial interest" as used in §206.31(a)(1).  "Financial interest" means an ownership or

other beneficial interest in a business, not a payment received from a business.

**1.      The Regulation's Words Do Not Support Labrador's Interpretation**

"To interpret a regulation, we look first to its plain language.  As with legislation, we pre-

sume the drafters said what they meant and meant what they said.  If the regulation is unambiguous,

its plain meaning controls unless such reading would lead to absurd results."[6]  When a … regulation

defines a term, that definition controls, and the court need not look to the dictionary or common

---

[5]"Back-funded" is an industry term for payments a lender makes to a mortgage broker outside of escrow and from its own funds.  "Servicing release premiums" and "yield spread premiums" are two common types of such lender payments. *See* HUD, *Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b)*, 66 Fed. Reg. 53052, 53054 n. 1 (Oct. 18, 2001); HUD, *Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers*, 64 Fed. Reg. 10079, 10081 (Mar. 1, 1999).

[6]*United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004) (citations omitted).

- 5 -

1  usage."[7]  "In the absence of such a definition, we construe a … term in accordance with its ordinary

2  or natural meaning."[8]

3      Neither §206.31 nor the set of HECM regulations of which it is a part specially defines

4  "financial interest."  However, the term has a well-known common meaning.  Black's Law

5  Dictionary (8th ed.) defines "interest" to mean "A legal share in something; all or part of a legal or

6  equitable claim to or right in property <right, title, and interest>."  A "financial interest," that

7  dictionary continues, refers especially to "an interest in the nature of an investment."

8      That is exactly the meaning given "financial interest" in a wide variety of statutes and

9  regulations dealing with conflicts of interest by governmental officials and employees.  The statute

10  governing disqualification of federal judges, for example, defines "financial interest" to mean

11  "ownership of a legal or equitable interest, however small, or a relationship as a director, adviser, or

12  other active participant in the affairs of a party."  28 U.S.C. §455(d)(4).

13      Similarly, 5 C.F.R. §2635.403(c)(1) defines "financial interest" for purposes of federal

14  employee conflict-of-interest rules to include "any current or contingent ownership, equity, or

15  security interest in real or personal property or a business and may include an indebtedness or

16  compensated employment relationship."[9]

17      HUD has many similar regulations banning conflicts of interest by those dispensing or

18  receiving its many types of financial assistance.  Many of those regulations are expressly more

19  inclusive, reaching beyond ownership interests in recipients to ban payments or any other sort of

20  gain.  These regulations use a stock phrase—"a financial interest *or benefit*"—to express their

21  broader scope.  For example, 24 C.F.R. §570.611(b), governing Community Development Block

22  Grants ("CDBGs") provides:

23          The general rule is that no persons … who exercise or have exercised
            any functions or responsibilities with respect to CDBG activities
24          assisted under this part, … may obtain ***a financial interest or benefit***
            from a CDBG-assisted activity, or have ***a financial interest in*** any

25  _____

26      [7]*Alaska Trojan Partnership v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. 2005) (citation omit-
    ted).

27      [8]*Id.*, quoting  *FDIC v. Meyer,* 510 U.S. 471, 476 (1994); *Bucher*, 375 F.3d at 932.

28      [9]*See also* 12 C.F.R. §§612.2130, 915.10; 17 C.F.R. §270.17a-6.

- 6 -

contract, subcontract, or agreement with respect to a CDBG-assisted activity, or with respect to the proceeds of the CDBG-assisted activity, either for themselves or those with whom they have business or immediate family ties, during their tenure or for one year thereafter.

(Emphasis added.)[10]

HUD's Uniform Administrative Requirements for Grants to state or local government entities sweep even more broadly:

No employee, officer or agent of the grantee or subgrantee shall participate in selection, or in the award or administration of a contract supported by Federal funds if a conflict of interest, real or apparent, would be involved. Such a conflict would arise when:

(i) The employee, officer or agent,

(ii) Any member of his immediate family,

(iii) His or her partner, or

(iv) An organization which *employs*, or is *about to employ*, any of the above, has *a financial or other interest* in the firm selected for award. The grantee's or subgrantee's officers, employees or agents will neither solicit nor accept *gratuities, favors or anything of monetary value* from contractors, potential contractors, or parties to subagreements.

24 C.F.R. §85.36(b)(3) (emphasis added); *see also* 24 C.F.R. §84.42.

As the quoted regulations illustrate, HUD knows how to write regulations broadly banning not just conflicting ownership interests, but also the receipt of any type of monetary or other benefit. HUD did not use that more inclusive wording in §206.31, choosing instead to ban payment of mortgage broker fees only when the broker and lender share a "financial interest"—that is, are commonly owned.

**2.    Regulatory History Refutes Labrador's Interpretation**

Even more conclusive than §206.31's wording is its regulatory history. It shows conclusively that §206.31's current wording was not intended to forbid payments to brokers for loan servicing rights.

---

[10]*See also* 24 C.F.R. §§280.25, 291.435, 511.12, 572.415, 574.625, 576.57, 582.340, 583.330, 585.503, 700.175.

- 7 -

Motion to Dismiss Complaint
Case No.: C 08-02270 MEJ

For its first decade, the HECM reverse mortgage program was a limited demonstration program. Its results were extremely modest. Though by 1995, there were about three million US households headed by elders 65 or older, a large portion of whom might have been aided by reverse mortgages, only 30,000 reverse mortgages of all types, including HECMs, had been issued.[11] One major obstacle to greater participation in the program was the $1,800 cap that HUD regulations then imposed on origination fees for HECM reverse mortgages.[12]

In 1998, Congress converted the HECM program from a temporary demonstration project to a permanent program and increased the number of HECM loans that HUD could insure to 150,000. Pub.L. 105-276, §593; 112 Stat. 2654, 2655. At the same time Congress added a new eligibility criterion: the mortgage must "have been made with such restrictions as the Secretary [of HUD] determines to be appropriate to ensure that the mortgagor does not fund any unnecessary or excessive costs for obtaining the mortgage, including any costs of estate planning, financial advice, or other related services." *Id.,* §593(e)(1), adding 12 U.S.C. §1715z-20(d)(11).

To implement this new authority, HUD issued its Mortgagee Letter 00-10, implementing "a number of changes to the HECM program to increase its availability …." The first change the Mortgagee Letter mentioned was an increase in the loan origination fee:

> FHA permits a lender to charge a loan origination fee agreed upon by the borrower and lender. However, we are now capping the amount of the origination fee that can be charged the borrower and also permitting the borrower to finance the entire amount of the fee. The origination fee amount will now be limited to the greater of $2000 or 2 percent of the maximum claim amount on the reverse mortgage.
>
> The financed origination fee is now the full amount that the borrower can pay for the origination and underwriting of the mortgage and must also include the full amount of any mortgage broker fee or loan correspondent fee. The borrower is not permitted to pay any additional origination fees of any kind to a mortgage broker or loan correspondent. Lenders are reminded that a mortgage broker fee can be included as part of the origination fee only if the mortgage broker is engaged independently by the homeowner and that a mortgage

---

[11] *See* Jean Reilly, *Reverse Mortgages:  Backing Into The Future*, 5 Elder L.J. 17, 19 (1997).

[12] *Id.,* at 31, 73 ("[T]he FHA program's origination fee is set at $1,500 regardless of the loan amount …. The bottom line is that banks simply do not make a lot of money off these loans …." "[L]enders still say that the cap on the origination fee is unreasonable in light of the subservicing reverse mortgages require.").

MOTION TO DISMISS COMPLAINT
Case No.:  C 08-02270 MEJ

1    broker's fee is prohibited if there is any financial interest between the
     mortgage broker and lender.
2

3    HUD Mortgagee Letter 00-10, p.1 (publicly available at <www.hudclips.org>).

4        Apparently to confirm HUD's authority to impose this requirement, Congress again

5    amended §1715z-20 in 2000 (Pub. L. 106-569, §201(a)(1)(B); 114 Stat. 2948, 2950), adding sub-

6    section (k)(6) which provides:

7        The Secretary [of HUD] may establish a limit on the origination fee
         that may be charged to a mortgagor under a mortgage insured under
8        this subsection, except that such limitation shall provide that the
         origination fee may be fully financed with the mortgage and shall
9        include any fees paid to correspondent mortgagees approved by the
         Secretary.
10

11       In 2001, HUD issued new, interim regulations implementing the 2000 Act's provisions.  The

12   interim regulations revised §206.31(a)(1) to allow the mortgage to collect at closing:

13       A charge to compensate the mortgagee for expenses incurred in
         originating and closing the mortgage loan, which may be fully
14       financed with the mortgage.  The Secretary may establish limitations
         on the amount of any such charge.  ***Any limitation on the origination***
15       ***fee shall include any fees paid the correspondent mortgagees***
         approved by the Secretary.  HUD will publish any such limit in the
16       Federal Register at least 30-days before the limitation takes effect.

17   66 Fed. Reg. 30278, 30281 (June 5, 2001) (emphasis added).[13]

18       In 2004, HUD adopted final regulations implementing the 2000 Act, changing §206.31 to its

19   current wording.  HUD explained that change as a response to a complaint that the interim

20   regulation appeared to ban additional limited compensation for loan-servicing rights, a practice that

21   HUD had previously approved:

22       One commenter objected to the proposed language of §206.31(a)(1)
         providing that the HECM origination fee limits "shall include any fees
23       paid to correspondent mortgagees."  The commenter wrote that ***it has***
         ***always been HUD's policy that***, with respect to loans originated by
24       correspondent mortgagees …, ***the origination fee limit does not apply***
         ***to any additional limited compensation the correspondent might***
25       ***receive from the mortgagee related to the loan-servicing rights***. …
         Accordingly, the commenter recommended that HUD add an
26

27   ───────────────
     [13]HUD's comment accompanying the new interim regulation noted that HUD proposed to
     continue the existing origination fee limitation set in Mortgagee Letter 00-10, but also reiterated
     the interim regulation's rule that "any origination fee limit shall include any fees paid to corre-
28   spondent mortgagees …."  (66 Fed. Reg. at 30279.)

     - 9 -

explanatory phrase to §206.31(a)(1) clarifying that the HECM origination fee limit does not cover any loan-servicing charges provided to correspondents.

HUD Response. ***The commenter is correct that loan-servicing charges paid to a loan correspondent under the HECM program are not subject to the origination fee limit***. … The purpose of the proposed regulatory language was not to revise HUD policy, but only to clarify that the origination fee charged to the HECM borrower must include the full amount of any fee paid to a loan correspondent ***related to the origination of the mortgage***. This is consistent with HUD's existing policy regarding HECM origination fees, as described in Mortgagee Letter 00-10 (issued on March 8, 2000). HUD, however, agrees that the proposed regulatory language was confusing. The interim rule revises this language to more closely track the language of Mortgagee Letter 00-10 for purposes of clarity and consistency with the guidance provided in the Mortgagee Letter.

69 Fed. Reg. 15586, 15588 (March 25, 2004) (emphasis added).[14]

As the emphasized portions of the above-quoted comment and response show, HUD abandoned the wording of interim §206.31(a)(1), and adopted the section's current wording, which is closely modeled on Mortgagee Letter 00-10, in order to make it clear that the limitation on payments to the mortgage broker from the origination fee applied only to payments "related to the origination of the mortgage," and not to payments "related to loan-servicing rights." HUD agreed with the commenter's statement that it had "always been HUD's policy that … the origination fee limit does not apply to any additional limited compensation the correspondent might receive from the mortgagee related to the loan-servicing rights." HUD said its proposed 2004 regulation was not intended to change HUD policy in that respect, but to clarify that point, HUD revised §206.31(a)(1) to its current wording, more closely tracking Mortgagee Letter 00-10.

The regulation's drafting history shows why HUD chose "financial interest," not the broader "financial interest or benefit" language prevalent in its conflict-of-interest regulations. The regulation is designed to insure that any mortgage broker or correspondent lender paid a portion of

---

[14]In the following comment and response, HUD also clarified that the same rules apply to payments to mortgage brokers. 69 Fed. Reg. at 15588.

the origination fee is independently owned and independently hired by the borrower.[15]  Unlike the conflict-of-interest regulations, §206.31 is not intended to prohibit other mutually advantageous business transactions between mortgage brokers and reverse mortgage lenders.  In particular, the regulation was not intended to ban lenders from making payments to mortgage brokers or correspondent lenders "related to the loan-servicing rights."  Had the regulation banned any "benefit" as well as any "financial interest," it would have prohibited those payments.  To avoid that result, HUD carefully chose the narrower language that now appears in §206.31.

### 3.    Labrador's Counter Arguments Are Without Merit

Labrador's complaint alleges the seeds of two arguments as to why payments for servicing rights must create a prohibited "financial interest."  Both are incorrect and should be scotched before they sprout into full-grown error.

First, Labrador points out that servicing rights do not arise until a loan is consummated.  Since the lender, not the mortgage broker, funds the loan, Labrador claims that the mortgage broker could never have any servicing rights and so any payment to a mortgage broker nominally for servicing rights must, in fact, be a disguised "referral fee" prohibited by the Real Estate Settlement Procedures Act ("RESPA"; 12 U.S.C. 2607; 24 C.F.R. §3500.13).  (Compl., ¶¶18, 19, 29-31.)

HUD clearly does not agree.  In its 1999 RESPA Policy Statement Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10080 (Mar. 1, 1999),[16] HUD specifically noted that "back-funded" or "indirect" lender payments to brokers often take the form of "servicing release

---

[15]HUD's Handbook 4235.1, regarding the HECM loan program, confirms that independent ownership is the purpose of §206.31's ban on "financial interests" between brokers and lenders.  The Handbook's §6-13 lists the third-party fees that may be charged to the borrower in connection with a HECM loan.  It repeatedly emphasizes that such fees are permitted only when charged by a third party unaffiliated with the lender.  For example, a document preparation fee may be charged "if this service is performed by a third-party who is not controlled by the mortgagee."  Attorney's fees may be paid, but "only if the attorney is not an employee of the mortgagee."  Settlement fees are allowed but only if "the settlement agent is not an employee of the mortgagee" and "the settlement agent is an independent company or a subsidiary of the mortgagee that regularly closes loans for several different mortgagees."  The no "financial interest" restriction on payment of broker fees fits this same pattern.

[16]The Policy Statement expressly notes that it, as well as RESPA, regulates lender payments to brokers only when the lender funds the loan or consummates it directly, not when the broker makes the loan itself with its own money and then resells it to another lender.  *See* 64 Fed. Reg. at 10081.  That is, the Policy Statement concerns loans funded just as Labrador contends hers was.

premiums." Had HUD reasoned, as Labrador argues, that brokers never have any loan servicing rights in lender-funded loans, it would have condemned back-funded payments for servicing release premiums as "bare referral fees" that are illegal per se—just as Labrador contends. HUD did not do so, however. While noting that those payments must be separately disclosed in the HUD-1 closing statement, *see id.* at 10082-83, HUD's Policy Statement states that servicing release premiums, like yield spread premiums, are "not illegal per se," but violate RESPA only if (i) goods or facilities were not actually furnished or services were nor actually performed for the compensation paid or (ii) the payments were not reasonably related to the value of the goods or facilities or services furnished or performed. *Id.* at 10084.

HUD's treatment of lender payments to mortgage brokers "related to the loan-servicing rights" in connection with its 2004 rewrite of the HECM regulations confirms HUD's rejection of Labrador's theory. Surely, had HUD agreed that all such payments are, necessarily, "bare referral fees" prohibited by RESPA because brokers have no loan-servicing rights to sell, it would not have expressly permitted lenders to make such payments under the HECM program in addition to the limited loan origination fee payments allowed under §206.31.

Second, Labrador argues that a payment for release of servicing rights "links" the mortgage broker and lender "in a community of financial interest" because both the lender and the mortgage broker benefit from the arrangement: the broker receiving more compensation, the lender receiving more loans. (Compl., ¶¶19, 32.) It is hardly surprising that both lenders and brokers benefit from the arrangement. Indeed, if the lender paid the broker a fee and received nothing of value in return, the payment would violate RESPA. *See* 66 Fed. Reg. at 53055.

HUD could not have meant "financial interest" as used in §206.31(a)(1) to encompass all mutually beneficial arrangements between brokers and lenders, such as a payment for goods, products or services rendered. As shown above, HUD specifically adopted the "financial interest" wording found in the current version of §206.31 to clarify that payments to mortgage brokers "related to the loan-servicing rights." Those payments are mutually beneficial just as Labrador alleges SMC's payments are. Yet HUD expressly stated that they are allowed under §206.31(a)(1).

- 12 -

1    In short, there is no merit to Labrador's nascent arguments.  She has not alleged facts

2    showing any violation of §206.31.  As a result, her complaint should be dismissed.

3    **B.    Labrador Has Alleged No Other Basis For A Claim**

4    For the reasons just shown, Labrador's principal theory—that SMC violated 24 C.F.R.

5    §206.31(a)(1)—is incorrect and unsupported by the facts she alleges.  Labrador alleges no other

6    facts sufficient to sustain her claims, as shown below.

7    **1.    The First Cause Of Action Alleges No Actionable Facts**

8    Labrador alleges no independent basis for her first cause of action for elder abuse, even if

9    California law permitted such a claim—and it does not.  *See* pp. 16-17 below.

10   Apart from incorporating the allegations about the purported §206.31(a)(1) violation by

11   reference, Labrador's first cause of action avers no facts at all, just conclusions.  (*See, e.g.,* Compl.,

12   ¶47 ("At all relevant times, Defendant took and/or assisted in the taking of property from Plaintiff

13   for its own wrongful use and/or with intent to defraud."), ¶48 ("Defendant manipulated Plaintiff

14   and the Class into paying excessive, unlawful and unfair fees and costs in connection with her

15   reverse mortgage.").)

16   Those conclusions are insufficient to state a sufficient to withstand a motion to dismiss.

17   "[A] plaintiff's obligation to provide the grounds of his entitlement to relief 'requires more than

18   labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'

19   Rather, the allegations in the complaint 'must be enough to raise a right to relief above the

20   speculative level.'  A motion to dismiss should be granted if the complaint does not proffer enough

21   facts to state a claim for relief that is plausible on its face."[17]

22   As Labrador alleges no additional *facts* as opposed to *conclusions* or *labels* to support her

23   first cause of action, it should be dismissed once the Court determines that Labrador's §206.31

24   theory lacks merit.

25   **2.    The Second Cause Of Action Alleges No Actionable Facts**

26   Labrador's second cause of action under California's UCL should meet the same fate.

27   ──────────────────────

28   [17]*Minority Television Project Inc. v. FCC,* 2007 WL 4570293 at *3 (N.D. Cal. 2007), *quoting Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1964-65 (2007).

- 13 -

MOTION TO DISMISS COMPLAINT
Case No.:  C 08-02270 MEJ

The claim first alleges that defendant engaged in unlawful business practices which violate 24 C.F.R. §206.31 and California Welfare & Institutions Code §§15610.30 and 15657.5.  (Compl., ¶55.)  This allegation fails to state an actionable claim for the reasons already discussed.  The alleged facts show no violation of §206.31.  (*See* pp. 5-13 above.)  Labrador alleges no other facts to support her claim under the Elder Abuse Act.  (*See* p. 13 above.)

Paragraph 57 of the complaint alleges that defendant committed an unfair business practice "[a]s detailed in the preceding paragraphs" by selling "a reverse mortgage to Plaintiff with terms, conditions, and under circumstances that violate federal and state law and fundamental policies delineated in statutory provisions."  This allegation just repeats in other words paragraph 55's allegation of unlawful business practices.  Like paragraph 55, it fails to state a claim for the reasons set forth at pages 4-12 above.

Paragraph 57 continues:  "Defendant gained the trust of Plaintiff, had access to her private financial information, and induced her to encumber her personal residence and enter into a reverse mortgage."  This sentence alleges no conduct that is unfair.  California law cannot denounce as unfair a reverse mortgage loan that Congress has expressly sanctioned.  There is nothing wrongful or unfair in gaining Labrador's trust or using her financial information for the purpose of granting her the benefits of this federally sponsored loan program.

Finally, paragraph 58 alleges that defendant committed fraudulent business practices by making "misrepresentations about reverse mortgage that it knew were likely to be deceptive and misleading for senior consumers, failing to disclose all material features, facts, risks and/or attributes of reverse mortgages … all the time knowing that those sales practices were likely to be misleading and deceptive for Plaintiff."

This allegation of fraudulent conduct fails to meet Rule 8(a)'s requirement that the complaint set forth sufficient facts, not conclusions, to make the claim plausible.[18]  It fails even more

---

[18]The fraudulent practice claim is particularly implausible here since HUD's regulations require the borrower to obtain independent loan counseling before entering into a HECM reverse mortgage.  *See* 24 C.F.R. §206.41; HUD Mortgagee Letter 2004-25.  The independent loan counselor stands as an independent shield against a borrower's being gulled into a reverse mortgage by false representations regarding its features, risks or attributes, all of which the counselor must discuss with the borrower in a session from which the lender and broker are excluded.

- 14 -

1    surely to satisfy Rule 9(b), which applies to this assertion of fraudulent conduct as the foundation

2    of a UCL claim,[19] and which requires, "at a minimum, [that the pleader] set forth the 'who, when,

3    where and how' as well as the specific content of each alleged act of fraud …."[20]

4         In short, the second cause of action alleges no additional facts sufficient to withstand this

5    motion to dismiss.

6         **3.    The Third Cause Of Action Alleges No Actionable Facts**

7         Labrador's third cause of action attempts to state a claim under the CLRA.  As shown

8    below (pp. 17-25), it fails to do so because the CLRA does not apply to credit transactions such as

9    a reverse mortgage and because the complaint alleges no conduct violating the CLRA's specific

10    prohibitions.  That is so even if Labrador's §206.31(a)(1) theory were viable; it is doubly true given

11    the failure of that theory.

12         **4.    The Fourth And Fifth Causes Of Action Allege No Actionable Facts**

13         Labrador's final two causes of action allege no additional facts and state no actionable

14    claim apart from her §206.31(a)(1) theory.  The fourth cause of action for unjust enrichment simply

15    asserts that defendant has been unjustly enriched "[a]s a result of the relationship between the

16    parties and the facts stated above."[21]  (Compl., ¶73.)  The fifth cause of action seeks declaratory

17    relief, but alleges nothing other than the existence of a controversy.[22]  (*Id.*, ¶76.)

18

19

---

20    [19]*Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1103-05 (9th Cir. 2003); *Hartless v. Clorox Co.*, 2007 WL 3245260 at *6 (S.D. Cal. 2007); *Stickrath v. Globalstar, Inc.,* 2007 WL 2790727 at *4-5 (N.D. Cal. 2007); *Kennedy v. Natural Balance Pet Foods, Inc.,* 2007 WL 2300746 at *5-6 (S.D. Cal. 2007).

22    [20]*United States ex rel. Unite Here v. Cintas Corp.*, 2007 WL 4557788 at 4 (N.D. Cal. 2007).

23    [21]"California courts appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy."  *Parrish v. Nat'l Football League Players Ass'n,* 2007 WL 2601385 at *16 (N.D. Cal. 2007).  Here, as in *Parrish*, however, it is unnecessary to decide the point since apart from failing to allege wrongful or unjust acts on defendant's part, the complaint also shows that the charges—the origination fee and the correspondent fee—were not retained by SMC but were instead paid to the mortgage broker, Home Center.  (*See* Compl., ¶¶24, 25.)

27    [22]This Court has discretion in determining whether and when to entertain an action seeking declaratory relief even when the suit otherwise satisfies subject matter jurisdictional prerequisites and states a viable claim.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495 (1942); *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir.

1    In short, the demise of Labrador's theory that SMC violated §206.31(a)(1) is fatal to her

2   entire complaint, which should, therefore, be dismissed in its entirety.

3                                                V.

4              **THE FIRST CAUSE OF ACTION SHOULD BE DISMISSED**

5    Labrador's first so-called cause of action is purportedly brought under the Elder Abuse Act

6   and alleges, in conclusory terms only, that SMC committed financial abuse of an elder in violation

7   of Welfare & Institutions Code §15610.30(a) by "manipulat[ing] Plaintiff and the Class into paying

8   excessive, unlawful and unfair fees and costs in connection with her reverse mortgage."  (Compl.,

9   ¶¶46-48.)

10    These allegations do not state a claim on which relief may be granted because the Elder

11   Abuse Act confers no independent private cause of action.  The Elder Abuse Act "does not create a

12   cause of action as such, but provides for attorney fees, costs and punitive damages under certain

13   conditions" as additional remedies when the plaintiff establishes another, independent tort and

14   proves specified additional facts.[23]

15    The Elder Abuse Act's provisions support the just-quoted holding.  Section 15610.30 of

16   that act *defines* "financial abuse of an elder or dependent adult."  Section 15657.5 of the Elder

17   Abuse Act allows enhanced remedies—attorney fee awards and emotional distress damages in

18   survival actions—upon proof of financial elder abuse.  However, neither of these sections creates

19   an independent cause of action for financial elder abuse.

20

21

22   2004).  As all the rest of the complaint must be dismissed, the Court should dismiss the declaratory
     relief claim as well rather than allow the case to limp along on that claim alone, consuming re-
23   sources only to end in a judgment declaring SMC was right all along.

24    [23]*Berkley,* 152 Cal.App.4th at 529; *ARA Living Centers-Pacific, Inc,* 18 Cal.App.4th at
     1563-64; *Wolk v. Green*, 516 F.Supp.2d 1121, 1133 & n. 12 (N.D. Cal. 2007).  A few earlier fed-
25   eral court decisions uphold a separate cause of action under the Elder Abuse Act.  *Genton v. Vestin
     Realty Mortg. II, Inc.,* 2007 WL 951838 at *2 (S.D. Cal. 2007); *Negrete v. Fid. & Guar. Life Ins.*
26   *Co.*, 444 F.Supp.2d 998, 1002 (C.D.Cal.2006).  However, as explained at greater length below,
     under the rule recently reiterated by the Ninth Circuit, this court must follow the contrary decisions
27   of California's intermediate appellate courts absent "convincing evidence" the California Supreme
     Court would reject *Berkley* and *ARA Living Centers*.  *Ryman v. Sears, Roebuck & Co.,* 505 F.3d
28   993, 994-95 (9th Cir. 2007).  There is no such "convincing evidence."

                                            - 16 -

1   "If the Legislature intends to create a private cause of action, we generally assume it will do

2   so ' "directly[,] … in clear, understandable, unmistakable terms …" ' "[24]  The Elder Abuse Act

3   does not do so.  Quite to the contrary, as §15657.5 shows, the Legislature considered private

4   remedies for financial elder abuse.  It chose *not* to create a new cause of action for financial elder

5   abuse, but to allow, instead, enhanced remedies for existing causes of action when financial elder

6   abuse was proven in addition.[25]

7       Like §15657, on which it was modeled, §15657.5 "did not add a cause of action" but only

8   provided enhanced remedies as an incentive to encourage private suits under already existing

9   causes of action.[26]  Accordingly, there is no cause of action for financial elder abuse under Cali-

10  fornia.  Labrador's first so-called cause of action, therefore, states no claim on which relief may be

11  granted.  It should be dismissed.

## VI.

### THE THIRD CAUSE OF ACTION SHOULD BE DISMISSED

14      The Court should dismiss Labrador's third cause of action under the CLRA for two reasons:

15  First, the CLRA does not apply to transactions, such as the making of a reverse mortgage loan, that

16  involves only the extension of credit, not the sale of goods or services.  Second, Labrador has not

17  alleged facts showing a violation of the CLRA's specific prohibitions.

---

23      [24]*Vikco Ins. Serv., Inc. v. Ohio Indem. Co*., 70 Cal.App.4th 55, 62-63, 82 Cal.Rptr.2d 442
24  (1999), quoting *Moradi-Shalal v. Fireman's Fund Ins. Cos.,* 44 Cal.3d 287, 294-295, 250 Cal.
    Rptr. 116 (1988); citation omitted.

25      [25]Section 15657.5(a) provides that "in addition to all other remedies otherwise provided by
26  law," the court must award the plaintiff reasonable attorney fees and costs when "it is proven by a
    preponderance of the evidence that a defendant is liable for financial abuse."  When the plaintiff
27  proves financial abuse by the higher standard of clear and convincing evidence, he or she may also
    recover damages for emotional distress suffered by the abused elder prior to his or her death.

28      [26]*ARA Living Centers-Pacific, Inc.,* 18 Cal. App.4th at 1563-64.

- 17 -

**A.    The CLRA Does Not Apply To Credit Transactions**

"[N]either the express text of CLRA nor its legislative history supports the notion that credit transactions separate and apart from any sale or lease of goods or services are covered under the act."[27]

The CLRA's scope is discerned first from its statutory text.[28]  The CLRA's central provision, Civ. Code, §1770, bans various specified practices only if "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."  Thus, section 1770 and the rest of the CLRA's provisions apply only if the transaction involves the sale or lease of "goods" or "services."  Extension of credit is neither a good nor a service as the CLRA defines those terms; hence, the CLRA does not apply to credit transactions.

The CLRA defines "goods" to mean "tangible chattels."  Civ. Code, §1761(a).  "The extension of credit [such as a loan] is not a tangible chattel."  *Berry,* 147 Cal.App.4th at 229.[29]

The CLRA defines "services" to mean "work, labor, and services for other than a commercial or business use."  Civ. Code, §1761(b).  Credit is not a "service" within the CLRA's definition.  A loan involves no work or labor or any other "service," but only the use of the lender's money.  Nor do "deceptive and fraudulent business practices employed … in the sale of reverse mortgages" constitute "services."  (*See* Compl., ¶67.)  As the Texas Court of Appeals held in rejecting a similar claim under that state's Deceptive Trade Practices Act:

---

[27]*Berry v. American Express Pub., Inc.,* 147 Cal.App.4th 224, 233, 54 Cal.Rptr.3d 91 (2007).

[28]*Freeman v. DirecTV, Inc.,* 457 F.3d 1001, 1004 (9th Cir. 2006) ("The starting point for [the] interpretation of a statute is always its language."); *Shirk v. Vista Unified School Dist.,* 42 Cal.4th 201, 211, 64 Cal.Rptr.3d 210 (2007) ("We begin with the statutory language because it is generally the most reliable indication of legislative intent.")

[29]Labrador's conclusory allegation that SMC's reverse mortgages are "goods" within §1761(a)'s meaning (Compl., ¶67) does not make it so.  As the Supreme Court has recently re-emphasized, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do…. Factual allegations must be enough to raise a right to relief above the speculative level …."  *Bell Atlantic Corp.,* 127 S.Ct. at 1964-65.  Allegations of legal conclusions such as those recited in paragraph 67 of the complaint no longer suffice, if they ever did, to meet the pleader's burden; instead, facts must be averred to show that the transaction falls within the CLRA's scope.  *Mitan v. Feeney,* 497 F.Supp.2d 1113, 1126 (C.D. Cal. 2007).

1
> [T]he end and aim of [plaintiffs'] dealings with [her broker] was to obtain a mortgage loan.  [Her broker's] ancillary services served no purpose apart from facilitating a mortgage loan.  Therefore, we conclude that any services provided by [the broker] were, as a matter of law, incidental to the contemplated mortgage loan; they were not an objective of the transaction.  As such, [plaintiffs] were not consumers for purposes of the [DTPA].

2

3

4

5  *Maginn v. Northwest Mortgage Inc.*, 919 S.W.2d 164, 167 (Tex. Ct. App. 1996).

6      The CLRA's legislative history confirms the fact that the act does not apply to extensions

7  of credit.

8
> Early drafts of section 1761, subdivision (d), defined "Consumer" as "an individual who seeks or acquires, by purchase or lease, any goods, services, *money*, or *credit* for personal, family or household purposes." (Assem. Bill No. 292 (1970 Reg. Sess.) Jan. 21, 1970, italics added.)  But the Legislature removed the references to "money" and "credit," before CLRA's enactment, and they do not appear in the current version.

9

10

11

12  *Berry*, 147 Cal.App.4th at 230.

13      By deleting "money" and "credit" from the CLRA's definitional sections, the Legislature

14  evidenced its intent to exclude loans from the act's coverage.  "[T]he Legislature's deletion of the

15  terms 'money' and 'credit' from CLRA's definition of 'consumer' strongly counsels us not to

16  stretch the provision to include extensions of credit unrelated to the purchase of any specific good

17  or service."  *Id.* at 231.  "[C]ourts must not interpret a statute to include terms the Legislature

18  deleted from earlier drafts."  *Id.*

19      Other changes made during the Legislature's consideration of the CLRA's early drafts

20  confirm that deletion of the terms "money" and "credit" was intended to narrow the act's scope.

21
> For example, an early draft of section 1780 gave standing to "[a]ny consumer who *obtains credit*, or purchases or leases, or agrees to purchase or lease, goods or services primarily for personal, family, or household purposes, and who thereby suffers any damage...." (Italics added.) The draft's placement of the phrase "obtains credit" demonstrates the Legislature viewed the extension of credit as a separate activity from purchasing or leasing goods and services, rather than an example of it. The final version of section 1780 deleted the specific references to activities covered under the act, and it now confers standing on: "Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770...."

22

23

24

25

26

27

28  *Id.*, at 232.

- 19 -

As *Berry* points out, §1770 also evidences the Legislature's intent that the CLRA not extend to credit transactions. "Most of the matters in section 1770 appear directed toward the purchase and lease of tangible goods and services, and none suggests the statutory language covered extensions of credit unrelated to a specific sale or lease transaction." *Id.* Moreover, the section's above-quoted introductory phrase, limiting the section's prohibitions to practices undertaken in connection with the sale or lease of goods or services, is considerably narrower in scope than the section's initial draft, which would have banned the specified practices if "undertaken by any person in the conduct of any trade or commerce ...." *Id.*

Other recent state and federal decisions adopt *Berry's* careful analysis of the CLRA's text and legislative history as well as its conclusion that the act does not apply to credit transactions.[30]

Three recent decisions by judges of this Court have bucked this trend.[31] These decisions should not be followed because they fail to accord appropriate respect to *Berry* and *McKell*, two recent California Court of Appeal decisions on the same point.

As the Ninth Circuit has recently reiterated:

> [W]hen (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it.

*Ryman,* 505 F.3d at 994 (internal quotation marks & citation omitted).

There is no "convincing evidence" that the California Supreme Court would "decide differently" from and disapprove *Berry* and *McKell*. *Hernandez* says "the California Supreme Court and intermediate appellate divisions have found the CLRA applicable" in "similar matters involving financial transactions." *Hernandez,* 2007 WL 3101250 at *5. But, in fact, no decision has

---

[30]*Van Slyke v. Capital One Bank*, 2007 WL 1655641 at *3-4 (N.D. Cal. 2007) (CLRA does not apply to credit cards); *Augustine v. FIA Card Services, N.A.,* 485 F.Supp.2d 1172, 1174-1175 (E.D. Cal. 2007) (same); *McKell v. Washington Mut., Inc.,* 142 Cal.App.4th 1457, 1488, 49 Cal. Rptr.3d 227 (2006) (CLRA does not apply to home loans).

[31]*Jefferson v. Chase Home Fin. LLC*, 2007 WL 1302984 at *3 (N.D. Cal. 2007) (Henderson, J.); *Hernandez v. Hilltop Fin. Mortg., Inc.,* 2007 WL 3101250 at *5-6 (N.D. Cal. 2007) (Illston, J.); *Knox v. Ameriquest Mortg. Co.,* 2005 WL 1910927 at *4 (N.D. Cal. 2005) (Conti, J.).

so "found."  Instead, the single California Supreme Court case[32] and single Court of Appeal

decision[33] *Hernandez* cites for this proposition decided other issues, not whether plaintiffs had

stated proper CLRA claims.  *Hernandez* itself acknowledges as much.[34]  "A decision, of course,

does not stand for a proposition not considered by the court."[35]  Nor is such a non-decision "con-

vincing evidence" of how the court will rule when it does consider the issue.

Nor is the fact that three judges of this district have now disagreed with *Berry* and *McKell*

"convincing evidence" that the California Supreme Court will do so too.  To quote again from

*Ryman*, 505 F.3d at 995 n. 1:

> We note that the district court did cite opinions by other federal
> district judges expressing their disagreement with the *Yeager* rule.
> **The opinions of other federal judges** on a question of state law **do
> not constitute "convincing evidence that the state supreme court
> would decide [an issue] differently"** ....

(Emphasis added; citation omitted.)

None of the three decisions bucking the *Berry/McKell* trend cite any other "convincing

evidence" that the California Supreme Court will decide the issue of the CLRA's scope

---

[32] *Kagan v. Gibraltar Sav. & Loan Ass'n*, 35 Cal.3d 582, 596-97, 200 Cal.Rptr.38 (1984). In *Kagan*, the issue before the California Supreme Court was, as that court phrased it:  "May a consumer who notifies a prospective defendant of class grievances under the Consumer Legal Remedies Act and informally obtains individual relief, subsequently bring a class action for damages on behalf of herself and as a representative of the class against the prospective defendant?" *Id.* at 586-87.  The high court also held there was a triable issue of fact as to whether Gibraltar falsely advertised when it said it would impose no management fee but imposed a trustee fee instead. *Id.* at 596-97.  Neither of these issues raised, even tangentially, any issue regarding the CLRA's application to loan transactions, and the Supreme Court said nothing on that topic.

[33] *Corbett v. Hayward Dodge, Inc.*, 119 Cal.App.4th 915, 14 Cal.Rptr.3d 741 (2004).  In *Corbett*, the sole issue was whether the trial court had abused its discretion in denying the prevailing defendant attorney fees under Civil Code section 1780(d), part of the CLRA.  Since it had won on the merits and was seeking fees under the CLRA, the defendant certainly did not argue that the CLRA was wholly inapplicable.  The losing plaintiff was hardly in a position to urge that it had alleged a legally insufficient claim.  Moreover, the prevailing defendant had sold the plaintiff a car, so there was little question but that the CLRA applied at least to that aspect of the transaction.

[34] "[T]he courts in *Kagan* and *Corbett* did not specifically discuss whether the financial transaction at issue fell under the CLRA's definition of a 'good' or 'service' ...." *Hernandez,* 2007 WL 3101250 at *5.

[35] *Flatley v. Mauro*, 39 Cal.4th 299, 320, 46 Cal.Rptr.3d 606 (2006).

- 21 -

MOTION TO DISMISS COMPLAINT
Case No.:  C 08-02270 MEJ

1    differently.[36]  Indeed, the extant "other evidence" suggests just the contrary.  *Berry* and *McKell* are

2    consistent with decisions interpreting other states' statutes that are similar to the CLRA.[37]

3        In accordance with the rule reiterated in *Ryman*, the Court should follow *Berry* and *McKell*,

4    hold that the CLRA does not apply to credit transactions such as those alleged here, and dismiss

5    Labrador's third cause of action for that reason.

6        **B.    Labrador Has Not Alleged Violation Of The CLRA's Prohibitions**

7        Unlike California's UCL, the CLRA does not prohibit all "unfair" acts—even in transac-

8    tions to which the CLRA applies.  Instead, the CLRA's key provision, Civ. Code, §1770, declares

9    19 specifically defined practices to be unlawful, and §1780 gives a private right of action to con-

10   sumers injured by those specific prohibited practices.  Labrador fails to state a viable claim under

11   the CLRA because she alleges no facts showing that SMC committed any of the practices

12   forbidden by section 1770.

13       In conclusory fashion, paragraph 68 of the complaint alleges violation of three of §1770's

14   specific prohibitions:  those described in paragraphs (a)(3), (14) and (19).  The allegation is mere

15   "labels and conclusions."  It does not meet Fed. R. Civ. P. 8's requirement of a statement of the

16   grounds on which plaintiff is entitled to relief.  Instead, the complaint must allege *facts* that "raise a

17

18

---

19   [36]*Hitz v. First Interstate Bank,* 38 Cal.App.4th 274, 286-88, 44 Cal.Rptr.2d 890 (1995) pro-
20   vides no such evidence.  *Hitz* held the CLRA applied to a bank's practice of charging late and
     overlimit fees on credit cards because the cards had a convenience feature (allowing the holder to
     buy without carrying or using cash), a service apart from the cards' use as a means for the exten-
21   sion of credit.  A reverse mortgage loan, like those involved in this case, offers no such "conven-
     ience feature."

22
     [37]*See, e.g., Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174 (Tex.1980) [loan uncon-
23   nected with any specific good or service not covered under the Texas Deceptive Trade Practices
     Act]; *Waite v. BancTexas-Houston, N.A.,* 792 S.W.2d 538, 541 (Tex. Ct. App. 1990) ("the lending
24   of money is neither a good or service"); *Deerman v. Federal Home Loan Mortg. Corp.,* 955
     F.Supp. 1393, 1399 (N.D. Ala. 1997) [mortgage loan not a "good" or "service" under Alabama
25   Deceptive Trade Practices Act]; *Lamm v. AMFAC Mortgage Corp.,* 44 Or.App. 203, 204-05, 605
     P.2d 730b (1980) (deletion of "loans and extensions of credit" from the final version of bill "re-
26   solved any doubt" that Oregon's Unfair Trade Practices Act does not apply to mortgage loans);
     *Haeger v. Johnson,* 25 Or.App. 131, 135, 548 P.2d 532 (1976) [loan not a sale of goods or services
27   under Oregon's Unlawful Trade Practices Act]; *State v. First Nat'l Bank,* 660 P.2d 402, 413
     (Alaska 1982) (list of proscribed activities in statute suggests that the law is "directed solely at
28   regulating transactions involving 'products and services sold to consumers in the popular sense'").

1  right to relief above the speculative level." *Bell Atlantic Corp.,* 127 S.Ct. at 1965.  Labrador

2  alleges no facts that support her CLRA claim.

### 1.    Labrador Alleges No Violation Of §1770(a)(3)

4          The first provision Labrador relies on, §1770(a)(3), prohibits "[m]isrepresenting the affilia-

5  tion, connection, or association with, or certification by, another."  The CLRA's author published a

6  report in the Assembly Journal shortly after the bill's passage "to indicate more fully the intent of

7  the Legislature with respect to this measure."[38]  "By way of illustration" the report provides the

8  following example of conduct violating this paragraph:

> Representing that a product, such as tires, has the approval of
> Parnelli Jones, or that someone like Mario Andretti always uses
> brand X tire when he doesn't.

11         Labrador alleges no such misrepresentation.  She does not say that SMC said the reverse

12 mortgages were approved or used by anyone else when they were not.  Instead, she accuses SMC

13 of non-disclosure:  "fail[ing] to disclose and *thus* misrepresent[ing] [SMC's] financial relationship

14 with mortgage brokers, including … Home Center."  (Compl., ¶68(a) (emphasis added).)

15         This allegation falls short of demonstrating a violation of §1770(a)(3) for two simple

16 reasons:  First, Labrador has not alleged any facts showing that SMC owed her any duty to disclose

17 that information.  Absent an independent obligation to make a disclosure, mere non-disclosure does

18 not violate §1770(a).

> [A]lthough a claim may be stated under the CLRA in terms consti-
> tuting fraudulent omissions, to be actionable the omission must be
> contrary to a representation actually made by the defendant, or an
> omission of a fact the defendant was obliged to disclose.

*Daugherty v. American Honda Motor Co*., 144 Cal.App.4th 824, 835, 51 Cal.Rptr.3d 118 (2006).

23         Second, Labrador affirmatively alleges that the supposed "financial relationship" was, in

24 fact, disclosed to her on the HUD-1 closing statement.  Paragraph 25 of the complaint says that the

25 closing statement showed the $490 fee to the broker—the only "financial relationship" Labrador

26 claims.

---

28         [38]Report Relative to Assembly Bill No. 292 (Sept. 23, 1970), 4 Cal. Assembly Daily J.
(1970 Reg. Sess.) p. 8464; a copy is attached for the Court's convenience.

- 23 -

**2.    Labrador Alleges No Violation Of §1770(a)(14)**

The second provision on which Labrador relies, §1770(a)(14), bans misrepresentations concerning the "rights, remedies or obligations" that the transaction confers or involves.  The above-mentioned legislative report illustrates a violation of this paragraph as follows:

> In this case the subsection would be violated if the seller advertised "satisfaction or your money back" or "10-day free trial", as they are usually construed as a guaranty that the full purchase price will be refunded.  Any conditions to the contrary should be set forth.

Labrador alleges no such misrepresentation.  Indeed, she alleges no facts showing any misrepresentation at all.  Instead, she merely reiterates the statutory language in conclusory terms: "Defendant represented that the transactions, services or goods it offers confer or involve rights that the transaction, service or good does not have."  (Compl., ¶68(b).)  This restatement of the statute does not satisfy Fed. R. Civ. P. 8's requirements,[39] let alone Rule 9(b)'s more stringent standards for pleading fraud.[40]

**3.    Labrador Alleges No Violation Of §1770(a)(19)**

The last CLRA prohibition that Labrador cites is §1770(a)(19), which proscribes "[i]nserting an unconscionable provision in a contract."  (Compl., ¶68(c).)  The complaint does not identify any provision of Labrador's contract, let alone allege facts showing that any portion of the contract is unconscionable.

Instead, paragraph 68(c) alleges that "while providing financial services to Plaintiff, Defendant failed to properly disclose costs, fees, and charges associated with its reverse mortgages."  As already pointed out, non-disclosure does not violate the CLRA absent an independent duty of disclosure, which Labrador does not allege.  *Daugherty*, 144 Cal.App.4th at 835.  Nor does

---

[39]*Bell Atlantic Corp.,* 127 S.Ct. at 1964-65 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

[40]*See Vess,* 317 F.3d at 1103-05; *Stickrath,* 2007 WL 2790727 at *4-5; *Kennedy,* 2007 WL 2300746 at *5-6; *Weinstein v. Saturn Corp.,* 2007 WL 1342604 at *1 (N.D. Cal. 2007); *see also Nordberg v. Trilegiant Corp.,* 445 F.Supp.2d 1082, 1097-98 (N.D.Cal.2006) (Rule 9(b) not strictly applicable to a CLRA claim, but plaintiffs "still required to provide some specificity in their pleadings").

MOTION TO DISMISS COMPLAINT
Case No.:  C 08-02270 MEJ

1   a non-disclosure render a contract or any of its provisions unconscionable.  At most, non-disclosure

2   might be an indication of procedural unconscionability, but under California law, procedural

3   unconscionability alone does not suffice; substantive unconscionability is also required before a

4   contract or its provisions may be deemed unconscionable.[41]

5        For each of the foregoing reasons, Labrador fails to allege a CLRA claim properly.

6   Accordingly, her third cause of action should be dismissed.

7   **VII.**

8   **CONCLUSION**

9        For the reasons stated above, the Court should dismiss the complaint and particularly its

10  first and third purported causes of action.

11  DATED:  May 6, 2008                        SEVERSON & WERSON
                                               A Professional Corporation
12

13

14  By: _____/s/_____
                                                   Andrea H. Henningsen

15                                             Attorneys for Defendant
                                               SEATTLE MORTGAGE COMPANY
16

17  I hereby attest that I have on file all holograph signatures for any signatures indicated by a "con-
    formed" signature (/s/) within this e-filed document.
18

19

20

21

22

23

24

25

26

27  [41]*Morris v. Redwood Empire Bancorp*, 128 Cal.App.4th 1305, 1317-24, 27 Cal.Rptr.3d 797
    (2005); *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal.App.4th 1199, 1212-13, 78 Cal.Rptr.2d 533
28  (1998).

- 25 -

MOTION TO DISMISS COMPLAINT
                                               Case No.:  C 08-02270 MEJ

1  JOHN B. SULLIVAN (State Bar No. 96742)
   jbs@severson.com
2  JAN T. CHILTON (State Bar No. 47582)
   jtc@severson.com
3  ANDREA H. HENNINGSEN (State Bar No. 167361)
   ahh@severson.com
4  SEVERSON & WERSON
   A Professional Corporation
5  One Embarcadero Center, Suite 2600
   San Francisco, CA  94111
6  Telephone:  (415) 398-3344
   Facsimile:  (415) 956-0439
7
   Attorneys for Defendant
8  SEATTLE MORTGAGE COMPANY

9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12

13  MARY B. LABRADOR, individually and on         Case No.:  CV-08-2270 MEJ
    behalf of all others similarly situated,
14                                                 **[PROPOSED] ORDER GRANTING
                        Plaintiff,                 SEATTLE MORTGAGE COMPANY'S
15                                                 MOTION TO DISMISS**
          vs.
16
    SEATTLE MORTGAGE COMPANY,
17
                        Defendant.
18

19          Seattle Mortgage Company's motion to dismiss came on for hearing before this Court,

20  _____ appearing for plaintiff and _____ appearing for defendant

21  Seattle Mortgage Company.  After consideration of the briefs and arguments of counsel, and all

22  other matters presented to the Court, IT IS HEREBY ORDERED THAT Seattle Mortgage

23  Company's motion to dismiss is GRANTED for the following reasons:

24          1.      Plaintiffs' entire complaint is dismissed on the ground that the complaint does not

25  allege facts showing a violation of 24 C.F.R. §206.31(a)(1) in that a lender's payment of a

26  "correspondent fee" to a mortgage loan broker does not create a "financial interest" between the

27  broker and lender.  The complaint alleges no other facts to make its other claims plausible.

28

2.      Plaintiffs' first cause of action is dismissed on the ground that California law creates no separate private right of action for elder abuse.

3.      Plaintiffs' third cause of action is dismissed on the grounds that:

a.      The California Consumers Legal Remedies Act (Civ. Code, §1750 et seq.) does not apply to transactions, such as those alleged in the complaint, involving only the extension of credit; and

b.      Plaintiff has not alleged facts showing a violation of the Consumers Legal Remedies Act's specific prohibitions.

IT IS SO ORDERED.

Dated: _____

_____
Hon. Maria-Elena James
Magistrate Judge, United States District Court