1   BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC
    ANDREW S. FRIEDMAN (to be admitted pro hac vice)
2   afriedman@BFFB.com
    GARRETT W. WOTKYNS (to be admitted pro hac vice)
3   gwotkyns@BFFB.com
    2901 N. Central Avenue, Suite 1000
4   Phoenix, AZ 85012
    Telephone:  (602) 274-1100
5   (602) 274-1199 (fax)

6   CHAVEZ & GERTLER LLP
    MARK A. CHAVEZ (Bar No. 90858)
7   mark@chavezgertler.com
    NANCE F. BECKER (Bar No. 99292)
8   nance@chavezgertler.com
    42 Miller Ave.
9   Mill Valley, CA  94941
    Telephone: (415) 381-5599
10  (415) 381-5572 (fax)

11  Attorneys for Plaintiff

12                   UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14

15  MARY B. LABRADOR, individually and on    )   Case No.:  CV-08-2270 SC
    behalf of all others similarly situated,  )
16                                            )   CLASS ACTION
               Plaintiff,                     )
17                                            )   PLAINTIFF'S MEMORANDUM IN
    vs.                                       )   OPPOSITION TO DEFENDANT'S
18                                            )   MOTION TO DISMISS COMPLAINT
    SEATTLE MORTGAGE COMPANY,                 )
19                                            )   Date:       Sept. 5, 2008
               Defendant                      )   Time:       10:00 A.M.
20                                            )   Courtroom:  B, 15th Fl.
                                              )   Before:     Hon. Samuel B. Conti
21                                            )
                                              )
22  _____ )

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  STATEMENT OF ISSUES TO BE DECIDED ................................................2

III. RELEVANT ALLEGATIONS ..........................................................................3

IV.  ARGUMENT .....................................................................................................4

    A.  The Complaint Alleges An Actionable Predicate Violation of Federal Reverse
        Mortgage Law. ..............................................................................................4

        1.  The Plain Meaning Of "Financial Interest:" Not Just Ownership. ...............5

        2.  The Design Of The Federal Reverse Mortgage Regulations Counsels Giving
            "Financial Interest" A Broad Meaning. ....................................................6

            a.  The Structure Of The Federal Reverse Mortgage Regulations: Built To
                Protect. ...............................................................................................6

            b.  The "Regulatory History" Of Section 206.31's Supplies No Basis For
                Second-Guessing The Plain Meaning Of "Financial Interest." ...............8

            c.  SMC's RESPA Red Herring. ..................................................................9

        3.  Definitions Of "Financial Interest" In Other Laws..................................10

            a.  Federal Conflict-Of-Interest Provisions.................................................11

            b.  Other HUD Regulations.........................................................................11

    B.  The First Cause Of Action Of The Complaint States A Valid Claim For Elder
        Financial Abuse. .........................................................................................13

    C.  Plaintiff's Third Cause Of Action States A Valid Claim For Violation Of The
        Consumer Legal Remedies Act. ................................................................15

    D.  Plaintiff Has Also Pled Valid Causes Of Action For Unfair Competition,
        Constructive Trust, And Declaratory Relief. .............................................20

    E.  In The Event The Court Finds Merit In Any Of SMC's Arguments, It Should
        Grant Plaintiff Leave To Amend. ...............................................................20

V.   CONCLUSION................................................................................................21

i

## TABLE OF AUTHORITIES

**CASES**

*Abels v. JBC Legal Group, Inc.,*
    434 F.Supp.2d 763 (N.D.Cal. 2006) .................................................................... 8

*Amoco Production Co. v. Village of Gambell, AK,*
    480 U.S. 531 (1987)................................................................................. 6, 12

*ARA Living Centers-Pacific Inc. v. Superior Court,*
    18 Cal.App.4th 1556 (1993) ............................................................................ 14

*Argabright v. United States,*
    35 F.3d 472 (9th Cir. 1994) ......................................................................... 2, 8

*Ball v. FleetBoston Financial Corp.,*
    164 Cal.App.4th 794 (2008) ........................................................................... 16

*Barris v. County of Los Angeles,*
    20 Cal.4th 101 (1999) .................................................................................. 14

*Benun v. Superior Court,*
    123 Cal.App.4th 113 (2004) ........................................................................... 14

*Berkley v. Dowds,*
    152 Cal.App.4th 518 (2007) ........................................................................... 14

*Berry v. American Express Pub., Inc.,*
    147 Cal.App.4th 224 (2007) ........................................................................... 16

*Boulware v. Crossland Mortgage Corp.,*
    291 F.3d 261 (4th Cir. 2002) ........................................................................... 7

*Breier v. Northern California Bowling Proprietors' Ass'n,*
    316 F.2d 787 (9th Cir. 1963) .......................................................................... 21

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984)................................................................................... 6

*Corbett v. Hayward Dodge, Inc.,*
    119 Cal.App.4th 915 (2004) ........................................................................... 19

*Covenant Care, Inc. v. Superior Court,*
    32 Cal.4th 771 (2004) .................................................................................. 14

*Cullen v. Investment Strategies,*
    139 Ore. App. 119 (Or. Ct. App. 1996) ............................................................... 17

**CASES (CONT'D.)**

*Forman v. Davis,*
 371 U.S. 178 (1962)................................................................... 20

*Gaeke v. Primus Auto. Fin. Serv.,*
 2002 U.S. Dist. LEXIS 26283 (W.D. Tex. No. SA 00-CV-1525 WWJ)......................... 17

*Haug v. Bank of America, N.A.,*
 317 F.3d 832 (8th Cir. 2003) ................................................................ 7

*Hernandez v. Hilltop Financial Mortgage, Inc.,*
 2007 U.S. Dist. LEXIS 80867 (N.D.Cal. No. C06-7401 SI) ........................................... 19

*In re Ocwen Loan Servicing, LLC Mortgage Servicing Litigation,*
 491 F.3d 638 (7th Cir. 2007) ................................................................. 12

*Intrieri v. Superior Court,*
 117 Cal.App.4th 72 (2004) ............................................................ 13, 14

*Kagan v. Gibraltar Sav. & Loan Ass'n,*
 35 Cal.3d 582 (1984) .................................................................... 18

*Knox v. Argent Mortgage Company LLC,*
 2005 WL 1910927 (N.D.Cal. No. C 05 00240 SC, Aug. 10, 2005) ................................ 19

*Kruse v. Wells Fargo Home Mortgage, Inc.,*
 383 F.3d 49 (2nd Cir. 2004)................................................................. 7

*Lee v. City of Los Angeles,*
 250 F.3d 668 (9th Cir. 2001) ............................................................... 4

*Maginn v. Norwest Mortgage,*
 919 S.W.2d 164 (Tex. Ct. App. 1996) ...................................................... 17

*McKell v. Washington Mutual, Inc.,*
 142 Cal.App.4th 1457 (2006) ............................................................. 19

*Moradi-Shalal v. Fireman's Fund Ins. Co.,*
 44 Cal.3d 287 (1988) .................................................................... 13

*Munoz v. Financial Freedom Senior Funding Corp.,*
 C.D. Cal. SA CV 07-710 CJC.......................................................... 17, 18

*Negrete v. Fid. & Guar. Life Ins. Co.,*
 444 F.Supp.2d 998 (C.D.Cal. 2006) ..................................................... 13, 14

iii

1

**CASES (CONT'D.)**

2

*Perez v. Citicorp Mortg.,*
    301 Ill. App. 3d 413 (Ill. App. Ct. 1998) ........................................................ 17

3

*Perlin v. Fountain View Mgmt., Inc.,*
    163 Cal.App.4th 657 (2008) ........................................................................ 14

4

5

*Provencher v. T&M Mortg. Solutions, Inc.,*
    2008 U.S. Dist. LEXIS 47616 (D. Me. No. 08-31-P-H)................................ 17

6

7

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)........................................................................................ 3

8

9

*T.C. Jefferson v. Chase Home Finance LLC,*
    No. 06-6510, 2007 U.S. Dist. LEXIS 36298 (N.D.Cal. May 3, 2007)................ 18, 19, 20

10

*Thompson v. Davis,*
    295 F.3d 890 (9th Cir. 2002) ...................................................................... 2-3

11

12

*United States v. Locke,*
    471 U.S. 84 (1985)........................................................................................ 6

13

14

*Wolk v. Green,*
    516 F.Supp.2d 1121 (N.D.Cal. 2007) .......................................................... 15

15

16

*Zimmer v. Nawabi,*
    2008 WL 2073596 (E.D. Cal. No. CIV. 07-16 WBS KJM, May 14, 2008).................... 13

17

18

**FEDERAL STATUTES & REGULATIONS**

19

24 C.F.R.
    §85.36(b)(3) ................................................................................................ 12

20

    §206.21........................................................................................................ 7
    §206.23........................................................................................................ 7

21

    §206.31.................................................................................................. *passim*
    §206.31(a)(1) ........................................................................................ *passim*

22

    §206.105(a)-(b) ............................................................................................ 7

23

    §570.611(b) ................................................................................................ 11

24

5 C.F.R.
    §2635.403(c)(1) .......................................................................................... 11

25

26

U.S.C.
    §2607 *et seq.* .............................................................................................. 2

27

28

**OTHER AUTHORITIES**

3 Moore, Federal Practice,
§ 15.10 (2d ed. 1948) ............................................................................................................ 21

Black's Law Dictionary
(8th ed. 2004) ...................................................................................................................... 5

**CALIFORNIA STATUTES**

Cal. Ins. Code
§790.03 .............................................................................................................................. 13

Cal. Civ. Code
§1750 *et seq.* .................................................................................................................... 15
§1760 .......................................................................................................................... 15, 18
§1761(b) ............................................................................................................................ 18
§1761(f) ............................................................................................................................... 3
§1770(a) ...................................................................................................................... 15, 17

Cal. Welf. & Inst. Code
§15610.27 ............................................................................................................................ 3

## I.    **INTRODUCTION**

This lawsuit is brought to enforce fundamental protections of federal and state law that were enacted to protect senior homeowners like Plaintiff Mary Labrador when they enter into complex reverse mortgage transactions.  In order to prevent mortgage brokers from steering homeowners into unsuitable transactions motivated primarily by the maximization of fees, federal regulations prohibit lenders from charging reverse mortgage "origination fees" and sharing those fees with mortgage brokers whenever "there is [a] financial interest between the mortgage broker and the [mortgage lender]."  24 C.F.R. § 206.31(a)(1).  Plaintiff alleges that Seattle Mortgage Company ("SMC") has broken that federal law, along with California laws prohibiting such unlawful conduct, by: (1) paying back-channel fees to mortgage brokers to induce them to steer loans to SMC, and thus creating a community of financial interest between SMC and those selected brokers, and (2) then giving those brokers the reverse mortgage origination fees that SMC has charged senior citizens such as Plaintiff.

SMC asserts that even if Plaintiff's allegations are assumed to be true (as they must be for purposes of adjudicating this motion), SMC still cannot be held liable.  Its argument is based on an unsupported, highly restrictive interpretation of "financial interest" as limited to lender/broker relationships in which the lender owns or has a "beneficial interest" in the broker.  However, neither the statutory language, the legislative purpose, nor relevant decisional law support that constrained interpretation.

First, the very sources cited by SMC in support of this view demonstrate that the concept of "financial interest" encompasses the bank-broker relationship that Plaintiff challenges in her Complaint.  Second, SMC's request for dismissal on the grounds that federal reverse mortgage regulations permit limited direct payments by banks to brokers to compensate brokers for releasing loan servicing rights is premature, as it would require the Court to resolve in SMC's favor a disputed question of material fact – namely, the true nature of SMC's back-channel payments to its reverse mortgage broker force.  SMC asserts that it pays "correspondent fees" to reverse mortgage brokers to compensate them for releasing servicing rights; Plaintiff alleges and intends to prove that SMC's "correspondent fees" are unrelated to the value of any servicing

1

1  rights that may be transferred, and are instead paid to incentivize its brokers to steer reverse

2  mortgage business to SMC. Adjudication of a disputed fact issue like this one incident to a Rule

3  12(b)(6) motion is inappropriate, and SMC's motion should be denied for that reason.

4      SMC's assertion that it cannot be held liable for its reverse loan origination practices

5  because those practices comply with the federal Real Estate Settlement Procedures Act, 12

6  U.S.C. § 2607 *et seq.* ("RESPA"), is equally specious. The Department of Housing and Urban

7  Development ("HUD") regulations that form the primary basis for Plaintiff's suit were enacted

8  to provide senior citizens like Plaintiff with protections above and beyond those provided by

9  RESPA. Whether or not SMC complied with RESPA is irrelevant to the resolution of Plaintiff's

10  claims.

11      SMC's state law arguments regarding Plaintiffs' Elder Abuse and Consumer Legal

12  Remedies Act claims are unfounded as well. There is no legal or equitable basis for exempting

13  those in the business of selling financial products and services to consumers from the protections

14  of California law, and the applicable case law does not so hold. For these reasons and others

15  discussed below, SMC's motion should be denied in its entirety. In the alternative, Plaintiff

16  requests leave to amend.

17  **II.    STATEMENT OF ISSUES TO BE DECIDED**

18      Where a reverse mortgage lender directly pays its loan brokers to reward them for

19  delivering loans to the lender and the lender, in turn, profits from that relationship, is there a

20  "financial interest" between those parties?

21      Does California's Elder Abuse Act create an independent private right of action?

22      Does the California Consumer Legal Remedies Act apply to the brokered sale of reverse

23  mortgage products and services alleged here?

24      In evaluating these issues on this motion to dismiss, the Court must accept as true all of

25  the material allegations in the Complaint and draw all reasonable inferences from those

26  allegations in Plaintiff's favor. *See Argabright v. United States*, 35 F.3d 472, 474 (9th Cir.

27  1994). "A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can

28  prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Thompson*

1  *v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).  In ruling on a motion to dismiss, the Court's "task

2  is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but

3  whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416

4  U.S. 232, 236 (1974).

5  ## III.    RELEVANT ALLEGATIONS

6       Plaintiff Mary Labrador is an 82-year-old woman who lives in San Francisco. (Class

7  Action Complaint ("Compl.") ¶ 7.)  Plaintiff is an "elder" within the meaning of California law.

8  (*Id.; see* Cal. Welf. & Inst. Code § 15610.27, Civil Code § 1761(f).))  SMC is a reverse mortgage

9  lender whose loan to Plaintiff is subject to cost and fee limitations contained in the federal

10  regulations that Plaintiff has invoked here. (Compl. ¶¶ 8, 26.)

11       In August 2006, Plaintiff entered into a reverse mortgage loan that was funded by SMC

12  and brokered by Home Center Mortgage ("Home Center"). (*Id.* ¶¶ 15, 23.)  According to

13  Plaintiff's HUD-I Settlement Statement, she paid at closing a $7,255.80 "origination fee" in

14  connection with her reverse mortgage loan. (*Id.* ¶ 24.)  SMC conveyed that fee in its entirety to

15  her mortgage broker, Home Center. (*Id.*)  According to Plaintiff's HUD-I Settlement Statement,

16  SMC also paid a "correspondent fee" to Home Center in the amount of $490 in connection with

17  Plaintiff's loan. (*Id.* ¶ 25.)

18       SMC violated 24 C.F.R. § 206.31(a)(1) by charging Plaintiff an origination fee on her

19  reverse mortgage loan and passing that fee on to her broker because there was a "financial

20  interest" between her broker and SMC. (Compl. ¶¶ 27, 28.)  SMC's payment of direct

21  "correspondent fees" to mortgage brokers like Plaintiff's creates a community of financial

22  interest between SMC and its broker force from which both parties benefit. (*Id.* ¶¶ 18, 19.)

23  SMC directly paid Plaintiff's broker a "correspondent fee" in connection with her loan in order

24  to reward her broker for delivering Plaintiff's loan to SMC, and to encourage Plaintiff's broker to

25  steer more such loans to SMC in the future. (*Id.* ¶¶ 18, 19, 31-32.)  SMC makes these direct

26  payments to brokers because it benefits from doing so. (*Id.*)  These payments help SMC to

27  obtain profitable and well-performing mortgage loans and to improve its position in the reverse

28  mortgage market segment. (*Id.* ¶ 19, 32.)

3

1    Plaintiff and SMC dispute the factual nature of these payments. A lawyer writing to

2  Plaintiff on behalf of Bank of America and its "predecessor in interest, Seattle Mortgage

3  Company," stated that the "correspondent fee" at issue here was: (a) a "back-funded payment to

4  [a] mortgage broker;" and (b) a fee that "the lender paid the originating broker for servicing

5  rights to the loan." (Compl. ¶ 29.) Plaintiff alleges that her loan was originated (initially funded)

6  by SMC (*Id.* ¶ 23) and that Home Center owned no servicing rights in her reverse mortgage loan

7  that it could sell to SMC or to any other party; that SMC pays "correspondent fees" to loan

8  brokers like Home Center under the false pretext of purchasing loan servicing rights from

9  brokers; and that the real purpose and effect of these payments is to reward brokers for steering

10  loans to SMC and to induce brokers to steer additional reverse loans to SMC in the future. (*Id.*

11  ¶¶ 18, 29, 31-32.) SMC's factual challenges to those allegations have no bearing on the legal

12  sufficiency of the allegations under Rule 12 (b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668,

13  688 (9th Cir. 2001).

14    Plaintiff was harmed by entering into her reverse mortgage loan with SMC. The

15  $7,255.80 origination fee that SMC charged Plaintiff was in whole or in part a mortgage broker

16  fee that Plaintiff should not have been charged given the community of financial interest existing

17  between SMC and Home Center. (*Id.* ¶ 34.)

18  **IV.    ARGUMENT**

19      **A.    The Complaint Alleges An Actionable Predicate Violation of Federal Reverse
20            Mortgage Law.**

21    SMC contends that Plaintiff's complaint should be dismissed because she has failed to

22  allege a cognizable "financial interest" between SMC and her mortgage broker. SMC asserts

23  that "'[f]inancial interest' means an ownership or other beneficial interest in a business, not a

24  payment received from a business." (Def. Mem. at 5.) According to the very sources cited by

25  Defendant, however, the plain meaning of "financial interest" encompasses more than just fee

26  simple or beneficial ownership. Further, the reverse mortgage regulations that use this term

27  clearly aim to protect senior homeowners involved with these complex financial products from

28  fee-related abuse by reverse mortgage brokers and lenders. Giving "financial interest" a

4

1  meaning more narrow than its plain meaning would defeat that legislative purpose.

2       **1.    The plain meaning of "financial interest:" not just ownership.**

3       The one point on which the parties agree is that neither 24 C.F.R. § 206.31 nor the

4  reverse mortgage regulations of which it is a part define the phrase "financial interest." (Def.

5  Mem. at 6.) SMC correctly observes that courts interpret phrases in laws that are not specifically

6  defined by looking first to the plain meaning of such phrases. (*Id.*) According to SMC, that

7  meaning should be derived by consulting the dictionary for evidence of what the plain meaning

8  of "financial interest" is. (*Id.*) SMC sensibly chooses the eighth (2004) edition of Black's Law

9  Dictionary for that purpose, which according to SMC contains the "well-known common

10  meaning" of the phrase "financial interest." (Def. Mem. at 6.) However, SMC does not actually

11  share with the Court the full definition of "financial interest" that appears in that volume, which

12  is: "***An interest involving money or its equivalent***; esp., an interest in the nature of an

13  investment." Black's Law Dictionary (8th ed. 2004).

14       Plaintiff's Complaint clearly alleges that an interest involving money or its equivalent

15  existed between SMC and her mortgage broker, Home Center, at the time Plaintiff entered into

16  her reverse mortgage loan. Plaintiff alleges that SMC paid a "correspondent fee" – money – to

17  Home Center in connection with Plaintiff's loan closing; that this payment reflects a community

18  of financial interest between SMC and Home Center; and that both SMC and Home Center

19  benefited financially from this arrangement. (Compl. ¶¶ 18, 19, 25.) Plaintiff alleges that SMC

20  directly paid Home Center money in connection with her loan in order to reward Home Center

21  for delivering Plaintiff's loan to SMC, and to encourage Home Center to steer more such loans to

22  SMC in the future. (*Id.* ¶¶ 18, 19, 31-32.) And Plaintiff alleges that SMC did this in order to

23  make more money (namely, by obtaining profitable and well-performing mortgage loans and

24  improving its position in the reverse mortgage market segment). (*Id.* ¶¶ 19, 32.)

25       Worth noting, then, is that Plaintiff's Complaint alleges that SMC made "correspondent

26  fee" payments to brokers as a business investment. *See* Black's Law Dictionary (8th ed. 2004)

27  (defining "investment" as "[a]n expenditure to acquire property or assets to produce revenue").

28  Plaintiff alleges that SMC expended money (by paying out "correspondent fees") in order to

1    acquire more revenue-producing assets (highly profitable reverse mortgage loans).  (Compl. ¶¶

2    19, 32.)

3           This, as the Supreme Court puts it, should be "the end of the matter." *Amoco Production*

4    *Co. v. Village of Gambell, AK*, 480 U.S. 531, 552 (1987) ("When statutory language is plain, and

5    nothing in the Act's structure or relationship to other statutes calls into question this plain

6    meaning, that is ordinarily 'the end of the matter.'" (quoting *Chevron U.S.A. Inc. v. Natural*

7    *Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984))); *see also United States v. Locke*,

8    471 U.S. 84, 95-96 (1985) ("Going behind the plain language of a statute in search of a possibly

9    contrary congressional intent is a step to be taken cautiously even under the best of

10   circumstances") (internal quotations omitted).).  So it should be here.

     **2.    The Design Of The Federal Reverse Mortgage Regulations Counsels**
     **Giving "Financial Interest" A Broad Meaning.**

13          The structure and purpose of the federal reverse mortgage regulations indicate that the

14   phrase "financial interest" ought to be construed at least as broadly as its plain meaning permits.

15   These regulations exist to protect vulnerable senior homeowners from self-dealing by fee-hungry

16   reverse mortgage brokers and lenders.  Adopting the narrow definition of "financial interest"

17   urged by SMC would frustrate that protective purpose for no good reason.

              a.    The Structure Of The Federal Reverse Mortgage Regulations: Built
                    To Protect.

20          For all SMC's Talmudic exegesis of the history of 24 C.F.R § 206.31(a)(1), Defendant

21   never addresses the basic structure and purpose of the regulations of which Section 206.31 is a

22   part.  Section 206.31 does not exist in a vacuum.  It is part of an extensive body of prophylactic

23   federal reverse mortgage regulations that protect borrowers by limiting the kinds and amounts of

24   fees reverse mortgage lenders and brokers can collect at reverse mortgage closings and the

25   circumstances under which lenders and brokers may collect them.  As Plaintiff alleges in her

26   Complaint, these regulations exist to prevent industry abuses of reverse mortgage borrowers,

27   who are senior citizens especially vulnerable to financial fraud.  (Compl. ¶ 17.)

28

                                        6

1    The HUD regulations are impressively specific and uniformly protective of senior

2 citizens like Plaintiff who participate in the federally guaranteed reverse mortgage program.

3 Notably, they go well beyond RESPA in protecting reverse mortgage borrowers from fee-related

4 abuses by banks and brokers at their loan closings.  Among other things, these regulations:

5    • empower the HUD Secretary to limit the amount of origination fees that reverse

6 lenders can charge borrowers;

7    • permit lenders to convey to mortgage brokers origination fees charged to

8 borrowers at closing only when there is no financial interest between the lender and broker and

9 when "the mortgage broker is engaged independently by the homeowner;"

10    • limit the amount that borrowers may be charged at closing for recording fees,

11 recording taxes, other recording charges, credit reports, property surveys, title examinations, title

12 insurance policies, and appraisal fees to "[r]easonable and customary amounts," and prevent

13 banks from charging borrowers more for these items than the banks themselves actually pay at

14 closing;

15    • limit the amount of "shared appreciation" levies reverse lenders can take from

16 borrowers whose homes appreciate in value during the life of their loan;

17    • control the type and size of interest rate increases reverse mortgage lenders can

18 impose on borrowers with adjustable-rate reverse mortgage loans; and

19    • limit the amount that reverse lenders can charge borrowers for mortgage

20 insurance.

21 24 C.F.R. §§ 206.21, 206.23, 206.31, 206.105(a)-(b); *compare Kruse v. Wells Fargo Home*

22 *Mortgage, Inc.*, 383 F.3d 49, 56 (2nd Cir. 2004) (RESPA does not prohibit settlement service

23 provider from charging "unreasonably" high prices for settlement services such as document

24 preparation, underwriting, surveys, and the like); *Haug v. Bank of America, N.A.*, 317 F.3d 832,

25 836 (8th Cir. 2003) (RESPA does not prevent banks from charging borrowers more for

26 settlement services than the bank paid for them); *Boulware v. Crossland Mortgage Corp.*, 291

27 F.3d 261, 266 (4th Cir. 2002) (same).

28

1    To say the least, nothing in this regulatory scheme suggests an intent that terms be

2 defined other than with reference to their plain meaning or in narrow ways that could disfavor

3 the rights of senior reverse mortgage borrowers.

4                    b.    The "Regulatory History" Of Section 206.31's Supplies No Basis
                          For Second-Guessing The Plain Meaning Of "Financial Interest."
5

6    Nonetheless, SMC argues that the "regulatory history" of 24 C.F.R. § 206.31 mandates a

7 strikingly narrow construction of "financial interest" and the ensuing dismissal of Plaintiff's

8 Complaint. According to SMC, that history "shows conclusively that § 206.31's current wording

9 was not intended to forbid payments to brokers for loan servicing rights." (Def. Mem. at 7.)

10    To begin with, SMC's argument on this point is premature and procedurally improper.

11 SMC implicitly asks the Court to resolve a core factual dispute concerning the nature of its

12 broker payments by determining that SMC's "correspondent fee" payment to Home Center was a

13 payment for "loan servicing rights." Plaintiff alleges that SMC's "correspondent fees"

14 (including the correspondent fee paid to Home Center) are not bona fide payments made to

15 compensate brokers for loan servicing rights, but instead are payments made under the false

16 pretense of buying servicing rights to encourage brokers to steer profitable and well-performing

17 reverse mortgage loans to SMC, and to help SMC improve its position in the reverse mortgage

18 market segment. (Compl. ¶¶ 18-19, 31-32.) Adjudication of a disputed fact issue like this one

19 incident to a Rule 12(b)(6) motion is inappropriate, since in ruling on such a motion the Court

20 must accept the truth of Plaintiff's well-pleaded factual allegations. *See, e.g., Abels v. JBC Legal*

21 *Group, Inc.*, 434 F.Supp.2d 763, 766 (N.D.Cal. 2006) (denying motion to dismiss under Rule

22 12(b)(6) and noting that such motions are "inappropriate" where application of statutes in

23 question would "involve  issues of disputed fact"); *Argabright v. United States, supra,* 35 F.3d at

24 474 (for purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the

25 Court must construe the complaint in the light most favorable to the plaintiff). SMC's argument

26 on this point should be rejected for that reason alone.

27    Putting aside that procedural defect, SMC's argument concerning the purported

28 "regulatory history" of Section 206.31 fails on its own terms. SMC's discussion on this point

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS, CASE NO. C08-2270-SC

1   chiefly concerns whether or not HUD believes lender payments to brokers for loan servicing

2   rights ought to count toward the two percent (2%) cap on reverse mortgage origination fees that

3   HUD established in Mortgagee Letter 00-10. (*See* Def. Mem. at 8-9, discussing Mortgagee

4   Letter 00-10; HUD Mortgagee Letter 00-10, p.1 (publicly available at www.hudclips.org).)

5   SMC rightly notes that HUD believes they do not. (Def. Mem. at 9-10.) However, whether or

6   not SMC's "correspondent fee" payments to its brokers count toward the two percent cap is a

7   fundamentally different question than whether those payments may in some circumstances

8   reflect a financial interest between a lender and brokers who receive such payments – the only

9   question at issue here.

10      The closest SMC comes to citing any authority on that point is a reference in a footnote

11   to a HUD handbook created in 1994 concerning the HECM reverse mortgage program. (Def.

12   Mem. at 11 n.15.) SMC cites portions of that handbook concerning document preparation fees,

13   attorney's fees and settlement fees, and concludes from those excerpts that "independent

14   ownership is the purpose of § 206.31's ban on 'financial interests' between brokers and lenders."

15   (*Id.*) Aside from the *non sequitur* quality of that reasoning, SMC ignores the fact that the HUD

16   handbook also features a section concerning § 206.31(a)(1)'s "financial interest" language – a

17   perfect opportunity for HUD to provide, if it were so inclined, an "independent ownership" gloss

18   on that section's meaning like the ones HUD provided concerning document preparation fees,

19   attorney's fees and settlement fees. Yet that section says nothing about "financial interest" being

20   limited to situations where lenders own brokers. *See*

21   http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4235.1/index.cfm (last viewed

22   August 10, 2008).

23                          c.      SMC's RESPA Red Herring.

24      SMC's misdirected argument concerning the purpose and structure of the federal reverse

25   mortgage regulations finds its nadir in SMC's invocation of RESPA. (Def. Mem. at 11.)

26   Although Plaintiff **makes no claim for relief under RESPA** and in fact mentions the statute only

27   once and in passing in her Complaint, SMC asserts that "Labrador claims that the mortgage

28   broker could never have any servicing rights and so any payment to a mortgage broker nominally

9

1  for servicing rights must, in fact, be a disguised 'referral fee' prohibited by the Real Estate

2  Settlement Procedures Act[.]" (*Id.*) SMC then proceeds dramatically to demolish Plaintiff's

3  imagined RESPA claim concerning SMC's improper payment of referral fees.

4         SMC's legerdemain is of no moment.  It is obvious that a bank may comply with RESPA

5  yet violate other laws.  As noted above, the reverse mortgage regulations of which Section

6  206.31 is a part go much further than RESPA in regulating lender-broker relationships and

7  mortgage closing fee assessments generally.  For that reason, a reverse mortgage lender like

8  SMC may engage in practices regulated by both RESPA and the federal reverse mortgage

9  regulations that comply with the former and violate the latter.  For example, if a reverse

10  mortgage lender paid $100 in recording fees to state and local authorities in connection with an

11  HECM reverse mortgage loan closing and charged the borrower a $150 "recording fee" to defray

12  those costs, that recording fee assessment likely would comply with RESPA yet would violate 24

13  C.F.R. § 206.31(a)(2)(i), which allows a reverse lender to collect "not more than the amount

14  actually paid by the mortgagee [lender]" for "recording fees and recording taxes[.]"  So the fact

15  that SMC may establish that Plaintiff's factual allegations do not support a claim for relief under

16  RESPA is irrelevant to determining whether her allegations state a claim for relief under

17  California laws incorporating the federal reverse mortgage regulations.

18         In short, the plain meaning of "financial interest" clearly encompasses the sort of broker-

19  bank relationship that Plaintiff alleges in her Complaint.  The design of the federal reverse

20  mortgage regulations indicates that this phrase and others like it are to be construed generously

21  in order to promote the regulations' aim of protecting vulnerable senior homeowners from self-

22  dealing by reverse mortgage brokers and lenders.

23                    **3.    Definitions Of "Financial Interest" In Other Laws.**

24         Finally, SMC argues that "financial interest" in 24 C.F.R. § 206.31(a)(1) ought to be

25  construed to mean only actual or beneficial ownership because other federal laws define the

26  phrase to mean only that.  (Def. Mem. at 6.)  To the contrary, the other federal laws that SMC

27  discusses do *not* define "financial interest" to include only ownership interests.

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS, CASE NO. C08-2270-SC

a.    Federal Conflict-Of-Interest Provisions.

Consider, for instance, the first statutory definition of "financial interest" that SMC discusses in its moving papers, which appears in 28 U.S.C. § 455(d)(4), the statute governing disqualification of federal judges. (*Id.*) That statute defines "financial interest" to mean not just "ownership of a legal or equitable interest, however small," but also "a relationship as a director, adviser, or other active participant in the affairs of a party." That definition plainly encompasses interested relationships between two parties beyond one simply owning a share in the other.

The same is true of the next federal law definition of "financial interest" SMC discusses, the one that appears in 5 C.F.R. § 2635.403(c)(1), the conflict-of-interest rules for federal employees. That definition includes not just "any current or contingent ownership, equity, or security interest in real or personal property or a business," but also, "an indebtedness or compensated employment relationship." As with the statute governing disqualification of federal judges, this law's definition of "financial interest" encompasses more than a simple ownership interest in another relevant party.

b.    Other HUD Regulations.

SMC's next attempt to cabin the meaning of "financial interest" runs even farther afield. SMC invokes two of the HUD regulations banning conflicts of interest by recipients of HUD largesse. (Def. Memo. at 6.) The first of those regulations, which concerns HUD Community Development Block Grants ("CDBG"), states that no person involved in CDBG activities assisted by HUD "may obtain a financial interest or benefit from a CDBG-assisted activity, or have a financial interest in any contract, subcontract, or agreement with respect to a CDBG-assisted activity[.]" 24 C.F.R. 570.611(b). This regulation, like the one that is the predicate for Plaintiff's suit, does not define "financial interest" or the phrase "financial interest or benefit."

Nonetheless, SMC asserts that because HUD's CDBG regulation in one place uses the phrase "financial interest or benefit," the meaning of "financial interest" in the federal reverse mortgage regulations must extend only to ownership activities and nothing else. This is another *non sequitur*. Once again, moreover, SMC has adduced legal authority that tends to prove the opposite of the proposition for which it is offered. In addition to barring participants in CDBG

11

1   activities from "obtain[ing] a financial interest or benefit from a CDBG-assisted activity," the

2   regulation also prohibits them from "hav[ing] a financial interest in any contract, subcontract, or

3   agreement with respect to a CDBG-assisted activity." (*Id.* [emphasis added].)  Given that one

4   cannot "own" a contract, a subcontract or an agreement, HUD's use of the phrase "financial

5   interest" in this context disproves SMC's theory that HUD categorically refers only to ownership

6   when it uses the phrase "financial interest" in its regulations.

7        SMC's discussion of HUD's Uniform Administrative Requirements for Grants to state

8   and local governments is likewise inapposite.  These regulations bar employees and officers of

9   state and local government grantees from doling out federal grant monies "if a conflict of

10  interest, real or apparent, would be involved." (*Id.*at 7 (citing 24 C.F.R. § 85.36(b)(3)).)  The

11  regulations go on to state that a conflict of interest exists where an organization that employs

12  state or local government officials "has a financial or other interest in the firm selected for

13  award." (*Id.*)  SMC asserts that this regulation illustrates that "HUD knows how to write

14  regulations broadly banning not just conflicting ownership interests, but also the receipt of any

15  type of monetary or other benefit." (*Id.*)

16       To this, Judge Posner might respond: "Well, of course." *In re Ocwen Loan Servicing,*

17  *LLC Mortgage Servicing Litigation*, 491 F.3d 638, 643 (7th Cir. 2007).  HUD also knows how to

18  define terms in regulations where it wants terms to be defined other than with reference to their

19  plain meaning, but it did not do so in the regulation at issue here.  In any event, that HUD chose

20  to define "conflict of interest" in its grant-giving regulations to encompass "financial or other

21  interests" does not say anything about what the meaning of "financial interest" is in HUD's

22  reverse mortgage regulations or even in its grant-giving regulations.

23       In sum, nothing in the aforementioned federal materials "calls into question" the plain

24  meaning of "financial interest" discussed above.  *See Amoco Production Co.*, 480 U.S. at 552

25  ("When statutory language is plain, and nothing in the Act's structure or relationship to other

26  statutes calls into question this plain meaning, that is ordinarily 'the end of the matter'") (citation

27  omitted).  As it concerns the meaning of "financial interest," therefore, SMC's motion should be

28  denied.

**B.    The First Cause Of Action Of The Complaint States A Valid Claim For Elder Financial Abuse.**

SMC's violation of the federal regulations limiting the fees that may be charged in connection with reverse mortgage transactions is particularly egregious because it is directed at senior citizens, one of the most financially-vulnerable segments of society.  Reverse mortgages are only available to individuals aged 62 and over, and such transactions are thus rife with the potential for elder abuse.  The rights and remedies provided by the Elder Abuse Act, Cal. Welf & Inst. Code § 15600 *et seq.*, are ideally suited for the protection of senior citizens injured by unscrupulous practices in connection with the sale of mortgages and other financial transactions. *See, e.g., Zimmer v. Nawabi*, 2008 WL 2073596, at *7 (E.D. Cal. No. CIV. 07-16 WBS KJM, May 14, 2008) (granting summary judgment to plaintiff in elder abuse action against mortgage broker arising from the refinancing of her home, and finding that broker was "liable under subsection 15610.30(a)(1).")

SMC nevertheless moves to dismiss Plaintiff's First Cause of Action on the alleged ground that the Elder Abuse Act does not create an independent cause of action.  SMC's argument is again contrary to the language of the statute, the legislative purpose, and the common law.

"The elements of a cause of action under the Elder Abuse Act are statutory, and reflect the Legislature's intent to provide enhanced remedies to encourage private, civil enforcement of laws against elder abuse and neglect." *Intrieri v. Superior Court*, 117 Cal.App.4th 72, 82 (2004); *see also Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F.Supp.2d 998, 1001 (C.D.Cal. 2006).  It is anomalous for SMC to suggest that a law designed to encourage private litigation as a means to prevent elder abuse, should be construed so as not to provide a mechanism for such enforcement.[1]  Not surprisingly, numerous cases have upheld the right of plaintiffs to pursue

---

[1]  *Compare* Cal. Ins. Code § 790.03, which defines unfair insurance practices but says nothing about prospective remedies, and which has been construed as not creating a private right of action.  (*See* Def. Memo. at 17:1-2 and n. 24; *Moradi-Shalal v. Fireman's Fund Ins. Co.*, 44 Cal.3d 287 (1988).)

1   separate causes of action to recover damages for the physical and financial abuse of the elderly.

2   *See, e.g., Intrieri, supra* (finding triable issues and reversing summary judgment on each of

3   plaintiff's causes of action for elder abuse, negligent misrepresentation, and fraud); *Benun v.*

4   *Superior Court,* 123 Cal.App.4th 113 (2004) (recognizing "causes of action against health care

5   providers for 'custodial elder abuse' under the Elder Abuse Act"); *Negrete, supra* (denying

6   motion to dismiss putative class action for wrongful taking and churning of investments, and

7   finding that plaintiff had adequately stated a claim under § 15610.30).

8       Most recently, in *Perlin v. Fountain View Mgmt., Inc.,* 163 Cal.App.4th 657 (2008), the

9   Court of Appeal surveyed the existing case law and concluded that "the [Elder Abuse] Act

10  creates an independent cause of action." 163 Cal.App.4th at 666. In so holding, the Court

11  criticized statements to the contrary in *Berkley v. Dowds,* 152 Cal.App.4th 518, 529 (2007) – the

12  principal authority cited by SMC – finding that *Berkley* "is inconsistent with the California

13  Supreme Court's dicta" and was wrongly decided. *Id.* at 665.[2]

14      *Berkley* is also distinguishable on its facts. There, the Court of Appeal determined that

15  the plaintiff had suffered no harmful conduct or injury sufficient to support a claim for willful

16  misconduct or negligence, and that there were no additional facts that might support a separate

17  claim for elder abuse. For that reason, the Court affirmed the trial court's decision to dismiss the

18  case. In *ARA Living Centers-Pacific Inc. v. Superior Court,* 18 Cal.App.4th 1556, 1563-64

19  (1993), the Court was primarily concerned with the retroactivity of the 1991 amendments to the

20  Elder Abuse Act (dealing with the recovery of attorneys' fees and damages for pain and

21  suffering). The Court reiterated that the statute was enacted "to 'enable interested persons to

22  engage attorneys to take up the cause of abused elderly persons. . . . '" *Id.* at 1560. It found that

23  the amendment allowing recovery of pain and suffering damages "did not add a cause of action,"

24

25  [2] The *Perlin* Court's analysis is based on *Barris v. County of Los Angeles,* 20 Cal.4th 101 (1999), which
26  describes a prior decision as recognizing a cause of action for "reckless neglect" under the Elder Abuse
    Act, and *Covenant Care, Inc. v. Superior Court,* 32 Cal.4th 771 (2004), which discusses the procedural
27  requirements for obtaining punitive damages "in actions alleging elder abuse." The decision also relies
    upon *Intrieri, Negrete,* and other cases cited herein.

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS, CASE NO. C08-2270-SC

1   but it did not address the financial abuse provisions of the law or otherwise comment on whether

2   or not a plaintiff can state an independent cause of action for elder abuse. *Id.* at 1563. In the

3   only other case cited on this point by SMC, *Wolk v. Green*, 516 F.Supp.2d 1121 (N.D.Cal. 2007),

4   the District Court assumed that a cause of action for elder abuse is viable, but found that the

5   plaintiff had failed to state such a claim. *Id.* at 1133.

6        In any case, whether or not Ms. Labrador can state a separate cause of action for, or

7   merely seek remedies under, the Elder Abuse Act is not material to her right to recover. In the

8   event that the Court rules for SMC in this regard, Plaintiff is still entitled to all appropriate

9   remedies available under the Act.

10   **C.    Plaintiff's Third Cause Of Action States A Valid Claim For Violation Of The**
11        **Consumer Legal Remedies Act.**

12        In her third cause of action, Plaintiff alleges that SMC's violation of the HUD regulations

13   also makes SMC liable under the California Consumer Legal Remedies Act ("CLRA"), Civil

14   Code § 1750 *et seq.*, which prohibits "unfair methods of competition and unfair or deceptive acts

15   or practices undertaken by any person in a transaction intended to result or which results in the

16   sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Like the Elder

17   Abuse Act, the CLRA was enacted "to protect consumers against unfair and deceptive business

18   practices and to provide efficient and economical procedures to secure such protection," and it is

19   to be "liberally construed and applied to promote its underlying purposes." Civ. Code § 1760.

20        Plaintiff claims that SMC violated the CLRA by, among other things:

21        (a) failing to disclose and misrepresenting its financial relationship with mortgage

22   brokers (§ 1770(a)(3));

23        (b) representing that the transactions, services or goods that it offers confer or involve

24   rights that they do not (§ 1770(a)(14)); and

25        (c) failing properly to disclose costs, fees, and charges associated with its reverse

26   mortgages (§ 1770(a)(19)).

27   (Compl. ¶ 68.) Contrary to SMC's assertions, each of those claims is amply supported by

28   Plaintiff's factual allegations regarding SMC's failure to disclose its financial relationships with

15

1    its mortgage brokers, the fact that the fees it was paying were in violation of federal law, and the

2    fact that Home Center's advice was not independent, but inured to its own financial benefit.

3    (*See, e.g.*, Compl. ¶ 18 (SMC misrepresents as "origination fees" fees that are in fact paid to

4    mortgage brokers); ¶ 31 (SMC fails to disclose that its "correspondent fees" are in fact referral

5    fees that are prohibited by federal law); ¶ 32 (discussing benefits to brokers and lenders of "back-

6    funded" payments).)  SMC moves to dismiss those claims, contending that its sale of reverse

7    mortgages do not involve the provision of "goods" or "services" within the meaning of the

8    CLRA.  There is, however, no legal or equitable basis for the Court to exempt SMC's reverse

9    mortgage business from the consumer protections afforded by the Act.

10    SMC bottoms this argument on a small group of cases beginning chronologically with

11    *Berry v. American Express Pub., Inc.*, 147 Cal.App.4th 224 (2007) and most recently including

12    *Ball v. FleetBoston Financial Corp.*, 164 Cal.App.4th 794 (2008), which hold that the CLRA

13    does not encompass claims arising from pure extensions of credit such as disputes over the basic

14    terms and conditions of credit card transactions.[3]  This is not a credit card case, however, and the

15    wrongful practices of which Plaintiff complains are significantly different from the wrongdoing

16    challenged in the cases on which SMC relies.

17    Unlike a reverse mortgage transaction, the provision of a credit card does not involve the

18    giving of financial advice or services separate and apart from the extension of credit to the

19    consumer.  *See Berry*, 147 Cal.App.4th at 229 (a credit card is not "bought or leased" by the

20    consumer, has no intrinsic value, and is not connected with the actual or contemplated sale of an

21    identifiable good or service).  Ms. Labrador's claims, in contrast, arise from SMC's pre-existing

22    business relationships with mortgage brokers, and are directed at its practice of collecting

23    unearned origination fees, which function "as a financial incentive to encourage mortgage

24    brokers to refer loan business to Defendant." (Compl. ¶ 1.)  Although the challenged fees are

25

26    [3]  In *Berry*, plaintiff challenged unauthorized charges to his credit card.  In *Ball*, plaintiff alleged that a

27    mandatory arbitration clause inserted into his cardholder agreement was unconscionable.

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS, CASE NO. C08-2270-SC

1    paid by SMC at the time a loan is closed, they are not compensation for the extension of credit,

2    but for the services of the mortgage brokers (in this case, Home Center) who refer business to

3    SMC.[4]   The exchange of such unlawful and undisclosed fees, along with the imposition of

4    unlawful origination fees on the borrower, falls squarely within the CLRA's prohibition of

5    "unfair methods of competition and unfair or deceptive acts or practices undertaken by any

6    person in a transaction intended to result or which results in the sale or lease of goods or services

7    to any consumer." Cal. Civ. Code § 1770(a); *see also* Compl. ¶ 68.

8         In the end, whether or not the CLRA applies to a particular transaction turns on a factual

9    analysis of whether the alleged wrongdoing was merely "ancillary" to a routine extension of

10   credit, or involved the provision of additional services separable from the loan transaction itself.[5]

11   Due to the complex nature of reverse mortgage transactions and the continuing services provided

12   to the borrower by the lending bank, the Central District of California has expressly held that the

13   sale of a reverse mortgage is covered by the CLRA.

14        In *Munoz v. Financial Freedom Senior Funding Corp.*, C.D. Cal. SA CV 07-710 CJC,

15   the Court denied a motion to dismiss on grounds quite similar to what SMC argues here. In this

16   proposed class action case, the plaintiff alleged that her mortgage broker persuaded her to enter

17

18   [4] The Complaint alleges that the $7,255.80 "origination fee" that Plaintiff paid upon the closing of her loan
19   "was conveyed in its entirety not to the bank that actually originated the loan (Defendant SMC), but to her
     mortgage broker, Home Center." (Complaint ¶ 24.) In its motion to dismiss, SMC concedes that, "SMC paid
20   the mortgage loan broker all or part of the origination fee it charged Labrador." (Def. MPA at 2:11.)

21   [5] This is true of the other state statutes on which SMC relies, as well. For example, in *Gaeke v. Primus
     Auto. Fin. Serv.*, 2002 U.S. Dist. LEXIS 26283 *5-6 (W.D. Tex. No. SA 00-CV-1525 WWJ), the Court
22   distinguished *Maginn v. Norwest Mortgage*, 919 S.W.2d 164 (Tex. Ct. App. 1996), which SMC cites for
     the proposition that mortgage-related services are not within the protections of the Texas Deceptive Trade
23   Practices Act (DTPA), stating that it "recognize[d] that an independant [*sic*] purchase of credit services
     could allow one to be a consumer under the DTPA," but found that "the facts presented here demonstrate
24   that the credit services were ancillary." Other states are in accord. *See, e.g., Provencher v. T&M Mortg.
     Solutions, Inc.*, 2008 U.S. Dist. LEXIS 47616 (D. Me. No. 08-31-P-H) (plaintiff's allegations of unfair
25   acts and practices in connection with a high-interest home loan stated a claim under Maine's Unfair Trade
     Practices Act); *Perez v. Citicorp Mortg.*, 301 Ill. App. 3d 413, 420 (Ill. App. Ct. 1998) (mortgage lenders
26   are subject to Illinois Consumer Fraud and Deceptive Business Practices Act); *Cullen v. Investment
     Strategies*, 139 Ore. App. 119, 127 (Or. Ct. App. 1996) (even though mortgage loans are exempt from
27   Oregon Unlawful Trade Practices Act, services of a loan broker may be covered).

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS, CASE NO. C08-2270-SC

1  into a reverse mortgage transaction with defendant bank without disclosing the terms, risks and

2  suitability of the loan.  Defendants argued that the sale of a reverse mortgage is not a "good or

3  service" under the CLRA.  The Court surveyed the applicable law and squarely rejected that

4  contention:

> After weighing the parties' arguments and cited authorities, the Court is
> persuaded that the reverse mortgage transactions at issue between the
> parties constitute a "service" under the CLRA.  *See* § 1761(b).  *Contrary to
> Defendants' arguments, the reverse mortgage transaction is not simply an
> extension of credit to the consumer.*  Instead, it is a complex financial
> transaction whereby the consumer is provided a regular revenue stream and
> retains ownership in the property but is still subject to contractual
> obligations related to that property.... The accompanying services included
> planning, structuring and administration of the reverse mortgage which are
> necessary to facilitate the transaction.... The reverse mortgage is more akin
> to the mortgage at issue in *T.C. Jefferson* because a customer does not enter
> into the transaction with the understanding that the reverse mortgage
> provider merely writes a check.  Instead, the customer looks to the lender
> for financial services necessary to effectuate and finalize the loan.  Here,
> Ms. Munoz's claims arise out of the administration, structuring and
> marketing of the reverse mortgage which is a part of the overall service she
> purchased when transacting with Defendants....

16  *Munoz* Order Granting in Part and Denying in Part Motion to Dismiss, October 16, 2007

17  (appended hereto) at pp.7-8 (emphasis added).  The Court also held that the defendants' limiting

18  construction of the CLRA was at odds with the stated purpose of the Act, which is to protect

19  consumers, and with the required liberal construction of the law.  *Id.*, p.8; *see* Civil Code § 1760.

20     The decision referenced in *Munoz*, *T.C. Jefferson v. Chase Home Finance LLC*, No. 06-

21  6510, 2007 U.S. Dist. LEXIS 36298, at *8 n.1  (N.D.Cal. May 3, 2007), is another putative class

22  action in which the Northern District Court rejected a bank's efforts to avoid liability under the

23  CLRA by arguing that the Act does not apply to mortgage loan transactions.  The plaintiff there

24  alleged that the defendant wrongfully failed to pay him and similarly-situated borrowers interest

25  on their mid-monthly payments on their loans, and the defendant moved for judgment on the

26  pleadings.  The Court denied the motion and upheld the CLRA claims, concluding that the

27  transactions "involve more than the provision of a loan; they also include financial services."  *Id.*

28  at *9.  *See also Kagan v. Gibraltar Sav. & Loan Ass'n*, 35 Cal.3d 582, 596-97 (1984) (discussed

1   in *Jefferson*, and upholding plaintiffs' standing as class representatives in action alleging that

2   defendant's failure to disclose management fees charged in connection with IRA accounts

3   violated the CLRA); *Corbett v. Hayward Dodge, Inc.*, 119 Cal.App.4th 915 (2004) (affirming

4   summary judgment for defendants, but stating that CLRA claims against car dealer and bank for

5   alleged misstatement of interest rate on a car loan "stated a plausible claim"); *Hernandez v.*

6   *Hilltop Financial Mortgage, Inc.*, 2007 U.S. Dist. LEXIS 80867, at *19-20 (N.D.Cal. No. C06-

7   7401 SI) (holding that plaintiffs' allegations that defendants made false representations regarding

8   the terms of their home loans stated a claim under the CLRA (and other statutes) because,

9   "plaintiffs did not seek just a loan; they sought defendants' services in developing an acceptable

10  refinancing plan by which they could remain in possession of their home"); *Knox v. Argent*

11  *Mortgage Company LLC*, 2005 WL 1910927, at *4 (N.D.Cal. No. C 05 00240 SC, Aug. 10,

12  2005) (decision by this Court denying a motion to dismiss and finding that plaintiff stated valid

13  "predatory lending" claims under the CLRA and observing that "California courts generally find

14  financial transactions to be subject to the CLRA").

15        SMC ignores this substantial line of authority, contending that this case is instead

16  controlled by *McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457 (2006). *McKell* has

17  been criticized as wrongly decided (*see, e.g., Jefferson, supra*, at *2; *Hernandez, supra*, at *19),

18  and it is distinguishable. In *McKell,* plaintiff sued his lenders for unfair competition, unjust

19  enrichment, breach of contract, and violation of the CLRA, alleging they overcharged him for

20  underwriting, tax services, and wire transfers in connection with his home loan. The plaintiffs'

21  claims there were premised on the existence of an implied contractual agreement that the bank

22  would limit its charges for such services to a "pass through" of costs actually incurred. The

23  majority of the Court's analysis is devoted to the question whether the claims were preempted by

24  federal law (it found they were not). With respect to the CLRA claims, however, the Court

25  found that:

26        Plaintiffs cite no authority or [*sic*] make no argument demonstrating that
          Washington Mutual's actions were undertaken 'in a transaction intended to
27        result or which results in the sale or lease of *goods* or *services*,' [citation].
          Rather, its actions were undertaken in transactions resulting in the sale of

28

                                          19

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS, CASE NO. C08-2270-SC

1    real property. The CLRA thus is inapplicable and plaintiffs have
     demonstrated no error in the trial court's sustaining of defendants
2    demurrer...."

3    142 Cal.App.4th at 1488. The Court did not further analyze the issue.

4         SMC cannot take advantage of the "sale of real property" CLRA exemption because the

5    purpose of a reverse mortgage is *not* to sell or transfer realty but just the opposite: to enable a

6    homeowner to obtain enough cash to pay her bills *without* having to transfer title to her home.

7    To extend the exemption to transactions which do not involve either the construction or sale of

8    realty would be to violate the legislative mandate that the CLRA be liberally construed to protect

9    the interests of consumers. *See Jefferson, supra.* The Court should not indulge in such an

10   inequitable extension of the law.

11        D.    **Plaintiff Has Also Pled Valid Causes Of Action For Unfair Competition,
                Constructive Trust, And Declaratory Relief.**
12

13        SMC's violations of the HUD regulations, predation on the elderly, and collection of

14   hundreds of thousands, if not millions, of dollars of improper fees from mortgage consumers also

15   entitle Plaintiff to judgment under California's Unfair Competition Law, Business & Professions

16   Code § 17200 (Second Cause of Action) and warrant the imposition of a constructive trust on the

17   wrongfully obtained fees (Fourth Cause of Action). Further, because it is clear that there is a

18   present and existing controversy between the parties regarding SMC's reverse mortgage policies

19   and practices, it is appropriate for the Court to grant declaratory relief (Fifth Cause of Action).

20   Accordingly, each of the remaining causes of action in Plaintiff's Complaint should be sustained.

21        E.    **In The Event The Court Finds Merit In Any Of SMC's Arguments, It Should
                Grant Plaintiff Leave To Amend.**
22

23        Federal Rule of Civil Procedure 15(a) directs the courts to "freely give" leave to amend

24   "when justice so requires." The United States Supreme Court has held that "this mandate is to be

25   heeded," and that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a

26   proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."

27   *Forman v. Davis*, 371 U.S. 178, 182 (1962). It is the longstanding rule in the Ninth Circuit that

28   leave to amend should be granted whenever "it appears at all possible that the plaintiff can cure

                                              20

1  the defect" in her complaint. *Breier v. Northern California Bowling Proprietors' Ass'n*, 316

2  F.2d 787, 790 (9th Cir. 1963), quoting 3 Moore, Federal Practice, § 15.10 at 838 (2d ed. 1948).

3  Accordingly, in the event that the Court deems any of SMC's arguments to have merit, Plaintiff

4  requests that she be granted leave to amend her Complaint to address whatever concerns the

5  Court may have.

6  **V.    CONCLUSION**

7      SMC's motion to dismiss reflects significant legal and factual disputes between the

8  parties concerning the meaning and interpretation of the federal reverse mortgage rules and the

9  purpose and effect of SMC's business practices. The motion does not, however, demonstrate

10  that Plaintiff has failed to plead legitimate claims, or that SMC is entitled to judgment as a matter

11  of law. For all of the reasons discussed above, Plaintiff thus requests that the motion be denied

12  in its entirety.

13

14                                          Respectfully submitted,

15  Dated: August 15, 2008                 CHAVEZ & GERTLER LLP

16                                          BONNETT, FAIRBOURN, FRIEDMAN
                                              & BALINT, PC
17

18                              By:    _Nance Becker_
                                          Nance F. Becker
19                                        Attorneys for Plaintiff
                                          Mary B. Labrador
20

21

22

23

24

25

26

27

28

1　BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC
　　ANDREW S. FRIEDMAN (to be admitted pro hac vice)
2　afriedman@BFFB.com
　　GARRETT W. WOTKYNS (to be admitted pro hac vice)
3　gwotkyns@BFFB.com
　　2901 N. Central Avenue, Suite 1000
4　Phoenix, AZ 85012
　　Telephone:  (602) 274-1100
5　(602) 274-1199 (fax)

6　CHAVEZ & GERTLER LLP
　　MARK A. CHAVEZ (Bar No. 90858)
7　mark@chavezgertler.com
　　NANCE F. BECKER (Bar No. 99292)
8　nance@chavezgertler.com
　　42 Miller Ave.
9　Mill Valley, CA  94941
　　Telephone: (415) 381-5599
10　(415) 381-5572 (fax)

11　Attorneys for Plaintiff

12

13　UNITED STATES DISTRICT COURT

　　NORTHERN DISTRICT OF CALIFORNIA

14

15　MARY B. LABRADOR, individually and on ) 　Case No.:  CV-08-2270 SC
　　behalf of all others similarly situated, 　　　)
16　　　　　　　　　　　　　　　　　　　　)　CLASS ACTION
　　　　　　　　Plaintiff, 　　　　　　　　)
17　　　　　　　　　　　　　　　　　　　　)　**APPENDIX OF AUTHORITIES TO**
　　vs. 　　　　　　　　　　　　　　　　　)　**PLAINTIFF'S MEMORANDUM IN**
18　　　　　　　　　　　　　　　　　　　　)　**OPPOSITION TO DEFENDANT'S**
　　SEATTLE MORTGAGE COMPANY, 　　　　　)　**MOTION TO DISMISS COMPLAINT**
19　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant 　　　　　　　　)　Date: 　　　　Sept. 5, 2008
20　　　　　　　　　　　　　　　　　　　　)　Time: 　　　　10:00 a.m.
　　　　　　　　　　　　　　　　　　　　　)　Courtroom:　 B, 15th Fl.
21　　　　　　　　　　　　　　　　　　　　)　Before: 　　　Hon. Samuel B. Conti
　　　　　　　　　　　　　　　　　　　　　)
22　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
23

24

25

26

27

28

Priority ___
Send    X
Enter   ___
Closed  ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 07-710 CJC (ANx)                    Date:  October 16, 2007

Title: <u>MARY P. MUNOZ v. FINANCIAL FREEDOM SENIOR FUNDING CORP. et al.</u>

PRESENT:

### <u>HONORABLE CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE</u>

<u>Michelle Urie</u>                           <u>     N/A     </u>
Deputy Clerk                               Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:    ATTORNEYS PRESENT FOR DEFENDANT:

None Present                               None Present

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS CARTERET AND SOQUI'S MOTION TO**
**DISMISS [filed 10/01/07].**

Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* FED. R. CIV. P. 78; Local Rule 7-15.  Accordingly, the hearing set for October 22, 2007 at 1:30 p.m. is hereby vacated and off calendar.

Plaintiff Mary Munoz, on behalf of herself and others similarly situated, has brought this class action complaint alleging, *inter alia*, elder financial abuse, unfair business practices and breach of fiduciary duty relating to defendants Financial Freedom Senior Funding Corporation ("Financial Freedom"), Carteret Mortgage Corporation ("Carteret"), Louis Soqui and Kathleen Miller's sale and marketing of reverse mortgages to Ms. Munoz and other senior citizens.[1]  With respect to Carteret and Mr. Soqui (collectively "Defendants"), Ms. Munoz alleges Carteret, through its employee/agent Mr. Soqui, persuaded Ms. Munoz to enter into a reverse mortgage transaction by misrepresenting its benefits and failing to disclose its risks, costs and unsuitability.  Defendants move to dismiss Ms. Munoz's claims because (1) several of her claims are barred by the statute of limitations; (2) the sale of a reverse mortgage is not a "good or/ service[]" under the Consumer Legal Remedies Act; and (3) the complaint does not

---

[1] Class claims are alleged only against Financial Freedom.  The other parties are subject only to Ms. Munoz's individual claims.

DOCKETED ON CM

OCT 1 8 2007

BY _____ 037

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. SA CV 07-710 CJC (ANx)                    Date: October 16, 2007
                                                                      Page 2

allege reliance on Defendants' advertising necessary to support a false advertising claim. For the reasons set forth below, Defendants' motion is GRANTED IN PART AND DENIED IN PART.

### Standard of Review for a Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 1370, 1374 (9th Cir. 1997). When evaluating a Rule 12(b)(6) motion, the Court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Mayo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. FED. R. CIV. P. 8(a)(2). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, --- U.S. ---, 127 S.Ct. 1955, 1974 (2007). In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

### Background

Ms. Munoz, a senior citizen, alleges that she was injured by certain financial advice and products sold to her by Financial Freedom, Carteret, Mr. Soqui and Ms. Miller. Specifically, Ms. Munoz alleges that Carteret brokered a reverse mortgage between Ms. Munoz and Financial Freedom. (Compl. ¶ 51.) Mr. Soqui was the sales agent responsible for conducting the transaction on Carteret's behalf. (*Id.*) Ms. Munoz further alleges that Defendants received a service fee from Financial Freedom for brokering the transaction which became a hidden cost to Ms. Munoz. (*Id.* at ¶ 55.) According to Ms. Munoz, Defendants did not disclose the risks associated with the reverse mortgage at any timing during their transaction. (*Id.* at ¶ 54.) She further alleges that Defendants employed a sales scheme specifically designed to conceal or mislead senior citizens about the dangers and risks of reverse mortgages. (*Id.* at ¶ 49.) Ms.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. SA CV 07-710 CJC (ANx)                          Date: October 16, 2007
                                                                            Page 3

Munoz seeks to represent a class of seniors harmed by Financial Freedom's reverse mortgage, and seeks compensatory and punitive damages, injunctive relief and attorneys' fees for herself and on behalf of the class.

**Defendants' Statute of Limitations Defense**

Defendants argue that several of Ms. Munoz's claims are barred by their respective statutes of limitations. They contend that Ms. Munoz's injury occurred in October 2004: the date she completed the reverse mortgage transaction and purchased annuities from Ms. Miller. Ms. Munoz did not file her lawsuit until June 19, 2007, over two years after the alleged injury. Under Defendants' calculations, this bars Ms. Munoz's causes of action for elder abuse, implied covenant and negligence/negligent misrepresentation. Defendants further argue that to the extent Ms. Munoz is relying on the discovery rule to toll the statute, she has alleged insufficient facts to support application of the rule to her claims.

Ms. Munoz counters that she is under no burden to allege facts to prove that her claim was filed within the statutory period. It is instead Defendants' burden to present sufficient facts as to when the claim began to accrue. Because Defendants have not alleged when Ms. Munoz knew or had reason to know of her injury, they have not met their burden. Even if Defendants have made the proper showing, Ms. Munoz argues her complaint sufficiently alleges facts to support the application of the discovery rule or other equitable grounds to toll the running of the statute.

A complaint fails to state a claim upon which relief can be granted, and is therefore amendable to a motion to dismiss, when the face of the complaint indicates that the claim is time barred. *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). But, when the face of the complaint does not allege specific dates which indicate the timeliness of a cause of action, the statute of limitations defense is more properly decided on a motion for summary judgment. *See Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) (stating that determination of an equitable tolling argument is best resolved on summary judgment). Here, Ms. Munoz's complaint does allege specific dates to allow this Court to asses Defendants' statute of limitations defense on a 12(b)(6) motion. The reverse mortgage transaction is alleged to have occurred in September 2004. (Compl. ¶ 51.) Ms. Munoz purchased two annuities from Ms. Miller in October 2004.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. SA CV 07-710 CJC (ANx)                    Date: October 16, 2007
                                                              Page 4

---

(*Id.* at ¶ 53.) She has further devoted a section of her complaint to the issue of tolling of the statute of limitations. (*See id.* at ¶ 57-62.) In that section, she alleges that she did not learn of her injury until August 2006. (*Id.* at ¶ 60.) Given the dates contained in the complaint, and Ms. Munoz's specific attention to the applicability of the statute of limitations, Defendants' statute of limitations grounds defense is properly before this Court on a motion to dismiss. *See Jablon*, 614 F.2d at 682.

To resolve Defendants' statute of limitations defense, the Court must determine when the statute of limitations began to run and whether its accrual was tolled at any time. Under California law, a cause of action accrues "when, under the substantive law, the wrongful act is done." [2] *Norgart v. Upjohn, Co.*, 981 P.2d 79, 88 (Cal. 1999) (*quoting Neel v. Magana, Olney, Levy, Cathcart & Gelfand* 491 P.2d 421 (Cal. 1971)). The statute of limitations therefore began to run on Ms. Munoz's claims when all of the elements of her claim were present. *See id.* According to the complaint, the elements of Ms. Munoz's claims were present upon the completion of the transactions (either in September 2004 or October 2004). (*See* Compl. ¶¶ 51, 53.) Ms. Munoz's knowledge of her claims or her injury does not affect this conclusion. *See Norgart*, 981 P.2d at 88.

However, California applies the discovery rule to mitigate the seemingly harsh application of its statute of limitations. Under this rule, the cause of action does not begin to accrue until the "plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005). The statute is therefore tolled, and the claim does not accrue, when the plaintiff has no reason to suspect a factual basis for the elements of the claim. *See id.* at 921. For this rule to apply, the plaintiff must allege "(1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Id.* (emphasis in original); *see also Cal Sansome Co.*, 55 F.3d at 1407 (*citing CAMSI IV v. Hunter Tech. Corp.*, 282

---

[2] Ms. Munoz, citing *TwoRivers v. Lewis*, argues that the federal rule of accrual governs in federal court. 174 F.3d 987 ("[F]ederal, not state, law determines when a civil rights claim accrues.") *TwoRivers* and a number of similar cases cited by Ms. Munoz hold that federal civil rights claims are subject to federal rules of accrual and tolling. However, other decisions in the Ninth Circuit have applied California law on accrual, including the discovery rule, for claims grounded in state, not federal, law. *See, e.g., Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007) (theft and conversion); *Guidi v. Stryker Corp.*, 120 Fed. Appx. 45, 47 (9th Cir. 2005) (products liability); *Cal Sansome Co. v. United States Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995) (property damage). Each of Ms. Munoz's claims are state law causes of action. Accordingly, California law applies when determining whether Ms. Munoz's claim is barred by the statute of limitations.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. SA CV 07-710 CJC (ANx)                    Date: October 16, 2007
                                                                 Page 5

---

Cal. Rpr. 80, 86-87 (Cal. Ct. App. 1991) ("California law makes clear that a plaintiff must allege specific facts establishing the applicability of the discovery-rule exception.")). Both pleading requirements described in *Fox* are equally important to a court's determination of whether the discovery rule should apply. Knowing how the plaintiff finally discovered the injury is necessary for assessing whether that discovery should have occurred earlier. Equally important are allegations to support a conclusion that earlier discovery was not possible despite reasonable efforts by the plaintiff.

Ms. Munoz has not met that two-part burden here. The complaint is entirely devoid of any allegations describing how Ms. Munoz discovered that she had been injured by Defendants' conduct. Ms. Munoz does allege when this discovery occurred, August 2006, but that bare allegation is insufficient. (Compl. ¶ 60.) Ms. Munoz argues that her allegations of concealment are sufficient to fulfill the requirements of the discovery rule. (*See, e.g., id.* at ¶¶ 33-56.) But without allegations of how Ms. Munoz finally learned of the concealed fees and costs, and why she couldn't have discovered those costs earlier through reasonable diligence, this Court cannot determine whether the discovery rule should apply to toll the running of the statute of limitations on her claims. *See Fox*, 110 P.3d 914, 920

In light of Ms. Munoz's failure to plead allegations sufficient to support application of the discovery rule, the Court declines to consider whether Ms. Munoz's elder abuse, implied covenant and negligence claims are in fact time barred. To the extent that Ms. Munoz's claims rely on equitable tolling, Defendants' statute of limitations defense is more properly filed as a motion for summary judgment so that the Court may consider evidence submitted by the parties. *See Supermail Cargo, Inc.*, 68 F.3d at 1206. Defendants' motion to dismiss Ms. Munoz's causes of action for elder abuse, implied covenant and negligence is therefore GRANTED with leave to amend.

**Consumer Legal Remedies Act Claim**

Defendants argue that Ms. Munoz's allegations regarding her reverse mortgage cannot support a claim under the Consumer Legal Remedies Act ("CLRA") because a reverse mortgage is not a service under the CLRA. The CLRA prohibits unfair or deceptive practices with respect to "the sale or lease of goods or services." Cal. Civ. Code § 1770(a) (1996). Defendants rely on various federal and state authority holding that a credit card transaction is not a good or service that falls within the CLRA. Ms.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 07-710 CJC (ANx)                         Date: October 16, 2007
                                                                                                  Page 6

Munoz argues that case law holding that mortgage transactions fall within the CLRA's
protection are more applicable to reverse mortgages than the cases cited by Defendants
regarding credit card transactions. Alternatively, Ms. Munoz argues that even if the
reverse mortgage is not protected by the CLRA, the financial services related to the
reverse mortgage are nevertheless covered.

The dispositive issue here is whether the structuring and facilitation of a reverse
mortgage constitutes a "service" under the CLRA. Ms. Munoz's allegations that the
reverse mortgage is a "good" under § 1761(a) (Compl. ¶¶ 150,153) are erroneous in light
of the statutory definition of "good" as "tangible chattels." Cal. Civ. Code § 1761
(1996); *see also Berry v. Am. Express Publ'g, Inc.*, 147 Cal.App.4th 224, 229 (Cal. Ct.
App. 2007) (stating that an extension of credit by means of a credit card is not a tangible
chattel under § 1761(a)); *In Re Ameriquest Mortgage Co. Mortgage Lending Practices
Litig.*, 2007 W.L. 1202544, slip op. at *5 n.6 (N.D. Ill. April 23, 2007) ("Residential
mortgages are clearly not 'tangible chattels,' and cannot be 'goods' under the CLRA").
The CLRA defines "services" as "work, labor, and services for other than a commercial
or business use, including services furnished in connection with the sale or repair of
goods." § 1761(b). Neither party has cited authority holding that the CLRA does or does
not apply to reverse mortgages. However, the parties have cited conflicting decisions
about whether mortgages and the extension of credit constitutes a "service" under the
CLRA.

In *Berry v. American Express Publishing*, cited by Defendants, a California
appeals court held that the issuance of credit is not a service protected by the CLRA. 147
Cal.App.4th at 233. The *Berry* court relied on the legislative history of the statute
whereby the final version of the CLRA passed by the California legislature rejected a
definition of "consumer" which included one who purchased or leased "money, or
credit." *See id.* at 230 (*citing* Assem. Bill. No. 292 (1970 Reg. Session) Jan. 21, 1970).
By removing these terms from the statutes definition, the *Berry* court reasoned, the
legislature evidenced an intent that the statute only covered extensions of credit related to
the sale or lease of a specific good, not the extension of credit for general usage. *Id.* at
231. The *Berry* court also rejected the plaintiff's argument that § 1760, which dictates a
liberal construction of the CLRA in order to protect consumers, was a more proper
expression of legislative intent than legislative history. A number of other courts,
including federal courts, have cited *Berry* favorably when determining the applicability of
the CLRA to credit cards. *See, e.g., Augustine v. FIA Card Servs., Inc.*, 485 F.Supp.2d

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 07-710 CJC (ANx)                    Date: October 16, 2007
                                                                        Page 7

---

1172, 1175 (E.D. Cal. 2007). Defendants have further cited complimentary authority, also by a California appeals court, holding that the sale of insurance is not a good or service under the CLRA. *See Fairbanks v. Superior Court*, 154 Cal.App.4th 435, 442-43 (Cal. Ct. App. 2007).

In contrast, the United States District Court for the Northern District of California held that a mortgage loan provided to a consumer constituted a "service[]" under the CLRA in *T.C. Jefferson v. Chase Home Finance LLC*, 2007 WL 1302984, slip op. at *3 (N.D. Cal. May 3, 2007), cited by Ms. Munoz. In reaching its conclusion, the *T.C. Jefferson* court noted that the California Supreme Court and a court in the Central District of California have "applied the CLRA to allegations involving financial services." *Id.* (*citing Kagan v. Gibraltar Sav. & Loan Ass'n*, 676 P.2d 1060 (1984); *Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F.Supp.2d 1095, 1109 (C.D. Cal. 2006)). An extension of credit like a mortgage typically includes related financial services that brings the entire transaction within the CLRA's protection. *Id.* (*citing Hitz v. First Interstate Bank*, 38 Cal.App.4th 274, 286-88 (Cal. Ct. App. 1995). The *T.C. Jefferson* court rejected the reasoning of the *Berry* court because it relied too heavily on the legislative history of the CLRA's definitional section and failed to justify the holding in *Hitz v. First Interstate Bank* which recognized that additional financial services typically accompany an extension of credit or mortgage. *See id.* The court concluded the CLRA applied because the transaction at issue included the purchase of services in addition to the actual mortgage, and consumers should therefore be protected from unfair business practices related to those transactions. *Id.*

After weighing the parties' arguments and cited authorities, the Court is persuaded that the reverse mortgage transactions at issue between the parties constitute a "service" under the CLRA. *See* § 1761(b). Contrary to Defendants' arguments, the reverse mortgage transaction is not simply an extension of credit to the consumer. Instead, it is a complex financial transaction whereby the consumer is provided a regular revenue stream and retains ownership in the property but is still subject to contractual obligations related to that property. (*See* Compl. ¶¶ 10-12.) The accompanying services include planning, structuring and administration of the reverse mortgage which are necessary to facilitate the transaction. (*See id.* at ¶¶ 33-56, 156-64.) The reverse mortgage is more akin to the mortgage at issue in *T.C. Jefferson* because a customer does not enter into the transaction with the understanding that the reverse mortgage provider merely writes a check. Instead, the customer looks to the lender for financial services necessary to effectuate and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 07-710 CJC (ANx)                    Date: October 16, 2007
                                                                Page 8

finalize the loan. Here, Ms. Munoz's claims arise out of the administration, structuring and marketing of the reverse mortgage which is a part of the overall service she purchased when transacting with Defendants. (*See* Compl. ¶¶ 51-56.)

Furthermore, given the CLRA's stated purpose "to protect consumers against unfair and deceptive business practices," it is appropriate for this Court to liberally construe the CLRA to protect seniors from such practices in the reverse mortgage industry. The *Berry* court's decision to limit the scope of services based on the legislative history of the definitional section is plainly inconsistent with the statutory text commanding liberal construction. *See T.C. Jefferson*, 2007 WL 1302984, slip op. at *3. These transactions, whereby a reverse mortgage is sold, structured and administered, is properly classified as a "service" under the CLRA. By construing the statute to reach reverse mortgages, the Court does not apply an additional layer of regulation upon reverse mortgage lenders. Instead, the Court is ensuring that consumers injured by deceptive business practices will have adequate means of remedying and preventing violations occurring in the lending industry.

Accordingly, Defendants' motion to dismiss Ms. Munoz's CLRA claims is DENIED.

**False Advertising Claim**

Finally, Defendants argue that Ms. Munoz has failed to adequately plead her false advertising claims because she has not alleged reliance on the advertisements. Carteret raised this argument in its failed demurrer in the early state action. (Evans Decl. ¶ 6, Exh. A.) According to Ms. Munoz, the same allegations that support denial of the demurrer can be found in the federal complaint. (Opp. at 15) (*citing* Compl. ¶¶ 111 ("These representations were made by Defendants with the intent to induce and did, in fact, reasonably induce Plaintiff and the Class to purchase Defendants [products and services] . . . .") and 114-15 ("As a result of Defendants' misconduct as alleged herein, Plaintiff and the class have incurred actual financial losses and damages.")). Defendants make no attempt to argue why those paragraphs do not adequately plead reliance. The Court concludes that Ms. Munoz has adequately pled that her injury was the result of Defendants' allegedly false advertising.

**Conclusion**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 07-710 CJC (ANx)                          Date: October 16, 2007
                                                                                         Page 9

---

     Defendants' motion to dismiss Ms. Munoz's claims of elder abuse, implied covenant and negligence as time barred is GRANTED WITH LEAVE TO AMEND. Defendants' motion to dismiss Ms. Munoz's CLRA and false advertising claims is DENIED.

     Ms. Munoz has twenty days leave to amend her complaint consistent with this order.  Defendants have twenty days thereafter to file a responsive pleading.

sdt

MINUTES FORM 11
CIVIL-GEN                                                        Initials of Deputy Clerk