JOHN B. SULLIVAN (State Bar No. 96742)
jbs@severson.com
JAN T. CHILTON (State Bar No. 47582)
jtc@severson.com
SUNNY S. HUO (State Bar No. 181071)
ssh@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendant
SEATTLE MORTGAGE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARY B. LABRADOR, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

SEATTLE MORTGAGE COMPANY,

Defendant.

Case No.: CV-08-2270 MEJ

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT**

Hearing: September 5, 2008
Time: 10:00 a.m.
Courtroom: B, 15th Floor
Judge: Hon. Samuel B. Conti

# I.

# A LENDER GAINS NO "FINANCIAL INTEREST" *IN THE BROKER* BY PAYING A FEE FOR LOAN SERVICING RIGHTS

Labrador's suit turns on a relatively simple question: Did defendant Seattle Mortgage Company ("SMC") obtain a "financial interest" in the loan originator, Home Center, by paying it a "back-funded" fee for loan servicing rights? The answer is clearly "no." So all of Labrador's claims fail, and her suit should be dismissed.

As Labrador concedes, HUD regulations (24 C.F.R. § 206.31(a)(1)) permit a reverse mortgage lender to charge an origination fee and pay some or all of it to the originating mortgage broker. Labrador does not claim that the $7,255.80 origination fee she paid exceeded the amount the regulation allows.

Labrador also now concedes that there nothing improper about the "back-funded" $490 fee SMC paid the loan originator, Home Center. Despite her complaint's contrary allegation (Compl., ¶31), Labrador now agrees that she has no RESPA claim; the back-funded fee was paid for some good or service Home Center provided. (Opp., 9:26.)

So, unless SMC's payment of the "back-funded" $490 fee created a "financial interest between" Home Center and SMC, Labrador's complaint states no viable claim.[1]

## A. The Regulation's Words Refute Labrador's Claim

As HUD's regulation does not define "financial interest," both parties look elsewhere to define that key term.

Referring to legal dictionaries and other conflict-of-interest statutes and regulations, SMC showed n its opening memorandum (pp. 6-7) that "financial interest," in this context, means an ownership or other beneficial interest in the mortgage broker or lender.

---

[1] Under HUD's regulation, the mortgage broker's fee may be included in the origination fee "only … if there is no financial interest between the mortgage broker and the mortgagee." 24 C.F.R. § 206.31(a)(1). Labrador does not allege that any "financial interest" existed between Home Center and SMC apart from the "back-funded" $490 fee.

Labrador counters with two closely related arguments why the back-funded fee fits within Black's Law Dictionary's definition of "financial interest" as "*an interest involving money* or its equivalent; esp., an *interest in the nature of an investment*." (Opp., 5:12-13 (emphasis added).)

First, Labrador says the back-funded fee creates a money interest "between" Home Center and SMC because both Home Center and SMC benefited from the fee financially: Home Center obtained the extra money. SMC got or anticipated getting more loans from Home Center. (Opp., 5:14-24.) That cannot be a correct interpretation of "financial interest" as used in HUD's regulation for a simple reason: The mortgage broker fee, itself, creates exactly the same financial benefits and incentives. The broker gets the fee. The lender gets the loan and the anticipation of more to come. So, if Labrador were correct, the mortgage broker fee would create a "financial interest between the mortgage broker and the mortgagee," rendering that fee illegal in every case. As Labrador's interpretation renders section 206.31(a)(1)'s last sentence meaningless, it must be rejected.[2] *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997); *Schneider v. Chertoff*, 450 F.3d 944, 954 (9th Cir. 2006).

Second, Labrador argues that SMC pays the back-funded fee "as a business investment" in order to "acquire more revenue-producing assets (highly profitable reverse mortgage loans)." (Opp., 5:25-6:2.) This argument, too, is obviously flawed: SMC's "investment" and therefore its "financial interest" is not in Home Center,[3] but rather in the reverse mortgages SMC buys. Under Labrador's interpretation, an investor who buys Intel stock from Morgan Stanley, paying Morgan Stanley a broker's fee, acquires an investment or financial interest in Morgan Stanley. Obviously that is not so. The investor buys an investment, and acquires a financial interest, in the thing purchased—the Intel stock—not in the selling broker. So, too, SMC's business investment and

[2] Labrador's interpretation is also wrong because it treats "interest" as meaning "incentive," "concern," or "desire"—an implausible use of the word in this context. Instead, as SMC pointed out before, "interest" in the context of a conflict-of-interest provision and in association with the word "financial" means "[a] legal share in something; all or part of a legal or equitable claim to or right in property <right, title, and interest>." Black's Law Dictionary (8th ed.), "interest." Labrador does not and cannot claim that the $490 back-funded fee created any "legal share" in either Home Center or SMC.

[3] Section 206.31(a)(1) speaks, somewhat awkwardly, of a financial interest "between" the mortgage broker and mortgagee. HUD apparently chose this preposition as a shorthand means for saying a financial interest by the mortgage broker in the mortgagee or vice versa.

financial interest is in the revenue-producing assets (the reverse mortgage loans) it buys from Home Center, not in Home Center itself. Since the lender always acquires a financial interest in the reverse mortgage loan, section 206.31(a)(1)'s last sentence would be meaningless if that interest disqualified the lender from paying the mortgage broker an origination fee.

As Labrador argues, this is the end of the matter. (Opp., 6:3-10.) The regulation's clear language cannot bear Labrador's interpretation. She has not pleaded facts showing any financial interest between Home Center and SMC. Her complaint should be dismissed.

**B. Regulatory Structure, Purpose And History Do Not Support Labrador**

**1. Structure And Purpose Favor SMC's Interpretation**

Contrary to Labrador's next argument (Opp., 6:11-10:22), the structure and purpose of HUD's HECM regulations do not support her broad, not to mention illogical, interpretation of "financial interest."

In the first place, the HECM statute and regulations were *not* enacted solely to protect borrowers against "self-dealing by fee-hungry reverse mortgage brokers and lenders," as Labrador argues. (Opp., 7.) The statute and regulations were also adopted "to encourage and increase the involvement of mortgagees and participants in the mortgage markets in the making and servicing of home equity conversion mortgages for elderly homeowners." 12 U.S.C. § 1715z-20(a); 24 C.F.R. § 206.1. To accomplish that purpose, HUD found it had to increase the fees mortgagees were allowed to charge. (See Opening Memo., 8-10.) HUD's final regulation achieves a delicate balance between these two offsetting objectives: protecting borrowers from fee-gouging, while still providing sufficient financial incentives to encourage mortgagees and brokers to make HECM loans. SMC's interpretation of section 206.31(a)(1) is consistent with that balanced approach; Labrador's is not.

In the second place, statutory or regulatory purpose may explain ambiguities, but it is no substitute for statutory or regulatory language.

\\\

\\\

\\\

\\\

> To reason from the evils against which the statute is aimed in order to determine the scope of the statute while ignoring the language itself of the statute is to elevate substance over necessary form. The language in which the statute is cast confines and channels its purpose. Without due attention to the statutory terms, the statute becomes an open charter, a hunting license to be used where any prosecutor, plaintiff and judge sees an evil encompassed by the statute's purpose. To the contrary, statutory interpretation must start with the words that define and cabin its laudable purposes."

*Dedication & Everlasting Love to Animals v. Humane Society*, 50 F.3d 710, 713 (9th Cir. 1995).

Labrador never links borrower-protection purpose to regulatory language. So her argument leads nowhere.

**2. Regulatory History Supports SMC's Interpretation**

As shown in SMC's opening memo (pp. 8-10), section 206.31(a)(1)'s regulatory history refutes Labrador's assertion that payment of a back-funded fee for loan servicing rights renders the mortgage broker's origination fee illegal.

Labrador replies that HUD's commentary addresses whether a payment for loan servicing rights must be counted toward the two percent cap on the origination fee, not the analytically distinct question of whether a payment for loan servicing rights disqualifies the broker from receiving any origination fee at all. (Opp., 8:27-9:9.) It is a fine point; indeed far too fine. HUD would certainly not have approved adding a fee for loan servicing rights on top of the two percent loan origination fee if it thought paying that additional fee, no matter what its amount, rendered the loan origination fee illegal.

Labrador also tries to escape regulatory history by arguing that she has raised a question of fact about the true purpose of the "back-funded" fee SMC paid Home Center. (Opp., 1:22-2:3, 8:10-26.) Nonsense. Labrador's complaint alleges that the "back-funded" fee is paid for the stated purpose of buying loan servicing rights. (Compl., ¶¶18, 29.) The complaint avers that the stated purpose must be a mere pretext because, as a matter of law, not fact, the mortgage broker has no loan servicing rights to sell. (*Id.*, ¶¶18, 30, 31.) In its opening memo (pp. 11-12), SMC showed that Labrador is simply wrong. Mortgage brokers can sell loan servicing rights. HUD regulations prove otherwise.

In her opposition, Labrador back pedals, disavowing reliance on RESPA regulations she cites in her complaint—indeed, chastising SMC for showing her allegation is wrong. (*Compare*

Compl. ¶31 *with* Opp., 9:24-10:22.) But she never suggests how she could prove as a factual matter that the back-funded fee was not paid for loan servicing rights if, as she now appears to concede, the mortgage broker had those rights to sell. Moreover, Labrador fails to show why her purported factual dispute makes any legal difference. If a payment for loan servicing rights does not create a "financial interest" disqualifying the mortgage broker from receiving an origination fee under §206.31(a)(1), why would a payment made to encourage loan referrals? Labrador provides no answer because there is none. Simply stated, fees paid a broker for or in connection with a loan do not create a forbidden "financial interest" between broker and lender.

**3. Other Conflict-Of-Interest Laws And Regulations**

Labrador misses the point of the other conflict-of-interest statutes and regulations that SMC cited in its opening memorandum. (*Compare* Opening Memo., 6-7 *with* Opp., 11-12.) Unquestionably, "financial interest" can be, and has been, specially defined to include more than simply a legal or equitable ownership or entitlement in another entity. That, indeed, is just the point—when Congress or HUD wish the term to sweep more broadly, they do specially define it to do so. In §206.31(a)(1), however, the term is not specially defined, so its normal, narrower meaning is intended.

In short, Labrador's opposition does nothing to bolster the inadequate allegations of her complaint. Neither opposition nor complaint show any violation of 24 C.F.R. §206.31(a)(1). Accordingly, the entire complaint should be dismissed. Furthermore, since Labrador does not suggest how she could cure this defect by amendment, there is no reason to prolong this case. Dismissal should be without leave to amend.

## II.

## LABRADOR'S FIRST AND THIRD CLAIMS SHOULD BE DISMISSED FOR ADDITIONAL REASONS AS WELL

Labrador's first and third claims should be dismissed for reasons in addition to the fundamental defect discussed above. The first cause of action states no claim because the Elder Abuse act does not confer an independent right of action but only adds enhanced remedies to otherwise existing claims. The third cause of action fails because the Consumers Legal Remedies Act

("CLRA") does not apply to credit transactions, such as a reverse mortgage loan, and because Labrador has not alleged facts establishing a violation of any of the CLRA's specific prohibitions.

**A. There Is No Independent Right Of Action For Elder Financial Abuse**

The Elder Abuse Act provides additional protections for senior citizens, just not a new, independent cause of action. *Berkley v. Dowds*, 152 Cal.App.4th 518, 529 (2007). Rather, the Act "provides for attorney fees, costs and punitive damages" as heightened remedies when the plaintiff establishes some other, already existing tort and proves specified additional facts. *Id.*

Labrador's contrary authority, *Perlin v. Fountain View Mgmt., Inc.*, 163 Cal.App.4th 657 (2008), is unpersuasive for two reasons. First, *Perlin* relies completely on dicta as "authority for the proposition that the Act creates an independent cause of action." *Id.* at 666. Yet, dicta, even Supreme Court dicta, has no precedential value.[4]

Moreover, the dicta on which *Perlin* relies is particularly unpersuasive given the context of those decisions. In *Delaney v. Baker*, 20 Cal.4th 23, 29-32 (1999), the California Supreme Court held that *a* cause of action seeking the Act's heightened remedies was not based on professional negligence. *Delaney* was tried to a jury on negligence, willful misconduct, neglect and wrongful death. *Id.* at 28. The court emphasized that the "Act's goal was to provide heightened remedies" for elder abuse and "[r]egardless of what plaintiffs plead" they would have to prove "recklessness, oppression, fraud or malice" to recover those heightened remedies. *Id.* at 35, 41.

Likewise, *Covenant Care, Inc. v. Superior Court*, 32 Cal.4th 771, 790 (2004), actually held that it is the "gravamen of an action" that is determinative, not how the cause of action is styled. Since the gravamen of the plaintiffs' claims in that case was elder abuse, the limitations on pleading punitive damages in professional negligence actions (Code Civ. Proc., §425.13) did not apply to the plaintiff's common law tort claims for willful misconduct, fraud, battery, and false imprisonment. *Id.*

Second, unlike *Perlin*, *Berkley* relies on the statute itself as well as a prior appellate court decision which traced the legislative history of the Act before concluding that the 1991 amendment "fell short of creating a cause of action." *ARA Living Ctrs-Pac., Inc. v. Superior Court*,

---

[4] *People v. Gregg*, 5 Cal.App.3d 502, 506 (1970) (citing *Norris v. Moody*, 84 Cal. 143, 149, 24 P. 37 (1890)); *Sec. Pac. Nat'l Bank v. Wozab*, 51 C.3d 991, 1003 (1990).

18 Cal.App.4th 1556, 1563-64 (1993). Plaintiff, by contrast, cites cases which assumed, without deciding, that the Act creates a cause of action but did not consider the question.[5] "It is axiomatic,' of course, 'that [such] cases are not authority for propositions not considered." *Alfredo A. v. Superior Court*, 6 Cal.4th 1212, 1249 (1994).

Third, as the California Supreme Court itself said, "If the Legislature intends to create a private cause of action, we generally assume it will do so ' "directly[,] … in clear, understandable, unmistakable terms …" ' "[6] The Elder Abuse Act does not do so.

This Court should follow *Berkley* and *ARA Living*, not *Perlin*, and dismiss Labrador's first claim on the ground that there is no independent cause of action for elder abuse.[7]

**B. Labrador Alleges No Viable CLRA Claim**

**1. The CLRA Does Not Govern Reverse Mortgage Transactions**

In its opening memo (pp. 18-21), SMC showed that governing intermediate California appellate decisions have held that the CLRA does not apply to transactions, such as home mortgage loans, that are involve only the extension of credit. *Berry v. American Express Pub., Inc.*, 147 Cal.App.4th 224, 230 (2007); *McKell v. Washington Mut., Inc.*, 142 Cal.App.4th 1457, 1488 (2006).

Labrador responds with two federal district court decisions that hold to the contrary. (Opp., 16-20, citing *Munoz v. Fin. Freedom Senior Funding Corp.*, No. SA CV 07-710 (Oct. 16, 2007) (order on motion to dismiss) and *Jefferson v. Chase Home Fin. LLC*, No. 06-6510, 2007 U.S. Dist. LEXIS 36298 (N.D. Cal. May 3, 2007).)

As SMC pointed out in its opening memo (pp. 20, 21), the Ninth Circuit has directed district courts to follow decisions of a state's intermediate appellate courts interpreting that state's law

---

5 In *Intrieri v. Superior Court*, 117 Cal.App.4th 72, 82-85 (2004), the defendant moved for summary judgment on the ground there was no evidence of reckless neglect. The court of appeal disagreed, finding a triable issue of fact existed as to reckless neglect. In *Negrete v. Fidelity & Guar. Life Ins. Co.*, 444 F.Supp.2d 998, 1001-03 (C.D. Cal. 2006), the defendant contended that plaintiffs had not alleged facts showing it had "taken," "secreted," "appropriated," or "retained" the elder's funds.

6 *Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 44 Cal.3d 287, 294-295 (1988) (citation omitted).

7 Another appellate court has followed *Berkley*. *Oshiro v. All Nations Mission Church*, 2008 WL 2082140, *8 (Cal.App. 2008).

"unless the [district] court findings convincing evidence that the state's supreme court likely would not follow" those decisions. *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). "The opinions of other federal judges on a question of state law do not constitute 'convincing evidence that the state supreme court would decide [an issue] differently" from that state's intermediate appellate courts' decisions. *Id.* at 995 n. 1.

Under *Ryman*, this Court must follow SMC's intermediate state court decisions, not the conflicting federal district court cases that Labrador cites.[8]

**2. Labrador Has Not Alleged Facts Establishing A Violation Of The CLRA's Specific Prohibitions**

Even if the CLRA applied to the transaction, Labrador's third claim is insufficient because she alleges no facts showing any violation of the CLRA's prohibitions. (*See* Opening Memo., 22-25.) Labrador devotes less than a page to this question in her opposition, citing only three paragraphs of her complaint as supposedly averring the facts establishing the CLRA violation. (*See* Opp., 15:20-16:9, citing Compl., ¶¶18, 31, 32.) These small snippets are not up to the task.

Civil Code §1770(a)(3) prohibits misrepresenting "affiliation, connection or association with, or certification by" another. Labrador's complaint, even liberally construed, alleges no such misrepresentation. Rather, paragraphs 18, 31 and 32, cited in her opposition, aver that SMC misrepresented the purpose for which the back-funded fee was paid. Supposedly, SMC says the fee is paid for loan servicing rights when it is really paid to encourage the mortgage broker to send SMC more loans. (Compl., ¶¶18, 31, 32.) The purpose for which a fee is paid is not an "affiliation, connection or association with or certification by" another. Hence, even were the purpose misrepresented, the misstatement would not establish a violation of §1770(a)(3).

Civil Code §1770(a)(14) prohibits misrepresenting the "rights, remedies or obligations" that a transaction confers or involves. Paragraphs 18, 31, 32 of the complaint allege no misrepre-

[8] Moreover, *Munoz'* and *Jefferson's* reasoning is mistaken. The "services" they cite are nothing more than integral parts of the credit transaction itself. A credit product is not brought within the CLRA's regulatory scope simply because it is complex. Neither *Munoz* nor Labrador cite any feature of a reverse mortgage that involves anything other than the provision of credit—lending money upon the borrower's promise to repay and provision of security to assure fulfillment of that promise.

sentation regarding the "rights, remedies or obligations" of Labrador's reverse mortgage. What those paragraphs do allege is that SMC misstated the purpose of a payment that SMC made to Home Center in connection with Labrador's loan. The payment's purpose is not any right or remedy or obligation of Labrador's reverse mortgage transaction.

Finally, §1770(a)(19) bans inserting unconscionable terms in consumer contracts. Paragraphs 18, 31 and 32 of the complaint identify no term of Labrador's reverse mortgage, let alone aver facts showing the unmentioned term is unconscionable. Rather, as already stated, those paragraphs aver a misstatement of the purpose for which the back-funded fee is paid. Even if true, that allegation does not establish that SMC inserted any unconscionable provision in Labrador's loan agreement or any other contract she signed.

In short, Labrador's complaint fails to allege facts establishing a violation of any of the three CLRA provisions on which she relies.

## III.

## CONCLUSION

For the reasons stated above and in SMC's opening memo, the Court should dismiss the complaint without leave to amend.

DATED: August 21, 2008

SEVERSON & WERSON
A Professional Corporation

By: / s / (John B. Sullivan)
John B. Sullivan

Attorneys for Defendant
SEATTLE MORTGAGE COMPANY

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.