IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY LABRADOR, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>SEATTLE MORTGAGE COMPANY,<br><br>      Defendant. | Case No. 08-2270 SC<br><br>ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING LEAVE TO FILE FIRST AMENDED COMPLAINT |

## I. INTRODUCTION

Two motions are now before the Court in this matter. The first is the Motion for Summary Judgment ("MSJ") filed by Defendant Seattle Mortgage Company ("SMC" or "Defendant")). Docket No. 48. The second is Plaintiff Mary Labrador's ("Labrador's" or "Plaintiff's") Motion for Leave to File First Amended Complaint ("Mot. to Amend"). Docket No. 51. Both Motions are fully briefed. Docket Nos. 56 ("Pl.'s Opp'n to MSJ"), 58 ("SMC Opp'n to Mot. to Amend"), 60 ("SMC Reply re MSJ"), 62 ("Pl.'s Reply re Mot. to Amend"). Having reviewed all of the briefing submitted by both parties, the Court hereby DENIES SMC's Motion for Summary Judgment, and GRANTS Plaintiff leave to file a first amended complaint, for the reasons stated below.

**II. BACKGROUND**

This is a class action involving the legitimacy of certain fees that SMC has charged mortgagors who have entered into reverse mortgage transactions with SMC. According to Plaintiff's Complaint, a reverse mortgage, also known as a Home Equity Conversion Mortgage ("HECM"), is a type of home equity loan available only to senior homeowners whereby the homeowner is able to convert his or her home equity into cash while maintaining ownership of the home. Notice of Removal, Docket No. 1, Ex. A ("Compl.") ¶ 12. Unlike a typical mortgage, where the borrower makes monthly payments to the lender, in a reverse mortgage the lender makes monthly payments to the borrower. Id. These cash payments may in turn be used by the homeowner for living expenses, health care, or any other purpose. Id. The loan is secured by a deed of trust on the home. Id. Depending on the terms of the reverse mortgage, the borrower may not have to repay either the loan principal or the accrued interest so long as he or she remains living in the home. Id. If and when the homeowner is no longer able to care for him or herself and requires nursing-home care, or when the homeowner dies, the subsequent sale of the home is expected to generate the proceeds to repay the principal of the loan, as well as any interest, fees and expenses. Id. ¶ 13.

In July of 2006, a representative of Home Center Mortgage ("Home Center") contacted Plaintiff concerning the possibility of entering into a reverse mortgage loan. Id. ¶ 22. Plaintiff then entered into a reverse mortgage loan originated by SMC. Id. ¶ 23. At the close of the loan, Plaintiff paid an "origination fee" of $7,255.80 to SMC. Id. ¶ 24. This fee was conveyed in its entirety

2

by SMC to Home Center. In addition, SMC paid a "correspondent fee" to Home Center in the amount of $490 in connection with Plaintiff's loan. Id. ¶ 25. Although Plaintiff was told that the $490 fee was paid to Home Center for the servicing rights to the loan, she contends that the fee was in fact an incentive fee designed to motivate brokers to steer mortgagors to SMC. Id. ¶¶ 29-32.

The crux of Plaintiff's Complaint is that SMC violated the federal regulation 24 C.F.R. § 206.31(a)(1) ("§ 206.31(a)(1)"). This section states, in part, that a mortgage broker's fee may be included in the origination fee charged to the borrower "only if the mortgage broker is engaged independently by the homeowner and if there is no financial interest between the mortgage broker and the mortgagee." 24 C.F.R. § 206.31(a)(1). Plaintiff alleges that SMC, in paying the $490 "correspondent fee" to the mortgage broker Home Center, sought to induce Home Center to steer loans to SMC, and thereby created a financial interest between SMC and Home Center. Plaintiff alleges that, because this financial interest existed, SMC was prohibited under § 206.31(a)(1) from charging Plaintiff the origination fees she paid in connection with her reverse mortgage loan.

Plaintiff's Complaint currently includes four causes of action: (1) financial elder abuse, in violation of California's Elder Abuse and Dependent Adult Civil Protection Act ("Elder Abuse Act"), Welfare and Institutions Code § 15657.5 et seq.; (2) unlawful, deceptive, and unfair business practices, in violation of California Business and Professions Code § 17200 et seq.; (3) unjust enrichment; and (4) declaratory relief. See Compl. ¶¶ 45-

77.[1]

**III. LEGAL STANDARD**

    **A.    Summary Judgment**

Entry of summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must not weigh the evidence. Id. at 255. Rather, the nonmoving party's evidence must be believed and "all justifiable inferences are to be drawn in [the nonmovant's] favor." United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (quoting Anderson, 477 U.S. at 255). Where the party opposing summary judgment bears the burden of proof on a dispositive issue, it must offer specific evidence demonstrating a factual basis on which it is entitled to relief. Anderson, 477 U.S. at 256. The non-moving party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts. Id.

    **B.    Leave to Amend**

A party may amend its pleadings with leave of the court, and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy should be applied with

---

[1] The Complaint also includes a claim for violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1770 et seq., however this Court previously dismissed this cause of action following SMC's Motion to Dismiss. Docket No. 32. Plaintiff has not attempted to amend this cause of action.

4

"extreme liberality." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003). However, district courts may deny amendments that would cause undue prejudice to the defendant, that are sought in bad faith, that are futile, or that would cause undue delay. Bowles v. Reade, 198 F.3d 752, 757-58 (9th Cir. 1999). "Ordinarily, courts will defer consideration of challenges to the merits of a proposed amended pleading until after leave to amend is granted and the amended pleading is filed." Netbula, LLC v. Distinct Corp., 212 F.R.D. 534, 539 (N.D. Cal. 2003).

## IV. DISCUSSION

### A. Motion for Summary Judgment

Plaintiff relies upon § 206.31(a)(1) to establish the illegality of SMC's loan origination fee. This subsection lists the permissible "fees at closing," and it includes the following:

> A charge to compensate the mortgagee for expenses incurred in originating and closing the mortgage loan, which may be fully financed with the mortgage. The Secretary may establish limitations on the amount of any such charge. HUD will publish any such limit in the Federal Register at least 30 days before the limitation takes effect. The mortgagor is not permitted to pay any additional origination fee of any kind to a mortgage broker or loan correspondent. A mortgage broker's fee can be included as part of the origination fee only if the mortgage broker is engaged independently by the homeowner and if there is no financial interest between the mortgage broker and the mortgagee.

24 C.F.R. § 206.31(a)(1). Plaintiff's case rests upon the proposition that SMC violated the restriction in the fourth sentence of this subsection; i.e., that SMC charged her a "mortgage broker's fee" even though the mortgage broker was not "engaged independently by the homeowner" or there was a "financial interest

5

between the mortgage broker" and SMC.

SMC rests its Motion for Summary Judgment on a single argument, which is based upon its interpretation of this subsection. SMC argues that Home Center could not have been a "mortgage broker" as this regulation uses the phrase, because it was instead a "loan correspondent." See MSJ at 6-7. SMC notes that the third sentence forbids unauthorized payments by a mortgagor to both "a mortgage broker or loan correspondent." However, the fourth sentence -- upon which Plaintiff's claims rest -- forbids origination fees only to nonindependent "mortgage brokers," and makes no reference to "loan correspondents." SMC can therefore prevail if it can establish that Home Center was not a "mortgage broker" within the meaning of the subsection.

SMC has provided evidence to establish that Home Center is and was a loan correspondent approved by the United States Department of Housing and Urban Development ("HUD"). See SMC Request for Judicial Notice, Docket No. 49, Ex. A ("HUD Home Center Summary").[2] SMC does not argue that Home Center was not acting as a mortgage broker as the term is generally used. Rather, it is making a purely legal argument based on its reading of the regulation, and concedes that there are no disputes of underlying fact. Id.; SMC Reply re MSJ at 1. SMC claims that, if a party is acting as a

---

[2] SMC has requested judicial notice of a printout from Neighborhood Watch, a web site that displays data on lenders and appraisers, located at https://entp.hud.gov/sfnw/public/. Plaintiff does not object to this request, nor does she contest the facts contained therein. Because these facts are not subject to reasonable dispute, and are capable of determination using sources whose accuracy cannot reasonably be questioned, this Court takes judicial notice of the fact that Home Center is a HUD-approved loan correspondent. See New Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of data on web sites of federal agencies).

"loan correspondent," then that party can never be subject to the constraints placed on "mortgage brokers" by the fourth sentence of § 206.31(a)(1). See MSJ at 6-7.

Plaintiff counters that Home Center's status as a loan correspondent is irrelevant, because the terms "mortgage broker" and "loan correspondent" are not mutually exclusive. Pl.'s Opp'n to MSJ at 1. Plaintiff argues that Home Center was operating as a "mortgage broker" when it helped originate Plaintiff's reverse mortgage loan, and urges this Court to read the term "mortgage broker" in the fourth sentence of § 206.31(a)(1) to include Home Center. Id.

The term "mortgage broker" is not defined by the relevant HECM regulations, Part 206 of the Code of Federal Regulations Title 24. In fact, as SMC points out, § 206.31(a)(1) is the only time that Part 206 uses the term "mortgage broker" at all. Black's Law Dictionary defines a "mortgage broker" as, "An individual or organization that markets mortgage loans and brings lenders and borrowers together; A mortgage broker does not originate or service mortgage loans." Black's Law Dictionary 220 (9th ed. 2009). This is consistent with the definition of "mortgage broker" that HUD has issued for regulations pursuant to the Real Estate Settlement Procedures Act ("RESPA"), which state that a "[m]ortgage broker means a person . . . or entity that renders origination services and serves as an intermediary between a borrower and a lender in a transaction involving a federally related mortgage loan . . . ."

7

24 C.F.R. § 3500.2.[3]

Plaintiff has submitted evidence that an agent of Home Center contacted her, and arranged for her to enter into an HECM loan with SCM, and arranged for her to sign the necessary documents to establish the loan. See Johnson Decl. Ex. F ("Fullam Depo.") at 21:17-22:24, 25:23-26:09, 29:16-30:11.[4] Yet SMC, and not Home Center, served as the lender and mortgagee for this loan. Id. 72:25-73:14; Johnson Decl. Ex. B ("HUD-1 Settlement Statement"). For the purposes of summary judgment, the Court accepts, and SMC has not denied, that Home Center marketed, and provided origination services for, a loan to Plaintiff for which SMC was the lender; Home Center therefore appears to have functioned as a "mortgage broker" as the term is generally understood.

SMC therefore faces something of an uphill battle; to prevail, it must show that § 206.31(a)(1) uses the term "mortgage broker" in a unique way that somehow excludes Home Center. It attempts to do so by arguing that "HUD regulations use those words as a term of art. A loan correspondent is a HUD-approved loan origination company; whereas, a mortgage broker is not. HUD has always restricted the participation by non-approved entities in FHA-insured mortgage programs. Hence, § 206.31(a)(1)'s greater restrictions on payments to non-approved mortgage brokers." MSJ at 7. SMC claims that HUD generally has more controls and checks in

---

[3] As discussed further below, this definition explicitly includes "loan correspondent[s] approved under 24 CFR 202.8 for Federal Housing Administration programs . . . ." 24 C.F.R. § 3500.2.
[4] Mark. T. Johnson ("Johnson"), counsel for Plaintiff, submitted a declaration in support of the Opposition to the Motion for Summary Judgment. Docket No. 57. This declaration included excerpts from a transcript of the deposition of Michael Fullam ("Fullam"), a real estate salesperson employed by Home Center. Fullam Depo. at 21:17-22:24.

8

place over approved entities than it does over non-approved entities, and the last sentence of § 206.31(a)(1) was meant as a check on non-approved entities, whose role in the origination of HECM loans has been significantly circumscribed by HUD. Id. at 9.

SMC has recounted the development and context of § 206.31(a)(1) through its regulatory history, various HUD Mortgagee Letters and HUD Handbooks, in which HUD has described the roles that different institutions can play in reverse mortgage transactions. MSJ at 7-12. However, the Court finds little support for SMC's proposed special reading of the term "mortgage broker" in HUD's HECM-related publications, which only occasionally use the term. Rather, as described more fully below, HUD's use of the phrase "mortgage broker" in the HECM context has been ambiguous and inconsistent at best.

The Court first addresses HUD Mortgagee Letter 2008-14 (May 16, 2008) ("HML 08-14").[5] The Court begins its analysis with this document because it describes precisely what SMC means when it refers to "non-approved entities," and because it is the publication that SMC relies upon most heavily. This Letter addresses "the use of non FHA-approved mortgage brokers, subsequently referred to as a non-approved entity or third party (i.e., advisor, consultant, mortgage broker)." HML 08-14 at 1.

According to HML 08-14, loan origination can only be performed by FHA-approved entities, which include loan correspondents and sponsors (such as Home Center and SMC). See id. "However, FHA policy permits a non-approved entity or third-party to assist in

---

[5] The various HUD Mortgagee Letters cited in this Order are available on HUD's website, and are located at http://www.hud.gov/offices/adm/hudclips/letters/mortgagee/.

9

the origination of insured loans in certain limited ways, and to receive compensation for such services actually provided under certain limited circumstances." Id. Whereas FHA-approved entities must complete the origination process in order to receive compensation, a non-approved entity may only provide limited services "and may be compensated for those limited services under the circumstances described in this Mortgagee Letter and applicable FHA and RESPA regulations." Id. The Letter identifies certain activities that can be performed only by FHA-approved entities (such as taking information from the borrower and filling out loan applications, analyzing a borrower's eligibility for reverse mortgages, etc.), as well as activities that non-approved entities can perform (so-called "advisor" services, including education services, advising borrowers on different loan products, etc.). Id. at 1-2.[6]

HML 08-14 specifically recounts that, "[u]nder 24 C.F.R. § 206.31(a)(1), a non-approved entity or third party must be 'engaged independently by the homeowner,' and there must be 'no financial interest between the mortgage broker and the mortgagee.'" Id. at 2. This Letter therefore unambiguously confirms one aspect of SMC's reading of § 206.31(a)(1): There is no question that non-approved entities may be considered "mortgage brokers" for the purposes of the fourth sentence of the subsection. However, this Letter does not suggest that the fourth sentence applies exclusively to non-approved entities, or that the term "mortgage

---

[6] The role of non-approved entities has been restricted since HML 08-14 was issued. After October 1, 2008, only HUD-approved mortgagees or loan correspondents "may participate and be compensated for the origination of HECMs to be insured by FHA." HUD Mortgagee Letter 2008-24 (Sept. 16, 2008) at 1-2.

10

broker" categorically excludes "loan correspondents" or approved entities in general. As one might expect from a Letter explicitly directed towards non-approved entities, HML 08-14 comments on the applicability of § 206.31(a)(1) to non-approved entities without offering any comment whatsoever upon the applicability of the subsection to loan correspondents. Its silence in this respect is, at best, meager evidence in support of SMC's reading of § 206.31(a)(1).

SMC next attempts to describe the historical development of § 206.31(a)(1). MSJ at 10-12. The subsection did not include either the current third or the fourth sentences when it was originally passed in 1989. See 54 Fed. Reg. 24822, 24837 (June 9, 1989). According to SMC, the rule embodied by these sentences first appeared in HUD Mortgagee Letter 1993-22, ¶ 12(I) (July 19, 1993). In a section addressing "Third-Party Fees," the Handbook states:

> Mortgage Broker's Fees. The borrower may pay only if the broker is engaged independently by the mortgagor. A broker's fee is prohibited if there is any financial interest between the broker and the mortgagee. The broker agreement must be submitted with the mortgage insurance application.

Id.[7] Neither this provision, nor any of the surrounding provisions, suggests that the term "mortgage broker" was being used as a specialized term of art by the handbook, or that it was used to exclude loan correspondents.

In 2000, HUD issued Mortgagee Letter 2000-10 (Mar. 8, 2000)

---

[7] This same provision again appeared in HUD's HECM Handbook, Dir. No. 4235.1 REV-1 (Nov. 18, 1994) ¶ 6-13(I). The HUD Housing Handbooks cited in this Order are available on HUD's website, and are located at http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/.

11

("HML 00-10"), in response to Congress's decision to make the HECM program permanent. In language that closely resembles the current § 206.31(a)(1), HUD stated:

> The financed origination fee is now the full amount that the borrower can pay for the origination and underwriting of the mortgage and must also include the <u>full amount of any mortgage broker fee or loan correspondent fee.</u> The borrower is not permitted to pay any additional origination fees of any kind to a mortgage broker or loan correspondent. Lenders are reminded that a mortgage broker fee can be included as part of the origination fee only if the mortgage broker is engaged independently by the homeowner and that a mortgage broker's fee is prohibited if there is any financial interest between the mortgage broker and lender.

HML 00-10 at 1 (emphasis in original). This brief comment reproduces, rather than illuminates, any ambiguity in § 206.31(a)(1). Once again, the context does not suggest whether the term "mortgage broker" was used to exclude loan correspondents.

HUD proposed revising § 206.31(a)(1) in June of 2001. Home Equity Conversion Mortgage Program; Insurance for Mortgages To Refinance Existing HECMs, 66 Fed. Reg. 30278, 30281 (June 5, 2001). The proposed amendment permitted the following payment:

> A charge to compensate the mortgagee for expenses incurred in originating and closing the mortgage loan, which may be fully financed with the mortgage. The Secretary may establish limitations on the amount of any such charge. Any limitation on the origination fee shall include any fees paid to correspondent mortgagees approved by the Secretary. HUD will publish any such limit in the Federal Register at least 30-days before the limitation takes effect.

Id. The proposed amendment therefore mentioned correspondent fees, even though it made no mention of broker fees. This omission was addressed by several commenters during the ensuing notice and

12

comment period, and HUD eventually amended § 206.31(a)(1) to mirror the language set out in in HML 00-10.  See Home Equity Conversion Mortgage Program; Insurance for Mortgages To Refinance Existing HECMs, 69 Fed. Reg. 15586, 15590-91 (Mar. 25, 2004).  HUD stated:

> Comment: . . . The commenters wrote that, by only referring to loan correspondent fees, the third sentence of proposed § 206.31(a)(1) appears to undercut the guidance provided in Mortgagee Letter 00-10.  According to the commenters, the proposed regulatory language could be interpreted to permit only loan correspondent mortgagees, and not also mortgage brokers, to receive fees within the origination fee cap.  The commenters urged that § 206.31(a)(1) be revised to more closely track the language of the Mortgagee Letter, and explicitly provide that the origination fee shall include fees paid to mortgage brokers under the circumstances permitted by the Secretary.
>
> HUD response: . . . HUD agrees that the proposed regulatory language was confusing and has revised the language for purposes of clarity.  The revised language more closely tracks the guidance provided in Mortgagee Letter 00-10, and clarifies that the HECM origination fee limit includes the full amount of any fee related to the origination of the HECM loan paid to a mortgage broker or loan correspondent.

Id.  Following the above comments and response, HUD amended § 206.31(a)(1) to its current form.

It is significant that, prior to the most recent amendment of § 206.31(a)(1), when the subsection only addressed "correspondent fees" and omitted reference to "mortgage broker fees," the subsection did not include the restrictions upon which Plaintiff now relies.  Only when HUD revised the regulation to explicitly address mortgage broker fees did it include this restriction. While this suggests that correspondent fees and broker fees may be distinct concepts -- and that the restrictions in the fourth sentence of § 206.31(a)(1) are related only to broker fees  -- it

13

does not suggest that these concepts are mutually exclusive. Plaintiff provides a coherent explanation for how these two concepts can be different without treating them as exclusive. There are correspondents who are not brokers -- for example, HUD's FHA Title II Mortgagee Approval Handbook, Dir. No. 4060.1 REV-2 (Aug. 14, 2006) ("FHA MAH"), sets out the various types of approved mortgagees, and recognizes both "supervised" and "non-supervised" loan correspondents. Id. ¶ 1-2A to 1-2D. A supervised loan correspondent is a "supervised mortgagee" that has received approval to act as a loan correspondent. Id. ¶ 1-2D. The definition of supervised mortgagee "is limited to financial institutions that are members of the Federal Reserve System, and financial institutions whose accounts are insured by the Federal Deposit Insurance Corporation (FDIC), or the National Credit Union Administration (NCUA)," and includes "banks, savings associations, and credit unions." Id. ¶ 1-2A. Unlike non-supervised loan correspondents, supervised loan correspondents may originate HECM loans and hold insured mortgages in their own portfolio. Id. ¶¶ 2-28, 2-29. A supervised loan correspondent therefore may act as a loan correspondent without acting as a mortgage broker. Consequently, HUD could use the terms "loan correspondent" and "mortgage broker" as distinct but overlapping concepts, with the latter excluding supervised loan correspondents but including non-supervised correspondents, as well as non-approved entities like the ones described in HML 08-14.

SMC does not dispute that Home Center is a non-supervised loan correspondent. See HUD Home Center Summary. Plaintiff has identified several instances in which HUD has referred to non-

14

supervised loan correspondents as "mortgage brokers." The most
explicit example of this was the FHA Title II Mortgagee Approval
Handbook, in which HUD titled its definition of non-supervised loan
correspondents as "Non-supervised Loan Correspondent (i.e.,
mortgage brokers)." FHA MAH ¶ 1-2C. HUD's website also refers to
Home Center as a "broker" in tables that track the HECM
originations of Home Center and various non-supervised loan
correspondents. See Pl.'s Request for Judicial Notice ("Pl.'s
RJN"), Docket No. 55, Exs. D, E.[8] In other contexts, specifically
in its RESPA regulations, HUD explicitly includes loan
correspondents within its definition of "mortgage broker," stating
that "[a] loan correspondent approved under 24 CFR 202.8 for
Federal Housing Administration programs is a mortgage broker for
purposes of this part." 24 C.F.R. § 3500.2. While none of this
conclusively establishes that HUD had non-supervised correspondents
in mind when it used the term "mortgage brokers" in § 206.31(a)(1),
it does suggest that HUD often blurs these categories, and it
undermines SCM's claim that loan correspondents generally, and Home
Center in particular, cannot be "mortgage brokers" for the purpose
of interpreting the fourth sentence of § 206.31(a)(1).

Although the exclusive distinction between "loan
correspondent" and "mortgage broker" that is urged by SMC is
plausible, it is not well supported by related HUD publications or
regulatory history. And while it is clear HUD is not using the
term "mortgage broker" in a purely traditional sense in the fourth

---

[8] The Court takes judicial notice of these exhibits for the same reasons that it took judicial notice of the exhibit submitted by SMC, discussed in footnote 2, supra.

15

sentence of § 206.31(a)(1),[9] there is no evidence that HUD meant to exclude the common referent of the term when it drafted § 206.31(a)(1) (i.e., one who "brings lenders and borrowers together," Black's Law Dictionary 220). The Court is therefore not persuaded that the restrictions in the fourth sentence of § 206.31(a)(1) necessarily exclude loan correspondents in general, or Home Center in particular. SMC's Motion for Summary Judgment is therefore DENIED.

### B. Leave to Amend

Plaintiff has also filed a Motion for leave to add a claim for negligence against SMC. Mot. to Amend at 3-5. Plaintiff claims that SMC acted negligently by allowing its employees to charge Plaintiff a fee that was unlawful under § 206.31(a)(1). See Becker Decl. Ex A ("Proposed First Am. Compl.") ¶¶ 63-72.[10] SMC's objections to this Motion can be organized into two categories: (1) the request is futile, and (2) the request is untimely or prejudicial.

#### 1. Whether the Proposed Amendment Would be Futile

Plaintiff responds that "a proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim." Pl.'s Reply re Mot. to Amend at 7 (quoting Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988)). However, as another

---

[9] In particular, HUD's Mortgagee Letters make it clear that the term "mortgage broker" is being used to capture activities that do not appear to be central to the concept of "mortgage broker," such as educational services. See HML 00-10 at 2.

[10] Nance Becker ("Becker"), Counsel for Plaintiff, submitted a declaration in support of the Motion to Amend, which attached the Proposed First Amended Complaint as Exhibit A. The Becker Declaration was filed as Attachment #1 to the Motion to Amend.

district court in California has recently observed, "in light of the recent Supreme Court decisions in Iqbal v. Ashcroft, 129 S.Ct. 1937 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), it might more appropriately be said that an amendment is futile when the proposed amended complaint fails to allege 'enough facts to state a claim to relief that is plausible on its face.'" Williams v. County of Ventura, No. 07-7655, 2009 U.S. Dist. LEXIS 110167, *39-40 (C.D. Cal. Aug 7, 2009) (quoting Twombly, 550 U.S. at 570). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949.

SMC argues that the proposed negligence claim is futile because, as a general rule, "a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." Nymark v. Heart Fed. Savings & Loan Ass'n, 231 Cal. App. 3d 1089, 1096 (Ct. App. 1991). Nymark involved the question of whether a lender owed a borrower a duty of care "in appraising the borrower's collateral to determine if it is adequate security for a loan." Id. at 1095-96. "Liability to a borrower for negligence arises only when the lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender.'" Id. (quoting Wagner v. Benson, 101 Cal. App. 3d 27, 35 (1980). As the panel in Nymark wrote:

> In California, the test for determining whether a financial institution owes a duty of care to a borrower-client involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the

> plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

Id. at 1098 (citations and internal quotation marks omitted).

Plaintiff is alleging that SMC engaged in an unlawful scheme with certain brokers to steer prospective borrowers towards SMC's business. She is not alleging that SMC violated a duty to her by inadequately performing certain functions that lenders normally perform to protect their own interest, such as appraisal or assessment of collateral. C.f. id. at 1095-96. The Court finds that the existence of a duty to Plaintiff in this context is questionable, but defensible. As such, the Court finds that Plaintiff's proposed amendment is not so weak as to preclude consideration. The prudent procedure would be to allow Plaintiff to amend her complaint and defer ruling on the existence of a duty until this issue is further developed. See Netbula, 212 F.R.D. at 539.

### 2. Timeliness of this Motion

SMC claims that this Motion is untimely, and that SMC would be subject to prejudice should Plaintiff be permitted to file the amended complaint. SMC Opp'n to Mot. to Amend at 4-9. There is no basis for concluding that this Motion, which was filed three days after SMC's Motion for Summary Judgment, was intended to (or even had the potential to) frustrate SMC's Motion for Summary Judgment. This claim rests, like all of Plaintiff's other claims, primarily upon Plaintiff's ability to prove a violation of § 206.31(a)(1). If Plaintiff fails to prove such a violation, her proposed

negligence cause of action will likely fail with each of her other claims. The proposed cause of action simply attaches an additional legal theory to the same facts that Plaintiff had previously alleged. For this reason, the Court does not believe that the proposed amendment threatens to significantly alter the prospective legal or factual landscape of this suit. This suit is still in its early stages, and discovery related to class certification is still ongoing. In light of this circuit's liberal policy towards allowing amended pleadings, the Court finds it appropriate to GRANT Plaintiff's Motion to Amend in spite of her delay in filing it.

**V.  CONCLUSION**

Defendant SMC's Motion for Summary Judgment is DENIED. Plaintiff Labrador's Motion to Amend is GRANTED. Plaintiff must submit her amended complaint no later than five (5) days after the date of this Order.

IT IS SO ORDERED.

Dated: January 14, 2010

_____
UNITED STATES DISTRICT JUDGE