1  CHAVEZ & GERTLER LLP
   MARK A. CHAVEZ (Bar No. 90858)
2  NANCE F. BECKER (Bar No. 99292)
   42 Miller Ave.
3  Mill Valley, California  94941
   Telephone: (415) 381-5599
4  mark@chavezgertler.com
   nance@chavezgertler.com
5
   SCHNEIDER WALLACE COTTRELL
6    BRAYTON KONECKY LLP
7      MARK T. JOHNSON (Bar No. 76904)
       180 Montgomery Street, Ste. 2000
8      San Francisco, CA 94104
       Telephone: (415) 421-7100
9      mjohnson@schneiderwallace.com
10     GARRETT W. WOTKYNS (admitted *pro hac vice*)
       7702 East Doubletree Ranch Road, Suite 300
11     Scottsdale, AZ 85258
       Telephone: (480) 607-4368
12     gwotkyns@schneiderwallace.com
13 BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC
   ANDREW S. FRIEDMAN (admitted *pro hac vice*)
14 2901 N. Central Avenue, Suite 1000
   Phoenix, Arizona 85012
15 Telephone: (602) 274-1100
   afriedman@bffb.com
16
   Attorneys for Plaintiff
17
                    UNITED STATES DISTRICT COURT
18
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
19
20 MARY B. LABRADOR, individually and on ) Case No.:  CV-08-2270 SC
   behalf of all others similarly situated,        ) CLASS ACTION
21                                                  )
              Plaintiff,                            ) **PLAINTIFF'S NOTICE OF MOTION,**
22                                                  ) **MOTION, AND MEMORANDUM OF**
   vs.                                              ) **POINTS AND AUTHORITIES IN**
23                                                  ) **SUPPORT OF CLASS**
   SEATTLE MORTGAGE COMPANY,                        ) **CERTIFICATION**
24                                                  )
              Defendant.                            ) **Date:**  Sept. 17, 2010
25                                                  ) **Time:**  10:00 a.m.
26                                                  ) **Ctrm:**  1
                                                    ) **Before:** Hon. Samuel Conti
27                                                  )
28 _____ ) Trial Date:  not set

# TABLE OF CONTENTS

**PAGE**

NOTICE OF MOTION AND MOTION
FOR CLASS CERTIFICATION ........................................................................... 1

RELIEF SOUGHT ............................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 2

I.      INTRODUCTION ........................................................................................ 2

II.     SUMMARY OF THE CASE ....................................................................... 3

        A.      Plaintiff's Reverse Mortgage Transaction ................................... 3

        B.      SMC's Reverse Mortgage Practices................................................ 4

        C.      Claims Asserted ................................................................................ 7

        D.      The Class ............................................................................................ 9

III.    ARGUMENT ................................................................................................ 10

        A.      This Case Meets Each of The
                Requirements of Rule 23(a) ............................................................ 10

                1.      Numerosity ............................................................................ 11

                2.      Commonality ......................................................................... 11

                3.      Typicality ............................................................................... 13

                3.      Adequacy ............................................................................... 15

        B.      This Case Meets Each of The
                Requirements of Rule 23(b)(3) ...................................................... 16

                1.      Common Questions of Law and Fact Predominate ......... 16

                2.      Class Treatment is Superior ................................................ 17

IV.     CONCLUSION............................................................................................. 18

1

# **TABLE OF AUTHORITIES**

2

**PAGE**

3

**CASES**

4

*Amchem Prods. Inc. v. Windsor*
    521 U.S. 591 (1997) ....................................................................... 16

5

*Barefield v. Chevron U.S.A., Inc.*
    1987 WL 65054 (N.D.Cal. Sept. 9, 1987) at *5 ....................................... 14

6

7

*Brewer v. Salyer*
    2009 WL 1396148 (E.D. Cal. May 18, 2009) ......................................... 10

8

*DeBoer v. Mellon Mortgage Co.*
    64 F.3d 1171 (9th Cir. 1995) ........................................................... 15

9

10

*Dukes v. Wal-Mart Stores, Inc.,*
    603 F.3d 571 (9th Cir. 2010) ............................................ 10, 11, 13, 15

11

*East Texas Motor Freight Sys. Inc. v. Rodriguez*
    431 U.S. 395 (1977) ..................................................................... 13

12

13

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011, (9th Cir. 1998) ........................................ 11, 13, 15, 16

14

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992) ........................................................... 13

15

16

*Haynes v. Logan Furniture Mart Inc.*
    503 F.2d 1161 (7th Cir. 1974) ......................................................... 18

17

*In re Southeast Hotel Properties Ltd. Partnership Investor Lit.*
    151 F.R.D. 597 (W.D.N.C. 1993) ..................................................... 15

18

19

*Jordan v. County of Los Angeles*
    669 F.2d 1311 (9th Cir. 1982) ......................................................... 13

20

*Kamar v. Radio Shack Corp.*
    254 F.R.D. 387 (C.D. Cal. 2008) ..................................................... 16

21

22

*Lerwill v. Inflight Motion Pictures, Inc.*
    582 F.2d 507 (9th Cir. 1978) ........................................................... 15

23

*Moore v. Hugues Helicopters, Inc.*
    708 F.2d 475 (9th Cir. 1983) ........................................................... 10

24

25

*Savino v. Computer Credit, Inc.*
    173 F.R.D. 346 (E.D.N.Y 1997),
    *aff'd* 164 F.3d 81 (2nd Cir. 1998) ................................................... 11

26

27

*United Steel v. ConocoPhillips Company*
    593 F.3d 802 (9th Cir. 2010) ........................................................... 10

28

ii

*Walters v. Reno*
    145 F.3d 1032 (9th Cir. 1998) ...................................................................... 11

*Weimer v. Syntex Corp.*
    117 F.R.D. 641 (N.D. Cal. 1987) .................................................................. 11

*Zinser  v. Accufix Research Institute, Inc.*
    253 F.3d 1180 (9th Cir. 2001) ...................................................................... 17

**STATUTES**

24 C.F.R. § 206.31 ........................................................................................*passim*

Cal. Welf. & Inst. Code § 15610.30(a) ...................................................................... 8

Cal. Welfare & Institutions
    Code §§ 15657.5 et seq. ................................................................................ 8

California Business & Professions Code §§ 17200 .................................................. 8

Fed. R. Civ. P. 23 ........................................................................................*passim*

**OTHER AUTHORITIES**

2 Alba Conte & Herbert B. Newberg, <u>Newberg on Class Actions</u> § 3:10, at
    271(4th ed. 2002) .................................................................................... 11, 13

FHA Title II Mortgagee Approval Handbook
    No. 4060.1 rev. 2 ...................................................................................... 5

HUD Mortgagee letter 08-34 ................................................................................ 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S MEMO. IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
*CASE NO. CV-08-2270 SC*

1       **NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

2 TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE that on September 17, 2010 at 10:00 a.m., or as soon

4 thereafter as the matter may be heard, in the courtroom of the Honorable Samuel Conti,

5 Judge of the United States District Court for the Northern District of California, Plaintiff

6 Mary Labrador will, and she hereby does, move the Court to certify this case as a class action

7 pursuant to the Federal Rules of Civil Procedure, Rules 23(a) and 23(b)(3).  Said motion is

8 based on this Notice, the accompanying Memorandum of Points and Authorities,

9 Declarations and Exhibits, documents on file in the record of this case, and such other

10 evidence and argument as may be submitted in Reply and presented at the hearing.

11              **RELIEF SOUGHT**

12      Plaintiff asks the Court to certify as a class action her claims for equitable and

13 monetary relief arising from defendant Seattle Mortgage Company's systematic violation of

14 regulations enacted by the federal Department of Housing and Urban Development ("HUD")

15 for the protection of senior citizens who purchase FHA-insured Home Equity Conversion

16 Mortgage ("HECM") loans, commonly known as "reverse mortgages."  Plaintiff will show

17 that, in clear violation of the HUD regulations promulgated at 24 C.F.R. §206.31(a)(1),

18 Seattle Mortgage Company improperly charged her and thousands of other California seniors

19 thousands of dollars in loan origination fees that the bank was not entitled to charge.

20 Plaintiff asks the Court: (a) to declare Seattle Mortgage Company's conduct unlawful; (b) to

21 impose a constructive trust and order restitution of all origination fees unlawfully collected

22 from Ms. Labrador and from the class; (c) to award damages for negligence *per se* and

23 statutory penalties and damages for elder abuse as provided by California law; and (d) to

24 award Plaintiff her costs and attorneys' fees.

25      By this motion, Plaintiff asks the Court:

26      (1) To certify the following class pursuant to Federal Rule of Civil Procedure

27 23(b)(3):  "All elders in California who, during the period March 19, 2004 through

28 June 20, 2007, purchased an SMC-funded Home Equity Conversion Mortgage

1  through a loan correspondent sponsored by SMC and were charged an "origination

2  fee," when (a) the loan origination fee was conveyed, in whole or in part, to the loan

3  correspondent, and (b) the loan correspondent was also paid a "correspondent" or

4  "service release premium" fee by SMC.

5        (2) To designate her as the class representative; and

6        (3) Pursuant to Federal Rule of Civil Procedure 23(g), to appoint the law firms

7  Schneider Wallace Cottrell Brayton Konecky LLP and Chavez & Gertler LLP as counsel for

8  the class.

9

10        **<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

11  **I.**   **INTRODUCTION**

12        This action seeks redress for thousands of California seniors who were overcharged

13  for closing costs when they refinanced their homes with FHA-insured HECM loans funded

14  by defendant Seattle Mortgage Company ("SMC").  Class certification is appropriate

15  because the predominant issue before the Court is whether SMC's manner of compensating

16  the loan correspondents (commonly known as mortgage brokers) who referred class

17  members' loans to it for funding was or was not contrary to applicable federal law.  That

18  issue is identical for each of the elderly homeowners on whose behalf Plaintiff sues.

19        In order to prevent correspondent brokers from steering homeowners into unsuitable

20  HECM loans motivated in whole or in part by the maximization of fees, federal regulations

21  prohibit lenders from charging borrowers expensive "origination fees" in connection with

22  such loans whenever there is a "financial interest" between the mortgage broker and the

23  lender.  *See* 24 C.F.R. § 206.31(a)(1).  It is undisputed that pursuant to a standardized

24  agreement, SMC paid hundreds of dollars in fees to each of the correspondents who referred

25  California reverse mortgage borrowers to SMC, and at the same time charged borrowers

26  thousands of dollars in origination fees which it also passed on to the brokers.  Plaintiff's

27  right to recover stands or falls on the question whether the correspondent payments – which

28

1    were competitively calculated to increase SMC's HECM market share – created a "financial

2    interest" between SMC and the correspondents within the meaning of the regulation.

3            Plaintiff Mary Labrador is one of at least 8,200 California seniors alleged to have

4    been victimized by SMC's illegal compensation scheme during the relevant period.  Because

5    these individuals reside throughout the state, are too numerous to join, and are very likely

6    unaware of this violation of their rights, and because the extent of SMC's liability to each

7    class member turns on the identical legal question of whether SMC's method of

8    compensating its reverse mortgage brokers violated federal law, this case meets all

9    requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) and should be certified

10   as a class action.

11   **II.     SUMMARY OF THE CASE**

12           **A.     Plaintiff's Reverse Mortgage Transaction**

13           A home equity conversion mortgage ("HECM"), commonly referred to as a "reverse

14   mortgage," is a type of home equity loan available only to homeowners aged 62 and over.

15   (*See* Deposition of Sarah Hulbert, April 15, 2010 ["Hulbert Depo.", Exh. C] at 26:3-15.)

16   Reverse mortgages are designed to allow the homeowner to convert the equity in his or her

17   home to cash while maintaining ownership of the home.  *Id.* Unlike a typical "forward"

18   mortgage, where the borrower makes monthly payments to the lender and the principal loan

19   amount decreases over time, in a reverse mortgage transaction it is the lender that makes one

20   or more payments to the borrower, while interest continues to accrue and the loan balance

21   goes up over time.  In most cases, the borrower does not need to repay either the principal or

22   the interest so long as s/he remains living in the home.  *Id.*

23           In or about June, 2006, Michael R. Fullam, a licensed real estate broker employed by

24   Home Center Mortgage, visited plaintiff Mary Labrador at her home and encouraged her to

25   refinance her existing loan with Washington Mutual with a reverse mortgage.  (Deposition of

26   Michael Fullam, March 30, 2010 ["Fullam Depo." Exh. B] at 21:17-22:24; 25:23-26:09;

27   29:16-30:11; Deposition of Mary Labrador, June 22, 2010 ["Labrador Depo.," Exh. D],

28   18:22-19:7.)  Ms. Labrador was over 80 years old and living by herself at the time.

1  (Labrador Depo. at 19:15-16.) Fullam presented Labrador with an application for a reverse

2  mortgage loan from SMC, which he filled out on the spot. (Fullam Depo. 72:25-73:14.) The

3  application was accepted and approved by SMC. As per their agreement, and as set forth on

4  the HUD-1 Settlement Closing Statement in connection with the loan (Exh. F), SMC paid

5  Home Center a $490 "correspondent fee" in exchange for the referral of the loan. SMC also

6  paid Home Center the entire $7,255 "origination fee" that Ms. Labrador was charged (less

7  certain agreed costs), which charge she financed from the proceeds of the loan. (Hulbert

8  Depo. at 183:7-18.) Although Ms. Labrador, like most reverse mortgage obligors, makes no

9  monthly payments on the loan, interest on the entire principal debt – including the $7,255

10  attributable to the illegal origination fee – continues to accrue on a monthly basis.

11  **B.    SMC's Reverse Mortgage Practices**

12  SMC sold reverse mortgages through both retail and wholesale channels. As

13  explained by SMC's Senior Vice President, Reverse Mortgages Sarah Hulbert, "retail"

14  reverse mortgage originations "are made by employees of the company, …, and they are

15  originated, funded, and closed in our company's name," while "wholesale" originations

16  occur when "loan correspondents" take loan applications from borrowers, fill out the

17  paperwork, and then submit the application materials to the lender for underwriting, approval

18  and funding. (Hulbert Depo. at 35:7-21, 27:10-20.)

19  With respect to its wholesale operations in California, SMC acquired and funded

20  HECM loans through a network of mortgage brokers approved by HUD as loan

21  correspondents, who applied to and received approval from SMC to participate in its loan

22  correspondent program. During the relevant time period, SMC approved and sponsored at

23  least 59 such companies, through which it funded more than 7,800 HECM loans. (Depo. of

24  Robert Engelhorn ("Engelhorn Depo."), May 11, 2010, [Exh. A] at 23:14-24:9; 29:5-6;

25  Engelhorn Exh. 48 [Exh. H hereto].)[1]

26

27  [1] Because of confidentiality issues, Exhibits H-L to this motion are filed conditionally under
    seal, along with a related Administrative Motion pursuant to Local Rule 79-5(d).

28

1    SMC's relationship with its loan correspondents was governed in all cases by a

2    standard form correspondent agreement. As explained by Ms. Hulbert,

> [T]he correspondent agreement is an agreement between the sponsor and
> the correspondent whereby the correspondent provides reps and warrants
> as to their ability and approval to legally originate reverse mortgages,
> originate loans.  The sponsor agrees to provide certain services, such as
> underwriting and such, and it outlines the nature of the relationship,
> including termination of the relationship, resolution of any issues that
> come up, as well as the compensation for the correspondent.

7    (Hulbert Depo. at 41:7-16.)

8    Throughout the relevant time period, from 2004 until SMC sold its reverse mortgage

9    assets to Bank of America in 2007, SMC had a standard template correspondent agreement

10   which was maintained on its computer server.  (Hulbert Depo., 42:21-43:13.)  The agreement

11   was drafted by SMC, and the body of the text was identical for virtually all of the

12   correspondents.  (*Id.*, 44:10-15, 49:10-50:10.)[2]  SMC's correspondent agreement with Ms.

13   Labrador's broker, Home Center (Exh. K hereto), was marked as Exh. 44 to the Hulbert

14   Deposition and "is the template that was created very shortly before [Ms. Hulbert] left

15   Seattle Mortgage."  (Hulbert Depo. 157:24-158:16, 160:19-161:7.)  Other templates used by

16   SMC during the relevant time period that have been identified by SMC's representatives are

17   filed conditionally under seal herewith as Exhibits I, J, L.

18

19

---

[2] While some loan correspondents (commonly known as "supervised" or "full eagle" correspondents) are authorized by federal law to act as lenders, most of SMC's reverse mortgage correspondents, including Home Center, are "unsupervised" ("mini-eagles"), meaning that they are not directly overseen by federal regulators.  Such unsupervised loan correspondents have no authority to enter into lending agreements in their own name and may not hold, purchase or service mortgages; instead, they are "sponsored" by one or more authorized lenders in whose name the loan is originated.  *See* Hulbert Depo. at 61:15-22, 66:13-21; FHA Title II Mortgagee Approval Handbook, No. 4060.1 rev. 2, Chapter 1, Section 1-2.  (The Handbook was previously submitted to the Court as Exh. E to SMC's Motion for Summary Judgment filed Aug. 28, 2009, Document No. 50-1.)  In 2004, SMC had two standard correspondent agreements, one for supervised correspondents and one for unsupervised correspondents.  (Deposition of John S. Nixon, May 12, 2010 ["Nixon Depo.," Exh. E] at 63:21-64:15; Hulbert Depo. 62:20-64;1.) The agreements were later combined. *Id.*  The distinction between supervised ("full eagle") and unsupervised ("mini-eagle") correspondents is irrelevant to the issues presented here, as during the relevant period *all* of SMC's correspondents were paid both "correspondent" and loan origination fees for loans that were originated in SMC's name.  (Hulbert Depo. at 184:5-10.)

At all times relevant hereto, the correspondent agreement consistently provided that a loan correspondent who referred a reverse mortgage loan that was approved by SMC would receive both a "correspondent fee" and the origination fee charged to the borrower.  (Hulbert Depo. at 183:19-184:10.)  This procedure was followed in Ms. Labrador's case:  SMC paid Mr. Fullam and Home Center a correspondent fee of $490, and the loan origination fee, $7,255.80, was taken out of the loan proceeds and paid to Home Center.  (Labardor HUD-1, Exh. F; Hulbert Depo. 183:7-18.) Ms. Hulbert confirmed that this was SMC's standard policy and practice:

> Q.  Was that the standard practice, the payment of those two fees, those two amounts, to loan correspondents in California who were participating in Seattle Mortgage's loan correspondent program?  [Mr. Huo: Objection, vague.]
>
> A.  It's my understanding that it was, yes. In my experience, it is customary.
>
> Q. That would have applied to all … of the mini-eagle California loan correspondents that participated in the program?
>
> A. Yes.
>
> Q. *During the period of time, the relevant period of time from April 2004 to August of 2007, were there any agreements, loan correspondent agreements, that didn't call for the loan correspondent to receive both an origination fee and a correspondent fee?*
>
> *A.  No.*

(Hulbert Depo. 183:19-184:10 [emphasis added].)

SMC elected to calculate the correspondent fees it paid on the basis of the amount of servicing fees to be collected on the loan, which were either $25, $30, or $35 per month. (Nixon Depo. at 103:17-105:4; SMC Correspondent Agreement [Engelhorn Depo. Exh. 49], Exh. I.)[3]  As a result, the larger the monthly servicing charge that the correspondent

---

[3]SMC at some point changed the name of the fee from "service release premium" or "SRP" to "correspondent fee."   This was a change in name and not substance.  (Hulbert Depo., 90:2-91:16; 69:16-70:1 ["A servicing release premium is a correspondent fee that is paid to the correspondent based upon the age of the customer and the monthly servicing fee that is charged to the customer…. It's additional correspondent compensation on the loan that is paid outside of closing…."].)

6

1   determined the borrower should pay, the larger the fee that SMC paid to the correspondent.

2   (*Id.*, 107:13-17.)  This system of compensation is *not* required or authorized by HUD; it was

3   something that SMC – borrowing from its major competitor, Financial Freedom – devised.

4   (*Id.*, 107:21-109:5.)

5         **C.**    **Claims Asserted**

6         Because they are targeted to seniors and are complex transactions, HECM loans are

7   heavily regulated.  Among other things, HUD is authorized to, and does, limit the amount of

8   the loan origination fee that the lender can charge the homeowner in connection with the

9   loan.  24 C.F.R. § 206.31(a)(1); HUD Mortgagee letter 08-34 (Exh. G).  The borrower cannot

10  be required to pay any additional origination fee of any kind to a mortgage broker or loan

11  correspondent.  24 C.F.R. §206.31(a)(1).  Finally, as relevant to this case, no part of a

12  mortgage broker's fee may be included in the origination fee charged to the borrower *unless*

13  "the mortgage broker is engaged independently by the homeowner *and ... there is no*

14  *financial interest between the mortgage broker and the mortgagee.*"  *Id.* (emphasis added).

15        The payment of correspondent fees was intended by SMC to, and did in fact, serve as

16  an incentive for brokers like Home Center to refer HECM loans to SMC, as opposed to

17  another bank.  For example, Plaintiff has recently obtained through discovery from Bank of

18  America (which in 2007 purchased SMC's entire reverse mortgage portfolio) a 2006

19  document titled "Strategic Partner Addendum" (Hulbert Depo. Exh. 36, Exh. L at pp. 23-24)

20  which amended SMC's standard template Reverse Mortgage Correspondent Agreement by

21  increasing the amount of correspondent fees eligible brokers could earn.  The Addendum

22  repeatedly refers to the correspondent lenders who refer large numbers of HECM loans to

23  SMC as the bank's "business partners," and offers those partners additional monetary

24  incentives in order to foster "a strong, productive working relationship with a business

25  partner."  The Addendum provided that the more loans the broker referred to SMC, the

26  higher its share of the unpaid balance of the borrower's loan would be.  ***SMC witnesses***

27  ***agree that the purpose of these new fee incentives was to increase referrals to SMC***.  *See,*

28  *e.g*., Nixon Depo. at 114:14-20 (agreeing that one of the purposes for offering correspondent

1  fees was "to encourage loan correspondents to bring their loans to Seattle Mortgage

2  Company rather than Seattle Mortgage Company competitors"); Hulbert Depo. at 199:4-

3  200:16 (for a limited time SMC paid out additional correspondent fees to brokers who

4  referred it 75% or more of their business in order to "increase market share" and "build our

5  business"); Engelhorn Depo. at 114:5-115:8 (when the secondary market for reverse

6  mortgages began to expand, SMC entered into agreements with its correspondents "to pay

7  them a certain amount of the secondary market price in return for a portion of the business

8  that that company generated."). These documents and testimony strongly support Plaintiff's

9  theory that there was a significant "financial interest" between Home Center and SMC which

10  precluded SMC from charging origination fees to Ms. Labrador and similarly situated

11  seniors.

12       SMC's violation of the HUD regulation constitutes (1) financial elder abuse, in

13  contravention of California's Elder Abuse and Dependent Adult Civil Protection Act (Cal.

14  Welfare & Institutions Code §§ 15657.5 et seq., § 15610.30(a));[4] (2) an unlawful and

15  deceptive business practice, in violation of California Business & Professions Code §§ 17200

16  et seq.; and (3) negligence per se (failure to comply with federal law and regulations).

17  Plaintiff accordingly asks the Court (a) to declare SMC's conduct unlawful, (b) to impose a

18  constructive trust and order restitution of all origination fees unlawfully collected from her

19  and from the class, (c) to award statutory penalties and damages for elder abuse and

20  negligence; and (d) to award her costs and attorneys' fees.

21       The Court has repeatedly denied SMC's efforts to avoid liability to Plaintiff and the

22  proposed class.  On October 10, 2008, the Court denied SMC's motion to dismiss (Document

23  No. 32), which was premised on its assertion that there was no "financial interest" between

24  SMC and Home Center as a matter of law.  The Court found that the term "financial interest"

25

26  [4] "Financial abuse" of an elder is defined in the statute to include the taking or appropriation of
    the real or personal property of an elder for a wrongful use and/or with intent to defraud, or
27  assisting in such taking.  Cal. Welf. & Inst. Code § 15610.30(a).

28

1   must be given its "plain and ordinary meaning" and concluded that resolution of that issue

2   must await "further factual development."  (*Ibid*, p. 6.)  It found that all of Plaintiff's other

3   remaining claims are also sufficient to state valid claims for relief.  Next, on January 15,

4   2010, the Court denied SMC's motion for summary judgment (Document No. 64), rejecting

5   SMC's contention that Ms. Labrador's loan is exempt from 24 C.F.R. §206.31(a)(1) because

6   Home Center is a "loan correspondent" and not a "mortgage broker."  The Court agreed with

7   Plaintiff that in this context, the terms "loan correspondent" and "mortgage broker" are not

8   mutually exclusive; found that "Home Center marketed, and provided origination services

9   for, a loan to Plaintiff for which SMC was the lender;" and held that "Home Center therefore

10  appears to have functioned as a 'mortgage broker' as the term is generally understood."

11  (*Ibid,* p.8.)

12          **D.      The Class**

13          As discussed above, it is undisputed that the correspondent agreement which

14  governed the relationship between Home Center and SMC was a standard form agreement,

15  drafted by SMC, which served as the model for all of SMC's dealings with its approved loan

16  correspondents in California.  Accordingly, the class Ms. Labrador seeks to represent is not

17  and should not be limited to seniors who obtained HECM loans through Home Center, but

18  includes all seniors who obtained brokered HECM loans funded by SMC within the relevant

19  period.  The proposed class definition is:

20          All elders in California who, during the period March 19, 2004 through
            June 20, 2007, purchased an SMC-funded Home Equity Conversion
21          Mortgage through a loan correspondent sponsored by SMC and were
            charged an "origination fee," when (a) the loan origination fee was
22          conveyed, in whole or in part, to the loan correspondent, and (b) the loan
            correspondent was also paid a "correspondent" or "service release
23          premium" fee by SMC.[5]

24

25  _____

26  [5] The cutoff date of June 30, 2007 is based on the fact that, pursuant to the Asset Purchase
    Agreement between SMC and Bank of America, loans signed on or before that date are
27  considered to be SMC loans, while loans funded thereafter are considered Bank of America
    loans.  (Engelhorn Depo. at 25:5-9; *see* Hulbert Depo. at 35:22-36:16.)

28

1   Mr. Robert Engelhorn, who was designated by SMC as its "person most knowledgeable"

2   about these issues, testified and authenticated documents showing that SMC paid both

3   correspondent and origination fees to some 59 mortgage brokers in connection with over

4   7,800 loans to class members.  (Engelhorn Depo. at 23:14-24:9; 29:5-6; 48:18-23

5   [confirming that all of the companies listed on Exh. 48 to his deposition were paid both a

6   correspondent and an origination fee]; Exh. H hereto.) The name and address of each of

7   those class members has already been ascertained by SMC.

8   **III.   ARGUMENT**

9       **A.   This Case Meets Each of The Requirements of Rule 23(a)**

10      Federal Rule of Civil Procedure 23(a) sets forth four requirements for certification as

11  a class action:  numerosity, commonality, typicality, and adequacy of representation.  In

12  determining whether those requirements are met, and thus whether certification is

13  appropriate, the Court is precluded from evaluating the merits, and is instead "only to

14  consider whether the type of proof offered by plaintiffs … will be of classwide character

15  such that class action treatment of the case will be superior to myriad individual actions."

16  *Brewer v. Salyer*, 2009 WL 1396148 (E.D. Cal. May 18, 2009); *see also Moore v. Hugues*

17  *Helicopters, Inc.,* 708 F.2d 475, 480 (9th Cir. 1983).  As the Ninth Circuit has recently

18  confirmed, "'nothing in either the language or history of Rule 23 … gives a court any

19  authority to conduct a preliminary inquiry into the merits of a suit in order to determine

20  whether it may be maintained as a class action.' [Citation.] * * * '[N]either the possibility

21  that a plaintiff will be unable to prove his allegations, nor the possibility that the later course

22  of the suit might unforeseeably prove the original decision to certify the class wrong, is a

23  basis for declining to certify a class which apparently satisfies [Rule 23].' [Citation.]."

24  *United Steel v. ConocoPhillips Company,* 593 F.3d 802, 808-809 (9th Cir. 2010); *see also*

25  *Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571, 588 (9th Cir. 2010) (while "a preliminary

26  inquiry into the merits is sometimes necessary to make a meaningful determination of class

27  certification issues," "[a]t the same time, the court is required to take the allegations of the

28  complaint as true." [Internal quotes and citation omitted.]).

1    The Court should certify the proposed class in this case because Ms. Labrador's

2    claims easily satisfy each of the requirements of the Federal Rules under those standards.

3            **1.    Numerosity**

4    Numerosity exists if "the class is so numerous that joinder of all members is

5    impracticable." Fed. R. Civ. Proc. 23(a)(1). The proposed class here is sufficiently

6    numerous to satisfy this requirement; it consists of over 7,800 senior citizens located

7    throughout California.

8            **2.    Commonality**

9    To proceed as a class representative, Plaintiff need only demonstrate that "there are

10   questions of law or fact common to the class." Fed. R. Civ. Proc. 23(a)(2). "Commonality

11   focuses on the relationship of common facts and legal issues among class members." *Dukes*,

12   603 F.3d at 599, citing [2 Alba Conte & Herbert B. Newberg, Newberg on Class Actions §

13   3:10, at 271(4th ed. 2002).] The purposes of this requirement are: (i) to ensure that absentee

14   members are fairly and adequately represented, and (ii) to promote practical and efficient

15   case management. *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998). The requirement is

16   construed permissively: "All questions of fact and law need not be common to satisfy the

17   rule. The existence of shared legal issues with divergent factual predicates is sufficient…."

18   *Dukes,* 603 F.3d at 599, quoting *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir.

19   1998). Further, the commonality requirement is qualitative rather than quantitative, and may

20   be satisfied "by showing a single issue common to all members of the class." *Weimer v.*

21   *Syntex Corp.,* 117 F.R.D. 641, 644 (N.D. Cal. 1987). *See also Dukes, supra,* at 599; *Savino*

22   *v. Computer Credit, Inc.,* 173 F.R.D. 346, 352 (E.D.N.Y 1997), *aff'd* 164 F.3d 81 (2nd Cir.

23   1998), and Conte & Newberg, *supra*, § 3:10, at 272-74.

24   The commonality requirement is easily satisfied here, as there is but a single

25   overarching issue to be resolved by the Court in determining SMC's liability to each class

26   member: whether SMC's relationship with its sponsored loan correspondents/brokers,

27   including its standard formula for compensating those brokers for the origination of HECM

28   loans in SMC's name, creates a "financial interest" within the meaning of 24 C.F.R. §

11

1  206.31.  If so, then the regulation prohibited SMC from charging each of the class member

2  homeowners the origination fees that were paid to the correspondent brokers.

3      Additional issues that may need to be addressed by the Court are also common to the

4  class.  They include:

5   • Whether, as SMC at times has contended, the correspondent fee was a payment for

6      the transfer of the servicing rights to HECM loans, rather than a referral fee paid for

7      originating loans in SMC's name;[6]

8   • Whether any of the affirmative defenses asserted by SMC in its Answer to the

9      Complaint (Document No. 66), which are equally applicable to all members of the

10     class, have merit; and

11  • The proper measure(s) of compensation to class members.

12 These controlling, common questions should be litigated and resolved in a class action to

13 assure that all California seniors affected by this practice are treated fairly and consistently.

14 Class treatment is also necessary to avoid a potential explosion of duplicative lawsuits on this

15 point.

16     Based on SMC's discovery responses, Plaintiff anticipates that SMC will argue that

17 only individuals who obtained their loans through the services of Home Center – as opposed

18 to any of the other correspondents who did business with SMC during the relevant period –

19 are potential members of the class.  This argument lacks merit.  As discussed above, SMC's

20 representatives have clearly acknowledged that all loan correspondents approved to originate

21 HECM loans in SMC's name in California were required to enter into the same Reverse

22 Mortgage Correspondent Agreement, as well as a license agreement for use of SMC's

23 proprietary "Reverseware" software that created the various disclosure and application forms

24 prospective borrowers were required to sign.  This agreement, although modified slightly

25

26 [6] It is undisputed that unsupervised loan correspondents like Home Center have no right, ability, or occasion to service reverse mortgages.  (*See, e.g.,* Hulbert Depo. 73:19-20 ["Mini-eagles are

27 not servicers…"]; 95:1-20,)

28

from time to time, was a standard form agreement drafted and distributed by SMC. Throughout the class period, *all* versions of the agreement provided for the payment of both correspondent fees and origination fees. Thus, if SMC's manner of compensating Home Center was, as Plaintiff will show, contrary to HUD regulations, then so was its manner of compensating each of the other mortgage brokers with whom SMC did business in California.

### 3.    Typicality

Rule 23(a)(3) requires that the claims of the proposed class representative be "typical" of the claims of the class. Similar to its interpretation of Rule 23(a)(2) commonality, the Ninth Circuit interprets Rule 23(a)(3) typicality permissively. *Hanlon,* 150 F.3d at 1020. To satisfy this requirement, the class representative need only "'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). As the Ninth Circuit has observed:

> "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class. [Citation.] Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." [Citation.] The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." [Citation.]

*Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (quoted in *Conte* and *Newberg, supra* §3:13 p. 327).

Thus, typicality does not require that the named plaintiff's claims be identical to those of the class, but only that they "arise[ ] from the same event, practice, or course of conduct that forms the basis of the class claims, and is based upon the same legal theory…." *Jordan v. County of Los Angeles,* 669 F.2d 1311, 1321 (9th Cir. 1982), *vacated on other grounds,* 459 U.S. 810 (1982); *see also Hanlon*, 150 F.3d at 1020 ("representative claims are typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."); *Dukes*, 603 F.3d at 613 ("Typicality requires that the named plaintiffs be members of the class they represent."). In most cases, "a finding of

1  commonality will ordinarily support a finding of typicality." *Barefield v. Chevron U.S.A.,*

2  *Inc.,* 1987 WL 65054 (N.D.Cal. Sept. 9, 1987) at *5.

3      Ms. Labrador is a typical California senior who refinanced her residence through an

4  SMC reverse mortgage loan and was charged impermissible loan origination fees.  The facts

5  on which her claims are based are essentially the same as the facts on which the claims

6  asserted on behalf of other putative class members are based.  Like Ms. Labrador, each

7  putative class member is an "elderly" California homeowner who obtained a HECM loan

8  that was originated by an SMC-sponsored loan correspondent.  Like Ms. Labrador, each

9  class member was charged a loan origination fee that, pursuant to SMC's standardized

10 agreement with the correspondent broker, was paid to the broker as compensation for

11 originating the loan in SMC's name.  Finally, each loan correspondent that originated a

12 HECM loan entered into by a class member was also paid a loan correspondent fee for that

13 loan as additional compensation for originating the loan in SMC's name.  Thus, there are no

14 facts on which Plaintiff's claims are based that are not typical of the facts on which the

15 claims asserted on behalf of the class are based.

16     Similarly, the legal theories on which Plaintiff basis her claims against SMC are not

17 only typical of the claims of the class but identical to those claims.  No issue is raised as to

18 the interpretation of different state laws, for example, since the core class claim is based

19 upon a violation of federal law, the proposed class is limited to California homeowners, and

20 all of the transactions at issue occurred in California.  Nor has SMC asserted any defenses

21 unique to Plaintiffs' claims. [7]

22

23

24 [7]  Although SMC's Answer to First Amended Class Action Complaint [Document No. 66]

25 includes *pro forma* defenses of failure to mitigate damages (Third Affirmative Defense), Comparative Fault (Fourth Affirmative Defense), Waiver Estoppel (Sixth Affirmative

26 Defense), Laches, (Seventh Affirmative Defense), Unclean Hands (Eighth Affirmative Defense) and Consent/Ratification  (Ninth Affirmative Defense), ***none*** of these affirmative

27 defenses allege any facts specific to Plaintiff and all of them are, in fact, completely devoid of any substance.

28

14

1   The sole factual difference between Ms. Labrador and some of the other class

2   members is that they used different brokers to obtain their HECM loans, but that has no

3   bearing on the legality of SMC's uniform compensation policies challenged here, and is a

4   distinction without a difference.  *See, e.g., DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171,

5   1174-75 (9th Cir. 1995) (affirming certification of settlement class in action challenging

6   defendant lender's method of calculating escrow accounts, and finding that "typicality is not

7   altered by the different mortgage instruments held by class members."); *In re Southeast*

8   *Hotel Properties Ltd. Partnership Investor Lit.,* 151 F.R.D. 597, 605 (W.D.N.C. 1993)

9   (expressly rejecting defendant's argument that plaintiffs' securities fraud claims were

10  atypical because they "learned of the investment through different brokers and other sources

11  and relied on the judgment of different persons [than did other class members] in deciding to

12  invest in [the partnership].").  The reasons why Ms. Labrador chose to refinance with a

13  reverse mortgage, the use she made of the money she obtained, and the extent of her

14  satisfaction or dissatisfaction with the transaction – issues about which SMC has insisted on

15  conducting invasive discovery – are equally irrelevant to the merits of her claims, or to the

16  propriety of class certification.

17          **4.      Adequacy**

18          Rule 23(a)(4) requires that "the representative parties will fairly and adequately

19  protect the interests of the class."  The standard for adequacy requires similarity, not identity,

20  of interests:  representation is adequate if (i) the named representatives appear able to

21  prosecute the action vigorously through qualified counsel, and (ii) there is no antagonism or

22  conflict of interest between the named representatives and the other members of the class.

23  *Dukes,* 603 F.3d at 614; *Hanlon,* ISO F.3d at 1020; *Lerwill v. Inflight Motion Pictures, Inc*.,

24  582 F.2d 507, 512 (9th Cir. 1978).

25          Ms. Labrador is aware of her responsibilities as the class representative (*see* Labrador

26  Depo. at 117:21-118:24) and has retained experienced and competent counsel to litigate this

27  action on behalf of herself and the class.  As explained in the accompanying declarations of

28  Nance F. Becker and Mark T. Johnson, Plaintiff's counsel have extensive experience in

15

consumer, financial, and class action litigation, and are capable of and committed to continuing their vigorous litigation of this case.  Nor does Ms. Labrador have any foreseeable conflicts with any members of the class, or interests antagonistic to those of the class.  She seeks the same relief for herself as for members of the class, which will benefit all class members in the same manner and will not harm any subset of the class.   All class members were subjected to the same business practices of SMC, were harmed in the same way, and share a common interest in obtaining redress for their injuries.

**B.     This Case Meets Each of The Requirements of Rule 23(b)(3)**

The Court may certify the class under Rule 23(b)(3) if it finds that (1) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  This case easily satisfies both the "predominance" and "superiority" requirements.

**1.     Common Questions of Law and Fact Predominate**

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997), 623. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022. When, as here, the claim is that a defendant's policy and practices have violated the law, the key question for class certification is whether the defendant adhered to a consistent practice that serves as the basis for classwide liability.  *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 399 (C.D. Cal. 2008).

Whether or not SMC's practice of compensating HECM brokers by paying them both correspondent and origination fees violated 24 C.F.R. § 206.31 is a common question which

1  has already dominated, and will continue to dominate, this proceeding.[8]   While SMC has

2  conducted discovery into other issues, such as the reasons why Ms. Labrador chose to

3  refinance her home and whether or not the transaction was beneficial to her, those issues

4  have no bearing whatsoever on the merits of her claims.  The sole, and clearly the

5  predominant, question before the Court is whether there was a "financial interest" between

6  SMC and its correspondents which precluded the bank from imposing origination fees on

7  these vulnerable consumers – a question common to each and every member of the class.

8  ## 2.    Class Treatment is Superior

9  Rule 23(b)(3) requires that a class action be superior to other available methods for

10  the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  In making

11  that determination, the Rule instructs the court to consider (a) the interest of class members

12  in individually controlling the prosecution or defense of separate actions; (b) the extent

13  and nature of any litigation concerning the controversy already commenced by or against

14  class members; (c) the desirability or undesirability of concentrating the litigation of the

15  claims in the particular forum; and (d) the difficulties likely to be encountered in the

16  management of the class.  "Consideration of these factors requires the court to focus on the

17  efficiency and economy elements of the class action so that cases allowed under subdivision

18  (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v.*

19  *Accufix Research Institute, Inc.,* 253 F.3d 1180, 1190 (9th Cir. 2001) (citation omitted).

20  All of these considerations weigh in favor of certification of this case.  Class members

21  are likely unaware they have been overcharged, and the amounts at issue, while significant,

22  are too small to give any individual or attorney the incentive to pursue an individual action.

23

24  [8]  For example, as noted above, SMC has already filed both a motion to dismiss and a motion

25  for summary judgment involving issues of interpretation of 24 C.F.R. § 206.31.  Its motion to dismiss asserted that SMC's relationship with its sponsored loan correspondents did not constitute a financial interest within the meaning of the regulation [Document No. 5].  Its

26  summary judgment motion argued that SMC's loan correspondents are not "mortgage brokers" and thus not covered by the regulation.  [Document No. 48].  Both issues, as matters

27  of regulatory interpretation, are common to the class and predominate in this action.  The Court denied both motions.  [Document No. 32; Document No. 64].

28

1   To Plaintiff's knowledge, there are no pending individual actions by class members against

2   SMC regarding its policy of charging both correspondent and origination fees.  (Becker Decl.

3   ¶ 10.)  The size of the claims coupled with the complexity of the law and the attendant cost

4   of proving these claims against a major financial institution with a strong incentive to fight

5   them, make the pursuit of individual actions very unlikely.  A class action is, therefore, not

6   only the superior but probably the *only* remedy available to redress SMC's violation of the

7   law.  *See Haynes v. Logan Furniture Mart Inc.,* 503 F.2d 1161, 1164-65 (7th Cir. 1974) (a

8   court must consider the "inability of the poor or uninformed to enforce their rights, and the

9   improbability that large numbers of class members would possess the initiative to litigate

10   individually.").

11          Finally, this case is clearly manageable as a class action.  No individual proof will be

12   required other than in the determination of the amount of relief to which each class member

13   will be entitled upon a finding of liability.  That information can be obtained from the

14   electronically stored data that SMC maintained as to each of the class member loan

15   transactions and/or the class members' HUD-1 settlement closing statements, which will

16   corroborate whether the broker received both a correspondent and an origination fee and

17   clearly state the amount of origination fees paid.  SMC's representatives have already

18   testified that it is a routine matter for them to conduct an electronic search of the database

19   and generate one or more reports with this information.  (Nixon Depo. at 54:2-10, 140:11-

20   141:12; Engelhorn Depo. at 88:2-89:2 [SMC's ReverseWare software can identify the loan

21   correspondent, the origination fee, and the correspondent fee identified with any particular

22   loan.]).

23   **IV.    CONCLUSION**

24          SMC's practice of paying its reverse mortgage correspondents both a correspondent

25   fee and the loan origination fee was a uniform practice that violates applicable federal

26   regulations designed to protect senior homeowners in California.  SMC's violation of the

27   regulation caused concrete financial injury to Mary Labrador and similarly-situated seniors

28   who, like plaintiff, entered into an HECM loan with SMC during the relevant period.

1   Plaintiff's challenge to this practice will, if successful, benefit thousands of individuals who

2   were equally affected by this practice, most of whom continue to be harmed as interest

3   accrues on the financed portion of the fees.  It is precisely to facilitate the resolution of such

4   common claims that the class action procedure was created.  For all of the reasons discussed

5   above, Plaintiff's motion for class certification should be granted.

6

7

8   Dated:  July 23, 2010

9                                          CHAVEZ & GERTLER LLP

10                                         SCHNEIDER WALLACE COTTRELL
                                               BRAYTON KONECKY LLP

11                                         BONNETT, FAIRBOURN, FRIEDMAN
                                               & BALINT, PC

12

13                              By:   _Nance F. Becker_____

14                                    Nance F. Becker

15                                    Attorneys for Plaintiff Mary Labrador
                                      And the Proposed Class

16

17

18

19

20

21

22

23

24

25

26

27

28